**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Advanced Fluid Systems, Inc., | : | Electronically filed |
| | : | |
| Plaintiff, | : | |
| v. | : | Civ. No. 13-cv-_____ |
| | : | |
| Kevin Huber, | : | Judge _____ |
| INSYSMA (Integrated Systems and | : | |
| Machinery, LLC), | : | |
| Livingston & Haven, LLC, | : | |
| Clifton B. Vann, IV, | : | |
| Thomas Aufiero and | : | |
| Orbital Sciences Corporation, | : | |
| | | |
| Defendants. | | |

## COMPLAINT

Plaintiff Advanced Fluid Systems, Inc. ("AFS"), by its undersigned counsel, brings this civil action for injunctive relief, and to recover compensatory damages and punitive damages, against defendants Kevin Huber; Integrated Systems and Machinery, LLC ("INSYSMA"); Livingston & Haven, LLC ("L&H"); Clifton B. Vann, IV; Thomas Aufiero; and Orbital Sciences Corporation ("Orbital"). AFS claims that the defendants, jointly and severally, have engaged in, among other things: unfair competition, misappropriation of trade secrets, violations of the federal Lanham Act and Computer Fraud and Abuse Act, civil conspiracy and tortious interference with actual and prospective contractual relations. In support thereof, AFS alleges as follows:

## THE PARTIES

1) Plaintiff AFS is a Pennsylvania corporation with its corporate headquarters located at 245 Campbell Rd., York, PA 17402. AFS designs, assembles and installs hydraulic systems that use pressurized fluids (typically oil or water) to move heavy machinery for complex

107057

operations.  The hydraulic application at issue here is the

Transporter/Erector/Launcher/Hydraulic System's ("TELHS") for Orbital's Antares rocket,

which AFS designed, assembled and installed pursuant to a contract with the Virginia

Commercial Space Flight Authority ("VCSFA") for its Mid-Atlantic Regional Spaceport

("MARS") on Wallops, Island, Virginia.  The TELHS lifts the 265 ton Antares rocket from a

horizontal to vertical position on the launch pad, and then immediately retracts upon the rocket's

firing.  AFS is also a distributor, representing over 60 manufacturers of equipment used in

connection with hydraulics.

       2)      Defendant Kevin Huber resides in New York at 187 Spring Street, Apt 4W, New

York, NY 10012 and/or at 301 Elizabeth Street, New York, NY 10012, and works at the

INSYSMA address in paragraph 3 below.  From November 2006 until October 26, 2012, Huber

was a full time salesman/engineer for AFS, receiving a salary, commission, and other benefits.

       3)      Defendant INSYSMA is a company which Mr. Huber secretly formed while he

was a full time employee of AFS.  According to its website, INSYSMA operates out of an

undisclosed office in New York City and at an engineering office at 170 Fort Path Rd., Suite 21,

Madison, CT.

       4)      Defendant L&H is a North Carolina limited liability company with its corporate

headquarters at 11529 Wilmar Blvd., Charlotte, NC 28273.  L&H is a distributor and installer of

fluid power systems.

       5)      Defendant Clifton Vann is the President of L&H, with his office address at 11529

Wilmar Blvd., Charlotte, NC 28273.

       6)      Defendant Thomas Aufiero is a sales manager for L&H, with his office address at

11529 Wilmar Blvd., Charlotte, NC 28273.

7)       Defendant Orbital is a Delaware Corporation that is headquartered at 45101 Warp Drive, Dulles, VA 20166.  Orbital designs and manufactures small and medium size rockets and space systems for commercial and military customers.

## JURISDICTION AND VENUE

8)       This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(1)-(7), and the Lanham Act, 15 U.S.C. § 1125.

9)       There is also subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is complete diversity of citizenship between the plaintiff, on the one hand, and all defendants on the other, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10)      This Court has personal jurisdiction over each defendant pursuant to 42 Pa. Cons. Stat. Ann. § 5322.  Section 5322 provides for personal jurisdiction over persons for "causing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth" and further that the Court shall exercise jurisdiction over a person "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States."

11)      As set forth in the Statement of Facts below, defendants carried out a successful scheme to gain access to plaintiff's confidential information and trade secrets located in York, PA, and then to misuse that information to illegally divert business away from AFS and to themselves.

12)      Personal jurisdiction over Kevin Huber and the defendant company he owns (INSYSMA) are proper.  Huber was a full time AFS employee from November 28, 2006 through October 26, 2012.  While an AFS employee, Huber travelled continuously from his residence in

New York to AFS' offices in Pennsylvania to meet with AFS employees and officers, including many meetings about the Antares rocket launch system that is the major subject matter of this lawsuit.  He received all of his salary and benefits from AFS in Pennsylvania.  Huber had hundreds of telephone calls and e-mail communications with AFS officers and employees located in Pennsylvania, including about the Antares rocket launch system.  He electronically accessed AFS' confidential information located in Pennsylvania on numerous occasions.

13)     Personal jurisdiction over L&H is proper because L&H participated in a conspiracy with Huber and INSYSMA to steal AFS' confidential information from its Pennsylvania office.  L&H electronically entered Pennsylvania in furtherance of this scheme by installing a Virtual Private Network ("VPN") and e-mail connection so that Huber could divert AFS' confidential information from its Pennsylvania offices to L&H.  The details of this are set forth in the Statement of Facts below.  L&H also initiated telephone calls to AFS' key engineers in York, PA, seeking to recruit them to leave AFS and to work at L&H on projects as to which L&H and Huber had stolen AFS' confidential information.

14)     Personal jurisdiction over Clifton Vann and Thomas Aufiero are proper because they are the officers at L&H who directed the illegal actions set forth in ¶ 13 above.

15)     Personal jurisdiction over Orbital is proper because Orbital participated in a scheme with the remaining defendants to wrongfully divert work from AFS to Huber, INSYSMA, and L&H.  Orbital entered Pennsylvania twice to meet with AFS officers and employees at AFS' offices concerning the Antares rocket launch system that is the subject matter of this lawsuit.  Orbital sent to AFS in Pennsylvania and received from AFS a continuous stream of documents, e-mails, and telephone calls concerning the Antares rocket launch system.

16)     All of defendants' tortious activities were aimed at plaintiff's confidential information located in Pennsylvania.  Plaintiff has felt the brunt of defendants' actions in Pennsylvania, and defendants knew and intended that plaintiff would suffer such harm and injury in Pennsylvania.  The causes of action arise from and relate to defendants' tortious actions directed at Pennsylvania.

17)     Jurisdiction over L&H is further consistent with fair play and substantial justice because L&H, over a period of many years, has done substantial business in Pennsylvania.

18)     For the last 30 years, L&H has been a distributor of hydraulic parts for HYDAC. Upon information and belief, L&H has purchased approximately $2 million of hydraulic parts and supplies this past year from HYDAC's Bethlehem, PA office, with corresponding amounts, adjusted for inflation, in past years.

19)     L&H currently and in past years has continuously signed distributor agreements with HYDAC consenting to jurisdiction in Pennsylvania for all legal disputes.  These agreements read in pertinent part:  "This Agreement shall be construed in accordance with the laws of the Commonwealth of Pennsylvania without giving effect to the choice of law provisions thereof. [L&H] agrees that all actions and proceedings in connection herewith shall only be brought in federal or state courts within the Commonwealth of Pennsylvania and the parties hereby agree to submit to the jurisdiction of such courts."

20)     L&H currently is, and has been for approximately 30 years, a distributor of industrial hydraulic products for Bosch Rexroth ("Rexroth"), whose Industrial Hydraulics division is located in Bethlehem, PA.  L&H purchased approximately $5 million in industrial hydraulic products during the past fiscal year, with roughly corresponding amounts, adjusted for inflation, for past years.  Rexroth is L&H's largest supplier.  L&H has continuously placed

orders for industrial hydraulic parts with Rexroth's Bethlehem division and received those parts from the Bethlehem division in a continuous stream of commerce.

21)     L&H also received substantial engineering advice from Rexroth's Bethlehem division over a period of many years, and on numerous occasions has sent its employees to training sessions to Rexroth facilities in Bethlehem, PA.  L&H's continuous activities with Rexroth's Bethlehem division are conducted, in part, through the exchange of hundreds of telephone calls and e-mails to and from Pennsylvania.

22)     L&H has sold to Airline Hydraulics in Bensalem, PA approximately $200,000 in hydraulic parts during this past year, with corresponding amounts, adjusted for inflation, for prior years.

23)     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this District, and/or a substantial part of property that is the subject of the action is situated in this District.

## STATEMENT OF FACTS

### A.    The Antares Rocket Lift and Launch Retract Hydraulic System

24)     AFS is a leader in designing, assembling, installing and servicing high-end hydraulic fluid systems.  AFS has a sophisticated engineering department which designs hydraulic controls for machinery, including state-of-the art electronic controls.  AFS then purchases component parts from suppliers, assembles the completed machines, tests and troubleshoots them at its customers' locations, and continues to service the machine, often for a period of many years.  Historically, AFS has received substantial revenue from upgrading and servicing hydraulic systems after they are placed in the field.  Due to the quality of its

engineering, AFS, with fewer than 50 employees, is able to compete for jobs with multi-national companies many times its size.

25)    One of the largest and most sophisticated projects in AFS history involves designing, assembling, installing an advanced hydraulic system for the launch pad used by the Antares rocket.

26)    NASA owns and operates the Goddard Space Facility in Wallops Island, VA, which is dedicated to sub-orbital launches.  NASA has leased portions of this facility for commercial launches to the State of Virginia and the VCSFA.  These entities oversee the MARS on Wallops Island.

27)    Orbital is the developer of the Antares rocket, which it uses to launch its Cygnus space freighter carrying commercial payloads into low-Earth orbit, such as supplies to the international space station ("ISS"), and commercial satellites for telecommunications.  The state entities, in turn, contracted with Orbital to launch the Antares rocket from MARS Pad-0A, which the state agreed to build.

28)    On September 30, 2009, AFS entered into a contract with the VCSFA for the "design and development of the Hydraulic Power System for the Transporter/Erector/Launcher (TEL)" for the Antares rocket at Wallops Island.  AFS contracted to provide the complete specification, engineering drawings, analyses, testing requirements, operating descriptions, interfaces with other launch facility systems and all related engineering and professional design services to develop the final and complete design for the Antares' rocket hydraulic motion control system.

29)    The Antares rocket is 133 feet long and weighs 265 tons.  For lift-off, the Antares rocket is wheeled horizontally to the launch pad on a large transporter.  The rocket is then lifted

into vertical position by two 24 ton hydraulic cylinder assemblies that AFS designed and assembled. After the rocket is in the vertical position, AFS electronic controls open the upper "gripper arms." At that point, the TELHS is retracted 2 degrees and remains in that position for the entire 24 hour count down prior to launch. Upon ignition and "blast off" the 153,000 lb. TELHS must retract an additional 13 degrees within 2.5 seconds, and come to a soft stop at 22 degrees from vertical. This entire lift and launch retract system uses fluid hydraulics and electrical controls.

30) The only other company that bid on this system was Rexroth, a very large multi-national firm with hundreds of engineers. All other potential companies declined to submit bids because of the complexity and novelty of the design.

31) Since signing the contract in 2009, AFS has worked successfully to design, assemble and install the TELHS system. The system was designed and assembled by AFS in York, PA and then transported to Wallops Island, VA for installation and further testing. The motion control system includes over 212 sensors and switches, 87 operating valves, over 5,100 feet of wiring, and proprietary software code.

32) AFS engineers and other employees have spent approximately 49,550 collective hours in design, project management, documentation and troubleshooting for this project. The Virginia contract was worth approximately $6 million to AFS.

33) The first test launch of the Antares rocket took place in February 2013. The first actual launch occurred in late April 2013. Both launches were successful, and AFS' system worked flawlessly. Indeed, Orbital's senior operations manager sent AFS an e-mail after the April launch stating: "The TELHS worked flawlessly…. Special thanks to Tom [Reiker] and

Larry [Quickel, both AFS Engineers] for coming to our aid whenever we called. The support has been tremendous and very much appreciated."

34)    A time-lapse sequence of AFS' TELHS system lifting the Antares rocket into position for launch is available for viewing at: http://wtkr.com/2013/09/17/watch-time-laps-of-antares-rocket-rolling-to-the-launch-pad-at-wallops.

35)    There was a second successful launch of the Antares rocket on September 18, 2013, and again the AFS TELS system worked flawlessly. A NASA video of this launch is available at: http://www.youtube.com/watch?v=i9ey1SJxUXk&feature=youtube_gdata.

36)    The Antares project was one of the largest contractual undertakings in AFS' recent history. Given its novelty and complexity, AFS significantly underbid what proved to be the actual cost of the Antares project. AFS completed the project for $6.1 million when the actual cost of time and materials at AFS' customary rates would have approached or exceeded $10 million. Nonetheless, AFS honored its obligations and completed the Antares project for the amount it bid, anticipating that this was a "loss leader" for continuing work on upgrading the TELHS system, and for designing new TELHS systems for Orbital's next series of launches from MARS, and other commercial space clients of the VCSFA and MARS, for many years into the future.

37)    AFS' engineering commitment for the Antares project was required due to the novelty of the project. AFS had to produce the entire hydraulic design, as well as the accompanying electronic controls as original engineering work product, with no outside input or assistance.

38)    AFS has generated substantial internal documentation for the Antares lift and launch retract system, including thousands of its own engineering drawings and diagrams, and

proprietary software code.  This documentation is kept in password-protected electronic files on

the AFS server.  The documentation qualifies as trade secrets because it includes formulas,

drawings, programs, devices, methods, techniques and processes that derive independent

economic value, actual and potential, from not being generally known to, and not being readily

ascertainable by proper means by, other persons who can obtain economic value from their

disclosure or use.

39)    Under the terms of the September 2009 contract between AFS and the VCSFA,

the latter acquired legal ownership to "all inventions or works" by AFS.  However, the contract

prohibited the VCSFA from further transferring any of these rights without the written consent of

AFS, and AFS has never provided any such written consent.  AFS has, at all times, remained in

possession and control of its trade secrets, and AFS has used them in a confidential manner to

complete its TELHS obligations.  MARS had a secure site for the placement of all intellectual

knowledge of the project.  When Orbital requested access to certain of these materials, AFS

provided the requested material because of Orbital's representation they were needed to integrate

the TELHS system with the rest of the Antares rocket project.

40)    AFS reasonably expected, and it expects, a continuing stream of future business

for upgrading, maintaining and servicing the Antares lift and launch retract system at MARS

Pad-0A.  This work can only be accomplished by using the drawings, charts, diagrams and other

documentation AFS generated in designing and installing the system.  The Antares rocket is

scheduled to launch four times per year for years into the future; meanwhile, a larger sized rocket

currently under development is expected to utilize an upgraded version of the Antares TELHS

for its launches.  Additionally, the VCSFA is charged with increasing usage by other commercial

space entities at the MARS facility on Wallops Island.  AFS reasonably expected to receive a

continued stream of future business from these future uses of the TELHS. Further, upon information and belief, low-orbit commercial satellite launches are planned to increase, and Orbital and other companies plan for other launch sites in North America besides the one they use on Wallops Island. AFS had a reasonable expectation for this continued business, but for the actions at issue in this lawsuit.

**B.     AFS Discovers The Theft Of Its Information**

41)     Defendant L&H also designs, assembles and installs hydraulic fluid systems. However, although L&H, with over 180 employees, is substantially larger than AFS, it did not bid on the Antares rocket project.

42)     Defendants L&H, Vann, Aufiero, and Huber conspired to misappropriate AFS' trade secrets to obtain upgrades and future work on the Antares rocket, and other AFS business opportunities.

43)     Thomas Aufiero is L&H's hydraulic sales manager. He was employed by AFS from 1989 until January 2011. During those 22 years, Aufiero became the head of AFS' sales force, a key member of the management team who had intimate knowledge of AFS' personnel, customer base, and existing contractual relationships. Aufiero resigned from AFS in January 2011, saying he needed to move to North Carolina for personal reasons. AFS subsequently learned that Aufiero had taken a position with L&H.

44)     Kevin Huber is a trained engineer. He was a full time AFS employee from November 2006 through October 26, 2012, when he abruptly resigned. Huber was initially hired by Tom Aufiero and reported to Aufiero through January 2011 (when Aufiero left AFS). Huber earned substantial income from AFS, from salary and commissions. As a full-time employee, Huber's AFS compensation was reported on IRS form W-2. AFS also provided Huber with

medical insurance, life insurance, a car or, alternatively, car allowance, a laptop computer and a cell phone, and reimbursed for all business expense.

45)    As an engineer/salesman, Huber had access to AFS' confidential drawings, diagrams, and other documents, including the complete set of drawings, diagrams and other documents generated in connection with the projects described below.  Huber also had access to AFS' component costs and labor costs, the transmission of which to L&H would give it an enormous competitive advantage.  All computer documents to which Huber had access are password protected.  All reside on AFS' computer server, which is located in York, PA.

46)    Defendant Huber did not design the AFS lift and launch retract system.  However, as a trained engineer he had the ability to understand it, and as an AFS engineer/salesman, AFS trusted him with access to all of the confidential design and installation schematics, diagrams and drawings concerning the system.  As a sales engineer, Huber was the main point of AFS' contact with Orbital, because he was acquainted from high school and college with Keith Fava, a key Orbital engineer for the Antares rocket.

47)    On October 9, 2012, Huber abruptly announced he was resigning from AFS, effective November 9, 2012.  He then shortened the effective date to October 26, 2012.  When Huber left AFS' employment, he did not return to AFS its laptop, cell phone, or company car. Consequently, an AFS employee had to travel to New York to retrieve these items from Huber on Sunday, November 11, 2012.

48)    AFS subsequently determined that Huber had erased all data from his laptop computer and cell phone.  AFS learned that on November 11, 2012, the day the laptop was retrieved by an AFS employee, Huber had successfully uninstalled the AutoCAD (engineering

drawing software) and Adobe Acrobat software from his laptop, apparently to remove their recent file histories.

49)     Upon restoring deleted information, AFS was shocked to learn that Huber had been working with L&H and Orbital for at least ten months while he was a full-time AFS employee, assisting L&H in misappropriating AFS' trade secrets, and using this information to divert work to L&H, himself and INSYSMA.  Huber had concealed his illegal activities from AFS while he was employed by the company, and he further sought to conceal his activities by attempting to erase all data from his laptop.  The information set forth in the remainder of this Statement of Facts was not knowable to AFS until November 11, 2012, at the earliest, when Huber surrendered his altered laptop to an AFS employee.  AFS did not actually know of Huber and the other defendants' illicit activities until January 2013, when AFS found evidence of the L&H VPN address on Huber's laptop.  This finding aroused suspicions and led AFS to take steps to restore as much of the deleted information as possible in an effort to learn the true nature of the defendants' conduct.

### C.     Reconstructed Chronology Of the Conspiracy

50)     The information that Huber tried to erase from his AFS laptop shows that defendants' illegal activities began at least as early as January 2012, nine (9) months before Huber resigned from AFS in November 2012.  The erased information, once restored, showed the following chronology of events, all of which Huber and the other defendants had actively and affirmatively concealed from AFS.

51)     L&H granted Huber access to L&H's private network through a VPN connection and password as early as _January 11, 2012_, nine months before Huber resigned from AFS.  VPN is an acronym for "Virtual Private Network," a connection that enables a host computer at L&H

to receive from Huber, and send to Huber, data across the Internet with all the functionality and security of the private network, by establishing a point-to-point connection through the use of dedicated connections and encryption. This VPN connection and password must have been intentionally granted by the host, L&H; it could not have been unilaterally established by Huber. The VPN log for Huber's activity on this connection is maintained by L&H.

52)     Cell phone records show that Huber was in Charlotte, NC (the city where L&H is headquartered) on the day that L&H created his VPN profile. Cell phone records place him in North Carolina from January 4-6 and January 9-12, 2012. During this period, L&H set up its VPN and an e-mail address at L&H for Huber to use, khuber@lhtech.com.

53)     L&H also established a password for Huber at L&H's e-mail system, khuber@lhtech.com. This e-mail address was functioning at least as early as January 11, 2012, the day L&H established the VPN for Huber.

54)     On April 12, 2012, Huber met secretly at the Wallops Island rocket facility with Clifton Vann, President of L&H; Tom Aufiero, Hydraulic Sales Manager for L&H, former long-time employee of AFS and Huber's former boss; Craig Hill, System Support Specialist for L&H; Keith Fava, Orbital's principal Integration and Test engineer for the Antares rocket; and Glenn Jackson of L&H. The purpose of the meeting was to discuss future upgrades to the Antares lift and launch retract system that AFS had designed and assembled. Huber had a long time friendship with Fava, and Huber was behind the organization of this meeting. Indeed, without Huber's participation and arranging for access passes, L&H would not have been able to participate in this meeting at Wallops Island. Furthermore, Orbital, L&H, Vann, Aufiero and Fava knew that Huber was a full-time employee of AFS and that this meeting was improper.

55)     The On April 11, 2012, the day before the meeting, Huber sent an e-mail invitation to the participants in which he described the purpose of the meeting as "Enhanced TEL Hydraulics Discussion."  The "Enhanced TEL Hydraulics" involves redesigning the main cylinder and gimbals of the AFS launch/retract system so the Antares rocket could lift heavier loads (such as larger and heavier satellites).  This is the upgrade and servicing work that AFS expected to receive, and had a reasonable expectation of receiving, given its role as the designer and installer of the Antares TEL hydraulic system on MARS Pad-0A and its contract with the State of Virginia.  After all, AFS was instrumental in designing and coordinating the physical layout of the cylinders and gimbals for interfacing to the launch pad, and its contract with Virginia stated that AFS' intellectual property could not be transferred by Virginia without AFS' written permission (which has never been sought nor provided).

56)     A message erased from Huber's laptop, dated April 10, 2012, two days before this meeting, is addressed by Huber to individuals at the meeting place and states:

> I have five people coming up to speak to Orbital & MARS about training and maintenance contracts regarding the TELHS and Gripper Arms.
>
> Can you put in a request to Michelle Marshall for one-day badges this Thursday (4/12) for:
>
> Robert Craig Hill
> Glenn Wayne Jackson
> Thomas Aufiero
> Clifton Benjamin Vann IV
>
> Thanks
>
> Kevin

57)     The scope of this meeting extends to all phases of the AFS lift and launch retract system.  "TELHS" refers to the cylinders, pistons and structure that lift the rocket from horizontal to vertical position for firing.  "Gripper Arms" refer to the clamp mechanism that

holds the rocket tight to the TELHS during elevation. "Maintenance contracts" refer to a stream of ongoing servicing of the entire system for many years into the future. And "training" refers to training personnel on the system. In short, the scope of the meeting was to divert all present and future work away from AFS and to Huber, L&H and Orbital.

58)     On September 12, 2012, about six weeks before he abruptly resigned, data from the erased laptop shows that Huber accessed AFS' server in York, PA to download 745 MB of data over a 4 hour 49 minute period. This is far larger than any previous download by Huber, and it does not correlate with any project on which Huber was legitimately working for AFS at this time. AFS believes that Huber downloaded AFS trade secret drawings, diagrams, and documentation about AFS' projects, and transmitted this confidential information to L&H, likely through the VPN connection L&H had provided to him.

59)     On October 18, 2012, Huber, while a full time AFS employee, formed his own company, "INSYSMA." Upon information and belief, Huber formed INSYSMA to divert work away from AFS.

60)     In October and November, 2012, Huber had saved folders of confidential AFS documents to an external drive. A subsequent analysis of the AFS computer used by Huber shows no evidence that he used an external drive from December 2009 (as far back as AFS can analyze) until October 10, 2012, the day after he announced his resignation from AFS. However, beginning October 10, 2012, and continuing until November 11, 2012 (when he surrendered this computer), Huber's laptop reflects repeated access to an external drive containing at least 3.4 gigabytes of AFS diagrams, drawings and documents, which are considered AFS trade secrets and/or confidential information. Huber did not return this external drive to AFS, and, upon information and belief, he has transmitted its contents to L&H and

Orbital. Further, the defendants have used the contents of this external drive to divert business away from AFS and to interfere with AFS' existing and prospective future contractual relations with its customers. By saving documents to an external drive before returning this laptop to AFS, Huber ensured he did not lose access to the files once he was disconnected from the AFS network. Further, it appears that Huber copied to this external drive the _entire_ "Quotes" folder of AFS, which contained _all_ pending quotes for all territories and projects — in other words, the entire future business of AFS.

61) In September 2012 (while a full-time AFS employee), Huber quoted bids to Orbital for upgrades of the gripper arms on AFS' system for the Antares rocket. He provided one quote on behalf of AFS for approximately $410,000, an unusually high number. He stated in an internal e-mail that he "went extremely high on the quote for a reason," and that the engineering department of AFS was not to know of this bid.

62) Unbeknown to AFS, Huber secretly and simultaneously submitted a bid on behalf of L&H for the same upgrade of the gripper arms on FS' system. The bid that Huber submitted on behalf of L&H bid was substantially lower that the bid he submitted on behalf of AFS, his employer at the time, for the same work.

63) On November 2, 2012, without AFS' knowledge, Huber wrote a six page letter to Orbital on L&H letterhead, transmitting a quote by L&H for upgrades to AFS' TELHS system for the Antares rocket. The "rough order of magnitude" for this work exceeded $3.7 million, and Huber stated: "[T]his proposal reflects a collaborative effort between S3 Group [L&H] and Integrated Systems and Machinery….[INSYSMA]."

64) The November 2, 2012 letter states that INSYSMA is an "agent" of the S3 Group at L&H.

65)     Huber also copied AFS engineering plans and then falsely claimed they were produced by INSYSMA.  In October or November, 2012, Huber created an identical copy of an AFS proprietary drawing titled "Weld Map Main HPU Welds 70-105 Orbital Taurus II." ("Taurus II" was the original name for the Antares rocket.)  The original drawing was originally completed by an AFS employee and is dated February 28, 2011.  Huber duplicated the drawing, signed his copy with his own initials, and dated it November 10, 2012.  The two drawings are identical.  Huber similarly copied at least three other AFS drawings.  All of the AFS drawings had a text box on the lower right-hand corner that read:  "This drawing discloses proprietary and confidential data of Advanced Fluid Systems, Inc., and may not be used disclosed or released, in whole or in part, for any purpose, outside the authorized recipient, without signed authorization, and must be returned upon request."

66)     While an AFS employee, Huber introduced L&H to the cylinder manufacturer for the TELHS system, Maritime Hydraulic ("Maritime") in Canada.  AFS has a non-compete agreement for all information it provided to Maritime.

67)     In November 2011, Huber accessed AFS' server and AFS' e-mail system to send L&H numerous photos and videos of testing of the Antares rocket that was then taking place on Wallops Island.  For example, on November 10, 2011, Huber used his AFS computer and AFS e-mail to send to L&H a video titled "Rapid Retract #4 (Standard).wmv," illustrating AFS' TELHS system in operation.  Huber's cover e-mail attaching the video stated:  "See attached. Pretty cool."

**D.    AFS' Loss of Contracts for Rocket Hydraulic Upgrades**

68)     Upon information and belief, L&H and INSYSMA received the gripper arms upgrade contract (¶¶ 61-62 above).  Without documents stolen from AFS and the assistance of

Huber, and but for defendants' illegal activities, this contract would have gone to AFS in the normal course of business.

69)     Orbital also made a decision to upgrade the entire TELHS system that AFS designed and installed so that a rocket can carry heavier payloads into orbit.  The rough order of magnitude for this upgrade is $4 million.

70)     On November 2, 2012, Huber surreptitiously provided Orbital with a quote on behalf of L&H and Huber's new company (see ¶ 63 above).

71)     AFS, through its President Jim Vaughn, repeatedly told Orbital that AFS desired to bid on this upgrade, as well as on all future upgrades, and for training and maintenance for the rocket system.

72)     The defendants interfered with AFS' ability to bid on or be awarded the contract for the upgrade.  Upon information and belief, the contract for the upgrade was awarded to INSYSMA and L&H instead.  While the exact amount is not currently known, it reasonably anticipated to be on the order of $4 million for the lift and launch/retract system.  Without documents stolen from AFS and without the assistance of Huber, and but for defendants' illegal activities, this contract would have gone to AFS in the normal course of business.

73)     The cylinders for the AFS launch and lift/retract system are manufactured by Maritime.  Information that AFS provided to Maritime is protected by a non-disclosure agreement, which states:  "AFS is sharing with you valuable and unique technology, intellectual property…and other proprietary information owned by AFS.  It could be extremely detrimental to AFS' interests if any of this information was disclosed and/or used by others not authorized to do so… Recipient shall maintain the confidentiality of all Proprietary Information received from AFS using the same care and safeguards as is used to maintain the confidentiality of its own

Proprietary Information, but in no event less than reasonable care." Huber introduced L&H to Maritime while he was still an AFS employee. Huber subsequently approached Maritime to obtain Maritime's quote on the cylinder upgrade. The owner, Kim Carruthers, told Huber that all information was proprietary information to AFS.

74)     Following the conversation with Huber, Carruthers received a call from Keith Fava of Orbital falsely stating that Orbital owned the rights to all AFS designs, and instructing Maritime to provide a quote to Huber. Maritime felt it had no other option, and did so. Huber and Orbital, with the likely participation of L&H, forced Maritime to breach its non-disclosure agreement, and to use AFS' confidential and proprietary data _against_ AFS and to benefit themselves.

75)     Huber's company, INSYSMA, has placed an order with Maritime for two new cylinders for the TELHS upgrade. Upon information and belief, these cylinders are close to completion.

76)     The current INSYSMA website displays a photograph of the successful launch of the Antares rocket from Wallops Island on September 18, 2013 (see ¶ 35 above). The website shows a picture of AFS' lift and launch retract system functioning during the successful lift-off, but does not attribute this system to AFS. Rather, the INSYSMA website states: "On September 18 at approximately 10:58 am EDT our valued client, Orbital Sciences Corporation, successfully launched its Antares launch vehicle carrying its Cygnus cargo logistics spacecraft… INSYSMA is currently working with Orbital Sciences on Mechanical and Ground Based Pressure Vessel Equipment in support of current and upcoming launches."[1] This falsely implies that INSYSMA

---

[1] _See_ http://www.insysma.com/2013/09/orbital-sciences-successfully-launches-antares-rocket (last visited December 22, 2013).

designed and installed the AFS lift and launch retract system, and admits that INSYMA has diverted business from AFS to itself.

77)     AFS understands that Orbital plans to launch commercial rockets from other launch sites, including in Alaska.  But for defendants' illegal conduct, AFS would have reasonably expected to receive contracts to assemble and install TELHS systems for these rockets.  Because of defendants' conduct, AFS has been shut out of all such work.

78)     But for the events set forth above, AFS would have also received upgrade business from and through the VCSFA, which was developing the Wallops Island launch facility for several potential clients, not just Orbital, and VCSFA was supposed to own the hydraulics. Orbital was just the end user of the AFS hydraulics system.  What Orbital actually did was injure both AFS and VCSFA.  Orbital wanted to use this system for other launch facilities, which it could not do if VCSFA owned the intellectual property for the first launch system.

79)     Indeed, on September 24, 2013, Orbital sued the state of Virginia, the VCSFA and Virginia's state comptroller, over $16.5 million that Orbital says the state owes if for money it paid to cover cost overruns for the construction of the state-owned MARS Pad-0A, which Orbital leased for the launch of its Antares rocket.  Orbital bought $42 million worth of hardware, including the TELHS, with the understanding that Virginia would eventually buy these assets back.  The state bought back $25.5 million of hardware in 2012 but balked at repurchasing the TELHS and associated hardware (including the AFS-designed and assembled "launch pad hydraulics"), arguing that this hardware could be used only for the launch of the Antares rocket and therefore was not a reimbursable cost.  Orbital disagreed.  Accordingly, Orbital and the VCSFA submitted their dispute as to whether the TELHS that launched the Antares rocket at MARS was unique to the Antares (and thus belonged to Orbital) or

alternatively could support other launch vehicles, existing and future, of similar class and weight design characteristics (and hence belonged to the VCSFA).  In February 2013, the arbitrator issued a binding decision that the launch paid hydraulics could be used to support other launch vehicles, existing and future, and thus belonged to the VCSFA.  Once again, the state balked at reimbursing Orbital, so Orbital sued to enforce the arbitrator's decision in September 2013.

80)     The arbitrator's decision, and Orbital's acceptance of and lawsuit to enforce this decision, constitute res judicata and a judicial admissions that the TELHS and associated intellectual property belong to Virginia in accordance with AFS' contract with the state.  The arbitrator's finding, which is binding upon Orbital and Orbital is seeking to enforce, further establishes the impropriety of the actions by Orbital and the other defendants as asserted in this lawsuit.

### E.    Air Force Hydraulic Test Stand

81)     Analysis by AFS of Huber's deleted laptop (see ¶¶ 47-49 above) showed that Huber had, unknown to AFS, been diverting other business opportunities to L&H while Huber was a full time employee of AFS.  AFS had no knowledge of this, because Huber actively concealed it.

82)     In June 2012, Huber sent Craig Hill at L&H a detailed 50-page bid proposal for a military hydraulic test stand.  This was for submission to the Air Force at its Hill Air Force base in Utah.  The bid was for over $1.6 million as a small business set-aside.  The bid proposal lists "Kevin Huber, Project Manager, Livingston and Haven—S3 Inc., 11616 Wilmar Blvd., Charlotte, N.C."  Huber was the author of this proposal.  A subsequent e-mail to the Air Force bidding officer, Francene Bielik, lists his contact information as:  "Kevin Huber, Livingston & Haven, khuber@lhtech.com."

83)    In July 2012, Huber sent Bielik a series of schematic drawings for the Air Force test stand that were drawn by L&H engineers.  L&H evidently sent these drawings to Huber at AFS to be used to divert business to L&H.

84)    On July 31, 2012, Huber sent Bielik the Final Proposal for the Air Force test stand.  This extensive, 43-page document states:  "Livingston & Haven (hereafter, S3) is pleased to quote the design, fabrication, test and installation of Universal Hydraulic Test Stand(s)."  Huber and four other L&H employees are listed as "key personnel" at L&H for this project.  In addition, Huber referenced the name and telephone number of Michael Brainard, Operation Manager of the Antares Program Launch Systems Group at Orbital, as someone who could verify the capability of L&H.  Huber and L&H evidently collaborated upon this document and sent versions back and forth between L&H and Huber.

85)    Included in the above L&H Final Proposal are examples of L&H's supposed "Recent Past Performance."  This document (falsely) states that L&H has, within the past three years, "designed, fabricated, and installed" on Wallops Island, Virginia the AFS lift and launch retract system for the Antares rocket.  Accompanying the description are three photographs of AFS' lift and launch retract system at Wallops Island.  The content depicted in the photographs is falsely attributed to L&H when this system was entirely designed, fabricated and installed by AFS.

86)    To buttress this falsity, Huber sent to Bielik AFS' 116-page "Wallops Flight Facility TEL Hydraulic System Start Up Procedure."  This is AFS' confidential and proprietary document about the start up procedure on the Antares rocket lift and launch retract system.  It states on its face that this document "was originated by and is the property of Advanced Fluid Systems."  This document is considered a confidential trade secret by AFS and contains

numerous diagrams and charts with technical data on design and installation of the system.  In sending this document to Bielik, Huber attempted to disguise and misrepresent AFS' role by stating, "I work with a sub-contractor that does all of our documentation."  In other words, Huber pretended that AFS' name was on the document simply as a "subcontractor" that provided "documentation" on behalf of L&H, the supposed actual party responsible for the TEL Hydraulic System at Wallops Island.

87)     Upon information and belief, Huber has also furnished this confidential document to L&H as one of many AFS documents used to divert the Antares rocket upgrade and maintenance business to L&H.

88)     On August 12, 2012, the Air Force decided not to award this test stand bid to L&H, but rather to another company (Aviation Technology in Manchester, NH).  However, Huber's failure to channel this bid proposal through AFS, as he should have, deprived AFS of the ability to bid on a proposal where AFS' unique expertise and past experience building similar test stands creates a substantial likelihood that AFS would have received this contract award.

**F.     Navy Hydraulic Test Stand**

89)     Documents from Huber's erased laptop further show that on December 14, 2011, Huber from his AFS computer and e-mail address sent Aufiero at L&H a message stating:  "Just received Test Stand Solicitation package...it'll take A LOT of work.  Are you ready to jump and swim?  I need to know if you are still interested ASAP."  Aufiero replied to Huber at AFS: "Yes."

90)     This refers to a hydraulic test stand being bid by the Navy to test motors and pumps for F-18 Hornet fighter jets.  Huber and L&H worked on this project jointly.  E-mails

recovered from Huber's hard drive show that Huber, while a full-time AFS employee, devoted substantial time to this project on behalf of L&H.

91)     In January 2012, while a full-time AFS employee receiving substantial compensation and benefits from AFS, Huber exchanged a series of e-mails with a Navy employee, Jillian Kohler, concerning the Navy Test Stand bid.  Huber requested an extension of the deadline for submitting drawings because the project "has 93 line items, and we are working diligently in trying to price together all lines."  Huber signed this communication as:  "Sincerely, Kevin Huber, L&H, Inc.,"  In another e-mail, Huber provided Kohler with the L&H Duns # and Federal Tax I.D. number.  In another, he told Kohler that the "ship to" address for the project was "11529 Wilmar Blvd. Charlotte, NC 28273-6448," L&H's headquarters address, and that the contact person was "Craig Hill," L&H's Systems Specialist, while also providing Hill's direct telephone number at L&H.

92)     On January 9, 2012, Huber e-mailed an employee at Dayton T. Brown, an independent engineering and testing laboratory, saying:  "My company is knee-deep in bidding this NAVAIR Hydraulic Test Stand (T-12)."  He then clarified which company was "my company" writing:  "I am working with L&H."  Elaborating, Huber explained that he was contacting Dayton T. Brown because "[L&H] do[es] not have the breadth of Test Engineering knowledge required to fulfill the contract obligation."  Huber asked whether Dayton T. Brown would like to participate "as a joint venture partner or subcontractor, with me as the prime material supplier."

93)     On January 11, 2012, Huber wrote a two-page, single-spaced letter to the same employee at Dayton T. Brown outlining the scope of work for the Navy Test Stand project.  The letter is written on L&H letterhead, lists Huber and two other contacts at L&H (Craig Hill and

Wayne Hawkins), and provides Huber's L&H e-mail address as khuber@lhtech.com. Subsequent e-mails, dated January 27, 2012, relating to the Navy Hydraulic Test Stand are copied to that L&H e-mail address.

94)     In late January and early February 2012, Huber, at AFS, received from Harry Kahn Associates extensive information that Huber had solicited regarding the Navy Hydraulic Test Stand project.  Harry Kahn erroneously believed this was a presentation to AFS.  ("Present to: Advanced Fluid Systems…3 February, 2012.")  In other words, Huber had this document prepared and sent to himself on the false representation that it was AFS, when in reality it was going to be used by L&H.

### G.     Army TACOM Hydraulic Manifold

95)     Documents from Huber's erased laptop show that on November 11, 2011, defendant Huber, at AFS, e-mailed to L&H plans for a "potential project."  "I am bidding on an Army TACOM hydraulic manifold.  Attached is the drawing… [M]aybe we can put the whole thing through Rexroth…"  Rexroth is L&H's principal supplier, and AFS' largest competitor. Huber attached detailed drawings for this project to his e-mail.  L&H e-mailed back to Huber on November 13, 2011:  "Kevin, a few technical questions.  Any idea of flow rates through each valve?  What fluid and viscosity?..."

### H.     Passaic Valley Sewer project and the New York Power project

96)     Two projects for which Huber had responsibility at AFS concerned the Passaic, NJ Valley Sewer project and the New York Power project.  Both were geographically located in Huber's New York territory.  Both generated substantial revenue for AFS (and substantial commissions for Huber).

97)     The analysis of defendant Huber's erased hard drive shows that between October 10, 2012 (the day after he announced his resignation) and November 11, 2012 (the day he surrendered his computer with the erased hard drive), Huber stored information about both projects on an external drive which he did not return to AFS.

98)     Huber evidently seeks to use this confidential AFS information to work, either with L&H and/or through his own company INSYSMA, to divert business belonging to AFS.

**I.      L&H Attempted Recruitment of AFS Engineers**

99)     After it had formed a plan to steal AFS' trade secrets, L&H telephoned Tom Reiker, one of AFS' top electrical engineers who works at AFS headquarters in Pennsylvania, and offered him a position to leave AFS and join L&H.  L&H sought by this recruitment to steal one of AFS' key employees in order to fully exploit its illegally obtained information.  Reiker stated he was not interested in leaving AFS.  This attempted recruitment was not known to AFS' officers until recently, as the evidence of defendants' wrongdoing surfaced.

100)    When Reiker showed no interest, L&H then tried to steal the services of AFS' chief electrical engineer, Larry Quickel.  While in York, PA, Huber spoke on a number of occasions to Quickel about leaving AFS to join L&H, and gave him telephone contact information for Tom Aufiero.  Shortly thereafter, Quickel received a telephone call from the 704 area code, which he believes came from L&H.  Quickel did not take the call.  These events occurred in the February or March, 2012 time frame.

101)    Following the successful launch of the Antares rocket in April 2013 (see ¶ 35 above), Huber telephoned Reiker to congratulate him on the launch.  He told Reiker that AFS would not be receiving any more upgrade work on the Antares rocket, with the implication being

that Reiker should join Huber and work with L&H so that he could continue to work on Antares rocket upgrades.

## COUNT ONE—MISAPPROPRIATION OF TRADE SECRETS
### (Against All Defendants)

102)    The foregoing allegations are incorporated by reference.

103)    AFS' drawings, diagrams and documentation for its projects constitute "trade secrets" under the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S.A. § 5302, in that: (a) this information derives independent economic value from not being generally known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (b) AFS has spent substantial sums of money to develop and generate these trade secrets and has taken steps that are reasonable under the circumstances to maintain their secrecy.

104)    AFS was at all times in lawful possession of these trade secrets, and used them exclusively in its lawful business activities.  AFS took steps that were reasonable under the circumstances to maintain their secrecy.

105)    As described in the foregoing paragraphs, the defendants, knowing that they acquired AFS' trade secrets by improper means, willfully misappropriated, retained and used AFS' trade secrets, in violation of 12 Pa. C.S.A. § 5302, *et seq.,* and have used those trade secrets to divert business away from AFS and to defendants.

106)    Defendants' actions and conduct in misappropriating AFS' trade secrets have caused substantial damage to AFS and were undertaken willfully and maliciously, entitling AFS to recover exemplary damages and attorney's fees as permitted by 12 Pa. C.S.A. §§ 5304 and 5305.

## COUNT TWO

**Computer Fraud and Abuse Act**
**(Against All Defendants)**

107)    The foregoing allegations are incorporated by reference.

108)    Huber was authorized by AFS to access AFS computers and servers only for the purpose of furthering AFS' business.  He was not authorized to access AFS computers for the purpose of diverting business to L&H so as to further L&H's financial interests.  Further, Huber was not authorized to erase the hard drive of the computer provided to him by AFS nor to connect an external hard drive to his AFS computer for the purpose of transferring AFS' trade secrets and other confidential information for subsequent retransmission to L&H and/or use on behalf of L&H.

109)    The computer supplied to Huber by AFS for use in performing his duties as an employee of AFS is a "protected" computer within the meaning of 18 U.S.C. § 1030(e)(2).

110)    With the knowledge and at the instigation of L&H and Orbital, Huber knowingly and willfully accessed numerous password-protected documents from AFS computers for the improper purpose of transmitting that protected information to L&H and Orbital in an effort to harm AFS.

111)    Huber's authorized access to his AFS-supplied computer did not extend to using that computer to misappropriate AFS' trade secrets or to supplying AFS' protected trade secrets to competitors.  In accessing his AFS-supplied computer for the purpose of misappropriating AFS' protected trade secrets and retransmitting those trade secrets to L&H, Huber exceeded his authorized access as defined in 18 U.S.C. § 1030(a)(2)(C) and (e)(6).

112)    Huber was not authorized to access his AFS-supplied computer using an external hard drive, which he deliberately and recklessly used for the improper purpose of transferring

AFS' protected trade secrets to that external hard drive for subsequent retransmission to L&H, causing damage to AFS in violation of 18 U.S.C. ¶ 1030(a)(5)(A)(ii) and (iii).

113)    Huber was not authorized to erase the hard drive installed on his AFS-supplied computer and, by deliberately erasing that hard drive, Huber intentionally caused damage to his AFS-supplied computer in violation of 18 U.S.C. § 1030(a)(5)(A)(i).

114)    AFS' computers are used in or affect interstate or foreign commerce or communication, because AFS continually uses those computers to communicate with its engineers in various states and foreign countries where they travel to service AFS clients and AFS projects.

115)    Huber's improper conduct in wrongfully and recklessly accessing his AFS-supplied computer for the purpose of misappropriating AFS' trade secrets, in wrongfully and recklessly erasing the hard drive installed on his AFS-supplied computer, and in wrongfully and recklessly connecting an external hard drive to his AFS-supplied computer for the improper purpose of misappropriating AFS protected trade secrets for subsequent retransmission to L&H caused damage to AFS in an amount aggregating more than $5,000 during a one-year period.

116)    L&H and Orbital aided, abetted and conspired with Huber in the wrongful and reckless activities described in this Count Two, in violation of 18 U.S.C. § 1030(b).

117)    All defendants have violated 18 U.S.C. § 1030, as set forth above, and AFS has been harmed thereby.

## COUNT THREE
### Lanham Act
### (Against All Defendants Except Orbital)

118)    The foregoing paragraphs are incorporated by reference.

119)    Defendants have falsely attributed to themselves the design, manufacture and installation of the Antares lift and launch retract system (see ¶¶ 65, 73, 79, 80). This constitutes false designations of origin, false or misleading descriptions of fact, and/or false or misleading representations of fact likely to cause confusion, mistake, and deception, and misrepresents the nature, characteristics, qualities, or geographic origin of goods, services, or commercial activities, in violation of 15 U.S.C. § 1125.

120)    AFS has been harmed and injured by these violations.

**COUNT FOUR**
**Tortious Interference with Contract and With Prospective Contractual Relations**
**(Against All Defendants)**

121)    The foregoing paragraphs are incorporated by reference.

122)    AFS has both existing and prospective contractual relations with its customers. It has ongoing contractual relations with the VCSFA for the lift and launch retract system that AFS designed and installed for the Antares rocket project. By the nature of its work, AFS historically has received substantial service, maintenance, repair and upgrade work from customers relating to hydraulic systems AFS has installed, and reasonably expected and expects such work with respect to the specific systems it has designed and installed on the Antares rocket project.

123)    Defendants have used the trade secrets and confidential information wrongfully taken from AFS to interfere intentionally and tortiously with AFS' existing and prospective contractual relations with its customers, including the contract to upgrade the AFS lift and launch retract system for the Antares rocket.

124)    AFS also has existing contractual relationships with its customers such as the Passaic NJ Sewer Authority and New York Power Authority, whose files defendants misappropriated from AFS' protected computer network.

125)    Defendants' actions prevented AFS from bidding on projects such as the Navy and Air Force hydraulic test stands.  Based upon AFS' particularized engineering skill, knowledge, and expertise, and its prior success in bidding on similar projects, AFS reasonably anticipates it would have successfully bid on and received contracts for these new projects but for the wrongful conduct of the defendants.

126)    Acting intentionally, without privilege, and with improper motive and purpose, defendants have interfered with AFS' existing contracts and with prospective business opportunities that AFS reasonably anticipated developing into new contractual relationships.

127)    Defendants' actions, as alleged herein, were committed with reckless indifference to the rights of AFS, and with either the specific intent to cause harm to AFS, or with reckless disregard to whether such actions would cause harm to AFS.  Thus, defendants' tortious interference with AFS' existing and prospective contractual relations warrants an award of punitive damages.

128)    AFS has been harmed and damaged by defendants' intentional interference with AFS' existing and prospective contractual relations.

## COUNT FIVE
### Unjust Enrichment
### (Against All Defendants)

129)    The foregoing paragraphs are incorporated by reference.

130)    The information wrongfully extracted by Huber from his AFS computer consists of trade secrets and other confidential information proprietary to AFS.  To the extent any such information is not determined to be a trade secret within the meaning of 12 Pa. C.S.A. § 5302, such information consists of confidential information proprietary to AFS with respect to which AFS took reasonable security measures to safeguard.

131)    As demonstrated by the allegations above, by wrongfully using AFS' confidential proprietary information for their own benefit and for the purpose of securing an improper competitive advantage against AFS, defendants have unjustly enriched themselves at the expense of AFS and should be required to disgorge their unjust gain.

**COUNT SIX**
**Common Law Unfair Competition**
**(Against All Defendants)**

132)    The foregoing paragraphs are incorporated by reference.

133)    Defendants have engaged in unfair methods of competition by diverting business from AFS to themselves through the wrongful use of confidential information belonging to AFS.

134)    Defendants' actions have been taken with specific intent to harm AFS, and violate general standards of fairness and social utility.

135)    Defendants' actions have caused harm and damage to AFS, as alleged herein.

**COUNT SEVEN**
**Conversion**
**(Against All Defendants)**

136)    The foregoing paragraphs are incorporated by reference.

137)    Defendants' actions in misappropriating AFS' confidential proprietary information have unlawfully deprived AFS of its property rights without consent or lawful justification.

138)    Defendants' wrongful actions have harmed and damaged AFS.

**COUNT EIGHT**
**Common Law Conspiracy**
**(Against All Defendants)**

139)    The foregoing paragraphs are incorporated by reference.

140)     The defendants combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means, namely to misappropriate AFS' confidential information and its customers' loyalty and business in order to gain a commercial advantage for themselves.

141)     Defendants combined and conspired with the intent to injure AFS.

142)     Defendants' actions were without justification.

143)     Defendants performed overt acts in further of this combination, as set forth in the statement of facts incorporated herein.

144)     AFS has been harmed by this unlawful combination and has suffered damages.

145)     Defendants' actions, as alleged herein, were committed with reckless indifference to the rights of AFS, and with either the specific intent to cause harm to AFS, or with reckless disregard to whether such actions would cause harm to AFS.  Thus, defendants' tortious acts in furtherance of their conspiracy warrant an award of punitive damages.

**COUNT NINE**
**Breach of Fiduciary Duty and Duty of Loyalty**
**(Against Defendant Huber)**

146)     The foregoing paragraphs are incorporated by reference.

147)     During the period of his employment by AFS, Huber acted as an agent of AFS and owed AFS the duties of loyalty and good faith in performing his duties, which are implied in law by the confidential nature of information entrusted to him.

148)     As described above, Huber breached his fiduciary duties of loyalty and good faith owed to AFS by wrongfully misappropriating AFS' trade secrets and confidential proprietary information; wrongfully transferring AFS' trade secrets and confidential proprietary information to its competitor, L&H; unlawfully organizing a meeting with Orbital to discuss diverting

business away from AFS; interfering with AFS' existing and prospective contractual relationships; setting up INSYSMA to divert business from AFS; and conspiring with L&H and Orbital to unlawfully harm AFS in its business operations.

149)    Huber's conduct in breaching his fiduciary duties to AFS was intentional, willful and egregious, warranting an award of punitive damages.

150)    Huber's breaches of fiduciary duty have harmed AFS and AFS is entitled to recover damages for that harm, including punitive damages.

**COUNT TEN**
**Aiding and Abetting a Breach of Fiduciary Duty**
**(Against All Defendants Except Huber)**

151)    The foregoing paragraphs are incorporated by reference.

152)    Knowing that Huber was employed by AFS, served as an agent of AFS, and owed fiduciary duties of loyalty and good faith to AFS, L&H, Orbital, Vann and Aufiero willfully aided and abetted Huber in breaching those fiduciary duties by knowingly encouraging, soliciting, and affirmatively assisting Huber's misappropriation of AFS' trade secrets and confidential proprietary information and intentionally aiding and abetting Huber's interference with AFS' existing and prospective contractual relations.

153)    These defendants' conduct in aiding and abetting Huber's breach of his fiduciary duties to AFS was intentional, willful and egregious, warranting an award of punitive damages.

**WHEREFORE**, plaintiff AFS prays for the following relief:

1)      Judgment in AFS' favor and against all defendants;

2)      A permanent injunction against:

A)      Huber and INSYSMA working on any facet of the Antares lift and launch retract system, or its upgrades;

B)    L&H working on any facet of the Antares lift and launch retract system, or its upgrades, that utilize or are based upon any information, design, or data that L&H or Huber learned while Huber was employed by AFS;

3)    An accounting of all sums earned by defendants from their actions described in this complaint;

4)    Restitution, compensatory and punitive damages;

5)    Pre- and post-judgment interest;

6)    Costs of suit including reasonable attorneys' fees;

7)    Such other and further relief as the Court deems appropriate.

**Jury Trial Demand**

Plaintiff AFS demands a trial by jury as to all claims and all issues so triable.

Date: December 24, 2013

David G. Concannon (PA61483)
Law Offices of David G. Concannon, LLC
200 Eagle Road, Suite 116
Wayne, PA 19087
Telephone: (610) 293-8084
Facsimile: (610) 293-8086
E-mail:  david@davidconcannon.com

Robert J. LaRocca
Kohn, Swift & Graf, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968
E-mail:  rlarocca@kohnswift.com

*Counsel for AFS*