## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ADVANCED FLUID SYSTEMS, INC.,** | : | **CIVIL ACTION NO. 1:13-CV-3087** |
| | : | |
| **Plaintiff,** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **KEVIN HUBER, INSYSMA** | : | |
| **(INTEGRATED SYSTEMS AND** | : | |
| **MACHINERY, LLC), LIVINGSTON &** | : | |
| **HAVEN, LLC, CLIFTON B. VANN IV,** | : | |
| **THOMAS AUFIERO, and ORBITAL** | : | |
| **SCIENCES CORPORATION,** | : | |
| | : | |
| **Defendants.** | : | |

### MEMORANDUM

Plaintiff Advanced Fluid Systems, Inc. ("AFS") filed the above-captioned action for injunctive relief and compensatory and punitive damages based on the misappropriation of trade secrets and violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Presently before the court are three motions to dismiss filed by defendants Livingston & Haven, LLC ("L&H"), Clifton B. Vann IV, and Thomas Aufiero (Doc. 28), Orbital Sciences Corporation ("Orbital") (Doc. 32), and Kevin Huber and Integrated Systems and Machinery, LLC ("INSYSMA") (Doc. 33) (collectively, the "Defendants"). For the reasons that follow, the court will deny the motions in part and reserve ruling on the remaining issues.

I.      **Factual Background and Procedural History**

A.      **Parties**

Plaintiff AFS is incorporated in the Commonwealth of Pennsylvania with its

headquarters in York, Pennsylvania.  (Doc. 1 ¶ 1).  AFS designs, assembles, and

installs hydraulic systems that use pressurized fluids to move heavy machinery for

complex operations.  (Id.)  Relevant to the instant action, AFS created the

Transporter/Erector/Launcher/Hydraulic System ("TELHS") for the Mid-Atlantic

Regional Spaceport ("MARS") on Wallops Island, Virginia pursuant to a contract

with the Virginia Commercial Space Flight Authority ("VCSFA") dated September

30, 2009.  (Id.)  Under the TELHS contract, VCSFA hired AFS to "provide the

complete specification, engineering drawings, analyses, testing requirements,

operating descriptions, interfaces with other launch facility systems and all related

engineering and professional design services to develop the final and complete

design for the Antares' [sic] rocket['s] hydraulic motion control system."  (Id. ¶ 28).

Defendant Orbital is a Delaware corporation that designs and manufactures

rockets and space systems and maintains its corporate headquarters in Dulles,

Virginia.  (Id. ¶ 7).  Orbital is the developer of the Antares rocket and agreed to

launch the Antares rocket from the MARS facility upon construction of the facility

and the purchase of certain hardware, including TELHS.  (Id. ¶ 27).  Since signing

the TELHS contract, AFS successfully designed, assembled, and installed TELHS

at the MARS facility, and the first test launch of the Antares rocket took place in

February 2013.  (Id. ¶¶ 31-33).  In the process of completing the contract, AFS

2

generated substantial internal documentation, including thousands of engineering drawings and diagrams and proprietary software code, which are kept in password-protected electronic files on AFS' server.  (Id. ¶ 38).  Although VCSFA acquired "legal ownership to all inventions or works" under the TELHS contract, AFS remains in possession and control of its trade secrets and has only used them in a confidential manner to fulfill its obligations.  (Id. ¶ 39).  When necessary, AFS also provided Orbital with certain information to help integrate TELHS with the Antares rocket.  (Id.)  However, AFS asserts that Orbital does not own TELHS and is merely the end user of TELHS.  (Id. ¶ 78).  In fact, on September 24, 2013, Orbital sued the Commonwealth of Virginia and VCSFA for $16.5 million to enforce a binding arbitration decision that VCSFA owned TELHS and related hardware and therefore must reimburse Orbital for the purchase of such hardware.  (Id. ¶ 79).

During the performance of the TELHS contract, defendant Kevin Huber was AFS' main point of contact for Orbital.  (Id. ¶ 46).  From November 2006 until October 26, 2012, AFS employed Huber, a New York resident, as a full-time salesman/engineer.  (Id. ¶ 2).  Huber was initially hired by and reported to defendant Thomas Aufiero, the head of AFS' sales force and a key member of AFS' management team, until Aufiero resigned from AFS in January 2011.  (Id. ¶¶ 43-44).  Aufiero now resides in North Carolina and is the hydraulic sales manager for L&H.  (Id. ¶ 6).  Defendant L&H is a North Carolina limited liability company that also designs, assembles, and installs hydraulic fluid systems and maintains its corporate headquarters in Charlotte, North Carolina.  (Id. ¶¶ 4, 41).

In his capacity as a salesman/engineer, Huber had access to AFS' confidential information, including complete sets of drawings, diagrams, and other documents generated in connection with numerous projects. (Id. ¶ 45).  Huber also had access to AFS' component and labor costs as well as AFS' quotes for all of its projects. (Id. ¶¶ 45, 60).  All of these documents are password-protected documents located on AFS' server in York, Pennsylvania. (Id. ¶ 45).

On October 9, 2012, Huber announced his resignation from AFS and officially left his position on October 26, 2012. (Id. ¶ 47).  When AFS finally retrieved Huber's company-issued laptop computer and cell phone, AFS determined that Huber had attempted to erase all the data from both devices. (Id. ¶¶ 47-48).  Upon restoring the deleted information, AFS discovered that Huber was working with L&H and Orbital as early as January 2012 while he was a full-time AFS employee. (Id. ¶¶ 49-50).

## B.    Conspiracy Among Defendants

AFS avers that Defendants conspired to gain access to AFS' confidential information and use that confidential information to divert business from AFS. (Id. ¶¶ 11, 42).  According to AFS, Huber first accessed AFS' server and e-mail system in November 2011 to send L&H photographs and videotapes of the Antares rocket test launches using TELHS. (Id. ¶ 67).  In January 2012, L&H granted Huber access to L&H's private network through a Virtual Private Network ("VPN") connection and password. (Id. ¶ 51).  L&H also set up an e-mail address for Huber in its internal e-mail system around the same time. (Id. ¶¶ 52-53).  On April 12, 2012, Huber

4

organized a secret meeting at the MARS facility with L&H and Orbital, including

defendants Aufiero and Clifton Vann, who is the President of L&H and a resident of

North Carolina.  (Id. ¶¶ 5, 54).  According to several deleted e-mails, the purpose of

the meeting was to discuss future upgrades to TELHS.  (Id. ¶¶ 54-57).  Upon

establishing the basis for the alleged conspiracy, AFS sets forth detailed allegations

regarding actions taken in furtherance of the conspiracy.

### C.   Stealing Confidential Information

AFS asserts that, beginning in September 2012, Huber accessed AFS' server

and downloaded numerous files that did not correlate with any project on which he

was working.  (Id. ¶ 58).  In October 2012, upon announcing his resignation, Huber

began saving significant amounts of confidential information to an external drive.

(Id. ¶ 60).  In particular, AFS discovered that Huber stored information about two of

his past projects—the Passaic NJ Valley Sewer and New York Power projects—as

well as a folder containing all pending AFS quotes for all territories and projects.

(Id. ¶¶ 60, 96-97).  AFS alleges that Huber transmitted this confidential information

to L&H and Orbital.  (Id. ¶¶ 58, 60).

On October 18, 2012, Huber formed a company called INSYSMA with offices

in New York and Connecticut.  (Id. ¶¶ 3, 59).  AFS states that Huber then duplicated

at least four AFS drawings of engineering plans and re-signed the drawings for

INSYSMA with his own initials.  (Id. ¶ 65).  Moreover, the INSYSMA website

displays a photograph of a successful launch of the Antares rocket using TELHS on

September 18, 2013.  (Id. ¶ 76).  However, the website does not attribute TELHS to

AFS; rather, the website states that INSYSMA is currently working with Orbital in support of current and upcoming launches and falsely implies that INSYSMA designed and installed TELHS.  (Id.)

Lastly, AFS asserts that, in February or March 2012, L&H attempted to recruit AFS' top electrical engineers, Tom Reiker and Larry Quickel.  (Id. ¶¶ 99-101).  L&H allegedly called Mr. Reiker in York, Pennsylvania and offered him a position, which Mr. Reiker declined.  (Id. ¶ 99).  Huber also spoke in person with Mr. Quickel, AFS' chief electrical engineer, on multiple occasions about leaving AFS to join L&H and gave Mr. Quickel the contact information for Aufiero.  (Id. ¶ 100).  In April 2013, after the successful launch of the Antares rocket, Huber called Mr. Reiker again to congratulate him.  (Id. ¶ 101).  During the call, however, Huber stated that AFS would not be receiving any more upgrade work on the Antares rocket in a purported second attempt to recruit Mr. Reiker to L&H.  (Id.)

### D.     Usurping Business Opportunities

In addition to stealing confidential information, AFS avers that the purpose of the alleged conspiracy was to divert AFS' business opportunities related to TELHS and other projects.  (Id. ¶ 42).

#### i.     *Business related to TELHS*

AFS first asserts that, in September 2012, Huber submitted an unusually high bid on behalf of AFS for upgrades to TELHS's gripper arms.  (Id. ¶ 61).  Huber then secretly and simultaneously submitted a substantially lower bid on behalf of L&H for the same project.  (Id. ¶ 62).  As a result, L&H and INSYSMA received the

6

contract for the gripper arms upgrade. (Id. ¶ 68). When Orbital subsequently decided to move forward with a $4 million upgrade to the entire TELHS system, (id. ¶ 69), Huber sent Orbital an informal quote on November 2, 2012 on behalf of L&H and INSYSMA, as agent of the S3 Group at L&H. (Id. ¶¶ 63-64, 70). AFS alleges that Jim Vaughn, President of AFS, had repeatedly informed Orbital that AFS wanted to bid on this upgrade and all future upgrades, as well as training and maintenance contracts. (Id. ¶ 71). However, L&H and INSYSMA received the contract for the complete TELHS upgrade. (Id. ¶ 72).

As part of the complete upgrade, Huber contacted Maritime Hydraulic, a cylinder manufacturer with whom AFS has a non-disclosure agreement, for a quote on new cylinders. (Id. ¶¶ 66, 73). Kim Carruthers, the owner of Maritime Hydraulic, informed Huber that all information related to the cylinders for TELHS was AFS' proprietary information. (Id. ¶ 73). According to the complaint, Keith Fava from Orbital called Ms. Carruthers and represented that Orbital owned the rights to AFS' designs. (Id. ¶ 74). Mr. Fava further instructed her to provide a quote to Huber. (Id.) With no other option, Maritime Hydraulic submitted a quote to Huber, and it is currently manufacturing two new cylinders for the TELHS upgrade. (Id. ¶¶ 74-75). As a result of all of these actions, AFS alleges that it has been shut out of all future work with Orbital at other launch sites as well as VCSFA's plan to further develop the MARS facility for Orbital and other commercial space clients. (Id. ¶¶ 77-78; see also id. ¶¶ 24, 36, 40).

### ii.     *Other Business Opportunities*

AFS also alleges that Defendants usurped several non-TELHS business opportunities. (Id. ¶ 81). First, as early as November 2011, Huber e-mailed L&H regarding plans for a potential bid on a U.S. Army TACOM Hydraulic Manifold and suggested submitting the bid proposal through Rexroth, L&H's principal supplier and AFS' largest competitor. (Id. ¶ 95). Second, in December 2011, Huber and Aufiero at L&H exchanged e-mails regarding a U.S. Navy Hydraulic Test Stand project. (Id. ¶¶ 89-90). Huber subsequently sent numerous communications to the U.S. Navy as well as an independent engineering and testing laboratory on behalf of L&H. (Id. ¶¶ 91-93). Huber also requested extensive information in support of a potential bid on the Navy Hydraulic Test Stand project from Harry Kahn Associates, who submitted a presentation under the impression that AFS had requested the information. (Id. ¶ 94).

Finally, in June 2012, Huber sent L&H a detailed bid proposal for a U.S. Air Force Hydraulic Test Stand, listing Huber as the project manager for L&H. (Id. ¶ 82). In the final version, Huber also listed Orbital as a reference for L&H's capabilities and represented that L&H designed, fabricated, and installed TELHS on Wallops Island. (Id. ¶¶ 84-85). In addition to such representations, Huber sent the U.S. Air Force a document containing the start-up procedures for TELHS, which clearly states that the document was "originated by and is the property of Advanced Fluid Systems." (Id. ¶ 86). However, Huber indicated to the U.S. Air Force that AFS was simply a subcontractor that generates L&H's documentation.

(Id.)  Thus, L&H and Huber, who acted as L&H's agent while a full-time AFS

employee, prevented AFS from pursuing these business opportunities.  (Id. ¶ 88.)

###### E.    Procedural History

On December 24, 2013, AFS filed a complaint against Defendants, alleging

several claims based on the misappropriation of trade secrets as well as violations of

the Computer Fraud and Abuse Act and the Lanham Act.  (Doc. 1).  On February

14, 2014, AFS requested a preliminary injunction to prevent Defendants from

working on upgrades to TELHS and constructing additional hydraulic launch

systems using the alleged trade secrets.  (Doc. 29).  Defendants simultaneously filed

the instant motions to dismiss (Docs. 28, 32, 33) for lack of subject-matter

jurisdiction under Federal Rule of Civil Procedure 12(b)(1), lack of personal

jurisdiction under Rule 12(b)(2), failure to state a claim upon which relief may be

granted under Rule 12(b)(6), and failure to join a required party under Rules

12(b)(7) and 19.  In the alternative, Orbital requests that the court transfer the case

to the U.S. District Court for the Eastern District of Virginia pursuant to 28 U.S.C.

§ 1404(a).  (Doc. 32 ¶ 4).

Prior to addressing the merits of the case, including a hearing for a

preliminary injunction, the court must ensure that it has jurisdiction over all the

parties.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93-95, 101-02 (1998);

Solis v. Koresko, No. 09-988, 2009 WL 2776630, at *4 (E.D. Pa. Aug. 31, 2009).  In this

memorandum, the court will address the threshold issues related to jurisdiction,

joinder, and venue.  The court will issue separate opinions with respect to the Rule 12(b)(6) motions and the motion for preliminary injunction.

## II.   <u>Legal Standard</u>

The court's jurisdiction in the instant matter is premised on both its power to decide questions of federal law and to hear claims by parties of diverse citizenship for amounts in controversy exceeding $75,000.  <u>See</u> 28 U.S.C. §§ 1331, 1332(a).  The court may also exercise supplemental jurisdiction over the state law claims.  <u>See id.</u> § 1367.  The state law claims are related to and share a "common nucleus of operative facts" with the federal law claims, thus forming part of the same case or controversy.  <u>Lyon v. Whisman</u>, 45 F.3d 758, 759-60 (3d Cir. 1995) (quoting <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725 (1966)).

Federal Rule of Civil Procedure 12(b) enumerates several potential bases for dismissal of an action:  lack of subject-matter jurisdiction, lack of personal jurisdiction, improper venue, insufficient process or service of process, failure to state a claim upon which relief may be granted, and failure to join a required party. FED. R. CIV. P. 12(b).  When a motion to dismiss is based on both lack of jurisdiction and another Rule 12(b) ground, constitutional concerns regarding the scope of judicial power dictate that the court first address the issue of jurisdiction.  <u>Steel Co.</u>, 523 U.S. at 94-95; <u>see</u> <u>also</u> <u>Tolan v. United States</u>, 176 F.R.D. 507, 509 (E.D. Pa. 1998).

### A.   **Subject-Matter Jurisdiction**

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a complaint for "lack of subject-matter jurisdiction."  FED. R. CIV. P. 12(b)(1).  "A

motion to dismiss for want of standing is also properly brought pursuant to Rule

12(b)(1), because standing is a jurisdictional matter." <u>Ballentine v. United States</u>,

486 F.3d 806, 810 (3d Cir. 2007).  In evaluating a Rule 12(b)(1) motion, a court must

determine whether the defendant presents a facial or factual attack.  <u>Mortensen v.</u>

<u>First Fed. Sav. & Loan Ass'n</u>, 549 F.2d 884, 891 (3d Cir. 1977).  A "factual" attack

argues that, although the pleadings facially satisfy jurisdictional prerequisites, one

or more of the allegations is untrue, rendering the controversy outside of the court's

jurisdiction.  <u>Id.</u>  In contrast, a "facial" attack assumes the veracity of the

allegations in the complaint, but argues that the pleadings fail to present an action

within the court's jurisdiction.  <u>Common Cause of Pa. v. Pennsylvania</u>, 558 F.3d 249,

256-57 (3d Cir. 2009); <u>Tolan</u>, 176 F.R.D. at 510.  In both instances, it is the plaintiff's

burden to establish the court's subject-matter jurisdiction.  <u>See</u> <u>Gould Elecs. Inc. v.</u>

<u>United States</u>, 220 F.3d 169, 178 (3d Cir. 2000); <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>,

926 F.2d 1406, 1409 (3d Cir. 1991); <u>Mortensen</u>, 549 F.2d at 891.  The court should

grant a Rule 12(b)(1) motion only if it appears with certainty that assertion of

jurisdiction would be improper.  <u>Gould Elecs. Inc.</u>, 220 F.3d at 178; <u>Kehr Packages</u>,

926 F.2d at 1408-09; Tolan, 176 F.R.D. at 510.  If the complaint is merely deficient as

pleaded, the court should grant leave to amend before dismissal with prejudice.

<u>See</u> <u>Shane v. Fauver</u>, 213 F.3d 113, 116-17 (3d Cir. 2000).

## B.     Personal Jurisdiction

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a party may also move

to dismiss a complaint for lack of personal jurisdiction.  FED. R. CIV. P. 12(b)(2).  In

ruling on a Rule 12(b)(2) motion, the court must accept the allegations in the complaint as true and draw all reasonable inferences supported by the well-pleaded factual allegations in the plaintiff's favor.  Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002); Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992).  However, the court's review is not limited to the face of the pleadings; consideration of affidavits submitted by the parties is both appropriate and required.  See Cateret Sav. Bank, 954 F.2d at 146 ("[O]nce the defendant raises the question of personal jurisdiction, the plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction.").

Even though the plaintiff bears the ultimate burden of proving personal jurisdiction over a defendant, Mellon Bank (East) PSFS Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992), the plaintiff need not make such a showing at the pleading stage of litigation.  Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009).  To survive a motion to dismiss, the plaintiff must merely allege sufficient facts to establish a *prima facie* case of jurisdiction over the defendant.  Id.; Cateret Sav. Bank, 954 F.2d at 142 n.1 (stating that the "plaintiff need only plead [a] prima facie case to survive the initial [Rule 12(b)(2)] motion, but must eventually establish jurisdiction by a preponderance of the evidence" (citation omitted)).

## C.    Required Joinder

Federal Rule of Civil Procedure 12(b)(7) provides for dismissal of a complaint for "failure to join a party under Rule 19."  FED. R. CIV. P. 12(b)(7).  Rule 19 promulgates the circumstances in which the joinder of an absent party is necessary

and, if such joinder is not feasible, the considerations for assessing whether the absent party is indispensable to the action.  See FED. R. CIV. P. 19; see also Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 107 (1968); Shetter v. Amerada Hess Corp., 14 F.3d 934, 937-38 (3d Cir. 1994).  The moving party bears the burden of showing that the absent party is a required party and thus dismissal is proper under Rule 12(b)(7).  Disabled in Action v. Se. Pa. Transp. Auth., 635 F.3d 87, 97 (3d Cir. 2011).  Similar to the other bases for dismissal, the court must accept the truth of the allegations in the complaint and view them in the light most favorable to the non-moving party.  Polygon U.S. Corp. v. Diversified Info. Technologies, 3:CV-12-0923, 2012 WL 5379168, at *4 (M.D. Pa. Oct. 31, 2012) (citing Cummings v. Allstate Ins. Co., No. 11-02691, 2011 WL 6779321, at *3 (E.D. Pa. Dec. 27, 2011)).  Under Rule 12(b)(7), however, the court may also consider relevant evidence outside the pleadings.  Id.

### D.    Transfer Under Section 1404(a)

Section 1404(a) of Title 28 of the United States Code provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division to which all parties have consented."  28 U.S.C. § 1404(a).  Under Section 1404(a), the court is vested with "broad discretion to determine, on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer."  Jumara v. State Farm Ins. Co., 55 F.3d 873, 883 (3d Cir. 1995) (citing Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29-30 (1988)).  However, the defendant bears the burden of

persuasion as to all elements of the Section 1404(a) analysis. <u>Jumara</u>, 55 F.3d at 879; <u>Lacey v. Cessna Aircraft Co.</u>, 862 F.2d 38, 43-44 (3d Cir. 1988). To carry its burden, the defendant "must provide enough information to enable the District Court to balance the parties' interests." <u>Lacey</u>, 862 F.2d at 44 (quoting <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 258 (1981). Mere assertions of inconvenience or hardship are insufficient to justify transfer. <u>Hillard v. Guidant Corp.</u>, 76 F. Supp. 2d 566, 571 (M.D. Pa. 1999); <u>Kisko v. Penn Cent. Transp. Co.</u>, 408 F. Supp. 984, 986 (M.D. Pa. 1976).

**III.   <u>Discussion</u>**

Upon consideration of the motions to dismiss, the court must resolve four preliminary issues prior to considering the merits of the instant action. First, the court must determine whether AFS has standing to invoke the court's subject-matter jurisdiction. Second, the court must ensure that it may exercise personal jurisdiction over Vann and Aufiero. Third, the court must decide whether VCSFA is a required party for this action. Finally, the court must evaluate whether the doctrine of *forums non conveniens* requires the transfer of this action to the U.S. District Court for the Eastern District of Virginia. The court will address these issues *seriatim*.

**A.   Standing**

Article III, Section 2 of the United States Constitution confers upon federal courts the power to adjudicate "cases" and "controversies." U.S. CONST. art. III, § 2. "No principle is more fundamental to the judiciary's proper role in our system

14

of government than th[is] constitutional limitation of federal-court jurisdiction."

Raines v. Byrd, 521 U.S. 811, 818 (1997) (quoting Simon v. E. Ky. Welfare Rights

Org., 426 U.S. 26, 37 (1976)).  The purpose of this limitation is to ensure that federal

courts only adjudicate a justiciable "case" or "controversy" that has real

consequences for the parties.  Id.; Khodara Envtl. *ex rel.* Eagle Envtl. L.P. v.

Beckman, 237 F.3d 186, 192-93 (3d Cir. 2001).

   The doctrine of standing is predicated on this case or controversy

requirement.  "[T]he standing question is whether the plaintiff has 'alleged such a

personal stake in the outcome of the controversy' as to warrant his invocation of

federal-court jurisdiction and to justify exercise of the court's remedial powers on

his behalf."  Warth v. Seldin, 422 U.S. 490, 498-99 (1975) (quoting Baker v. Carr, 369

U.S. 186, 204 (1962)).  In particular, a plaintiff must assert his or her own legal rights

and interests and cannot base his or her claims on the legal rights and interests of

third parties.  Id. at 499.

   In order to meet the "irreducible constitutional minimum of standing," the

plaintiff must show: (1) "an injury in fact—an invasion of a legally protected interest

which is (a) concrete and particularized, and (b) actual or imminent, not

'conjectural' or 'hypothetical,'" (2) "a causal connection between the injury and the

conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged

action of the defendant,'" and (3) "it must be 'likely,' as opposed to merely

'speculative,' that the injury will be 'redressed by a favorable decision.'"  Lujan v.

Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations omitted).  When

the plaintiff seeks injunctive relief, he or she must also demonstrate a "real and immediate threat of future injury by the defendant." City of Los Angeles v. Lyons, 461 U.S. 95, 101-02, 107 n.8 (1983). Any plaintiff who lacks constitutional standing is precluded from bringing suit in federal court. Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc., 454 U.S. 464, 475-76 (1982).

In the case *sub judice*, Defendants levy a facial attack upon the court's subject-matter jurisdiction, alleging that AFS cannot assert an injury in fact to establish standing because AFS no longer owns the alleged trade secrets associated with TELHS. (Doc. 35 at 10-12; Doc. 42 at 9-10; Doc. 43 at 4-5). Under the contract between AFS and VCSFA dated September 30, 2009, VCSFA "acquired legal ownership to all inventions and works by AFS" related to TELHS. (Doc. 35 at 10-11; Doc. 42 at 9; Doc. 43 at 5). Thus, Defendants contend that only VCSFA may enforce any rights or interests in TELHS. (Doc. 35 at 11; Doc. 42 at 10).

In response, AFS asserts that Defendants improperly confuse the merits of the asserted claims with the court's subject-matter jurisdiction.[1] (Doc. 47 at 11, 14-15). As AFS correctly notes, standing is a jurisdictional issue and does not depend on the merits of the plaintiff's claims. See Arbaugh v. Y&H Corp., 546 U.S. 500, 511 (2006) ("Subject matter jurisdiction . . . is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the [] law asserted as

---

[1] AFS also argues that many of its asserted claims do not depend on ownership or possession of trade secrets. (Doc. 47 at 12). However, the court need not address this argument because Defendants only challenge AFS' standing with respect to claims based on the ownership of trade secrets.

the predicate for relief—a merits-related determination." (citation omitted)); <u>Steel Co.</u>, 523 U.S. at 89 ("It is firmly established in our cases that the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, *i.e.,* the courts' statutory or constitutional *power* to adjudicate the case."); <u>Animal Science Prods., Inc. v. China Minmetals Corp.</u>, 654 F.3d 462, 466-67 (3d Cir. 2011).  The actual or threatened injury which gives rise to standing, however, may turn on the nature and source of the claims asserted.  <u>Warth</u>, 422 U.S. at 500.  For example, the injury may exist solely by virtue of the statute creating the plaintiff's legal rights.  <u>Id.</u>

The Pennsylvania Uniform Trade Secrets Act ("PUTSA") simplistically states that "a complainant is entitled to recover damages for misappropriation."  12 Pa. Cons. Stat. § 5304.  "Trade secrets" are defined as "[i]nformation, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process."  <u>Id.</u> § 5302.  Trade secrets must derive independent economic value from their confidential nature and reasonable efforts must be made to maintain such confidentiality.  <u>See id.</u>  In other words, trade secrets must be valuable precisely because those who seek to benefit from their disclosure cannot access them by proper means.  <u>See id.</u>  When trade secrets are acquired by improper means, or trade secrets are disclosed or used without express or implied consent, the plaintiff suffers an injury in fact from their misappropriation.[2]  <u>See id.</u>

---

[2] The parties' arguments regarding "legal ownership" of the alleged trade secrets, however, relate to the merits of AFS' claims.  Therefore, the court will resolve these arguments in its analysis of the Rule 12(b)(6) motions.

The court finds that AFS adequately alleges that it suffered an injury in fact and continues to face the threat of future injury from the misappropriation of its trade secrets. As a threshold matter, the complaint properly identifies the nature of the alleged trade secrets, notably the internal documentation created in the course of completing the TELHS contract. (Doc. 1 ¶ 38). Specifically, this internal documentation includes formulas, drawings, programs, devices, methods, techniques, and processes that derive independent economic value from not being generally known or available. (Id.) The documentation is kept in password-protected files on the AFS server. (Id.) AFS concedes that VCSFA acquired legal ownership to "all inventions or works" for TELHS; however, AFS alleges that it remains in lawful possession and control of its trade secrets and used them in a confidential manner consistent with its contractual obligations. (Id. ¶¶ 38-39, 103-04).

According to the complaint, AFS reasonably expected future business in the form of TELHS service and upgrade contracts using its trade secrets. (Id. ¶¶ 36, 40). However, beginning in January 2012 and continuing through November 2012, Huber, then an AFS employee, purportedly conspired with the other defendants to steal AFS' trade secrets and usurp AFS' work on TELHS and other potential projects. (Id. ¶¶ 42, 50). Indeed, the complaint specifically avers that Defendants met on-site at the MARS facility on April 12, 2012 to discuss future upgrades to TELHS. (Id. ¶¶ 54-57). Thereafter, Huber accessed the AFS server on multiple occasions to download numerous password-protected files related to various AFS

projects.  (Id. ¶¶ 58, 60).  According to the complaint, many of the copied files do not correlate with projects assigned to Huber.  (Id. ¶ 58).  For example, Huber copied a folder containing all of AFS' pending quotes for all territories and projects.  (Id. ¶ 60).  The complaint further states that Huber transmitted these files to L&H and Orbital, and that Defendants succeeded in usurping AFS' business.  (Id. ¶¶ 58, 60, 68-72).  In particular, L&H and Huber's INSYSMA received the TELHS upgrade contracts, (id. ¶¶ 68-72), and AFS has been excluded from contracts for Orbital's other commercial rocket launch sites.  (Id. ¶ 77).  Moreover, AFS faces the risk that Orbital may use the misappropriated trade secrets at other launch sites.  (Id. ¶ 78).

The complaint also asserts that Defendants stole confidential information and diverted business opportunities related to several non-TELHS projects.  (Id. ¶ 81).  AFS alleges that Huber stored information on an external drive related to the Passaic Valley Sewer and New York Power projects and altered at least four of AFS' engineering plans to place his name on the drawings.  (Id. ¶¶ 65, 96-97).  Moreover, Huber and L&H purportedly submitted a bid proposal for a U.S. Air Force Hydraulic Test Stand using one of AFS' confidential and proprietary documents about start-up procedures.  (Id. ¶¶ 82-86).

Given these detailed allegations, the court finds that the complaint includes sufficient factual assertions and that AFS has standing to bring its claims related to the misappropriation of trade secrets.

### B.    Personal Jurisdiction over Vann and Aufiero

Defendants Vann and Aufiero challenge the court's exercise of personal jurisdiction over them.[3]  (Doc. 35 at 12-13; Doc. 48 at 9-11).  Under Federal Rule of Civil Procedure 4(k)(1)(A), the court may exercise personal jurisdiction over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."  FED. R. CIV. P. 4(k)(1)(A).  In Pennsylvania, courts may typically extend personal jurisdiction over non-resident defendants "to the fullest extent allowed under the Constitution of the United States."  42 PA. CONS. STAT. § 5322(b).  Thus, "the statutory assessment of jurisdiction collapses into the constitutional one."  Clark v. Matsushita Elec. Indus. Co., 811 F. Supp. 1061, 1065 (M.D. Pa. 1993).

AFS primarily relies on the "tort out/harm in" provision of Pennsylvania's long-arm statute to establish personal jurisdiction over Vann and Aufiero.  (Doc. 47 at 17).  This provision allows the court to exercise personal jurisdiction over any non-resident defendant for "[c]ausing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth."  42 PA. CONS. STAT. § 5322(a)(4).  In its complaint, AFS sets forth detailed allegations that Vann and Aufiero conspired with the other defendants outside of Pennsylvania to misappropriate AFS' trade secrets and interfere with its business within Pennsylvania.  (Doc. 1 ¶¶ 13-14, 42, 140-44).  The court finds that the complaint

---

[3] The court notes that L&H does not dispute the court's exercise of personal jurisdiction over it as a corporate defendant.  (Doc. 48 at 10).

satisfies the requirements for personal jurisdiction pursuant to the "tort out/harm in" provision.  However, the court must also determine whether the exercise of personal jurisdiction under this provision comports with the constitutional requirements of due process.  See Pennzoil Prods. Co, v. Colelli & Assocs., Inc., 149 F.3d 197, 202 (3d Cir. 1998); Santana Prods., Inc. v. Bobrick Washroom Equip., 14 F. Supp. 2d 710, 715 (M.D. Pa. 1998).

Proceeding to the constitutional inquiry, the court's decision is guided by the familiar "minimum contacts" test established in International Shoe Co. v. Washington, 326 U.S. 310 (1945).  Under this standard, the plaintiff must show that the non-resident defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  International Shoe, 326 U.S. at 316 (internal quotations and citation omitted); see also Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007).  The focus of the minimum contacts analysis is "the relationship among the defendant, the forum, and the litigation," Shaffer v. Heitner, 433 U.S. 186, 204 (1977), specifically the extent to which the defendant has, through its contacts, "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefit and protection of its laws."  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  Physical presence within the forum state is not required to establish personal jurisdiction over the non-resident defendant.  Id. at 476.

A federal court must possess one of two forms of personal jurisdiction to comport with these principles.  See D'Jamoos *ex rel.* Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 102 (3d Cir. 2009) (citing Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414-15 (1984)).  General jurisdiction allows a court to exercise its jurisdiction over any party that possesses "systematic and continuous contacts" with the forum state, regardless of whether the claim results from the party's forum-related activities.  Helicopteros, 466 U.S. at 415 n.9; Marten, 499 F.3d at 296.  Specific jurisdiction, on the other hand, allows the court to hear claims that arise from or relate to the party's contacts with the forum state.  Helicopteros, 466 U.S. at 414 n.8; Telcordia Tech Inc. v. Telkom SA Ltd., 458 F.3d 172, 177 (3d Cir. 2006).  Here, AFS does not assert that Vann and Aufiero maintain systematic and continuous contacts with Pennsylvania to satisfy the higher standard of general jurisdiction.  Therefore, specific jurisdiction will be the sole focus of the court's personal jurisdiction analysis.

To determine whether the court has specific jurisdiction over a party, the court considers the following three factors: (1) whether the party purposefully directed its activities at the forum; (2) whether the causes of action arise out of or relate to at least one of those activities; and (3) if the first two requirements are met, the court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice.  See D'Jamoos, 566 F.3d at 102 (internal quotations and citations omitted); Marten, 499 F.3d at 296; O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 317 (3d Cir. 2007).

In the context of intentional tort claims, a plaintiff may establish minimum contacts by reference to the effects test articulated in <u>Calder v. Jones</u>, 465 U.S. 783 (1984).  Under the effects test, the plaintiff must show that (1) the defendant committed an intentional tort, (2) the tort was "expressly aimed" at the forum in which the action was brought, and (3) the forum was the "focal point of the harm" suffered.  <u>IMO Indus., Inc. v. Kiekert A.G.</u>, 155 F.3d 254, 261, 265-66 (3d Cir. 1998). To establish that the defendant expressly aimed his or her tortious conduct at the forum state, the plaintiff must identify specific activity indicating such express aim and demonstrate the defendant's knowledge that the plaintiff would suffer the brunt of the harm in the forum.  <u>Id.</u> at 266.

Application of the effects test to the instant case demonstrates that the court may exercise specific jurisdiction over Vann and Aufiero.  First, the complaint sets forth allegations that Defendants, including Vann and Aufiero, engaged in a conspiracy to misappropriate trade secrets from AFS and interfere with its business opportunities.  (<u>See</u> Doc. 1 ¶¶ 11, 13-14, 42).  Second, AFS avers that Defendants expressly aimed their conspiracy to engage in tortious conduct at AFS' headquarters located in York, Pennsylvania.  (<u>Id.</u> ¶ 16).  In fact, AFS states that it suffered harm in Pennsylvania with Defendants' knowledge and due to Defendants' intent.  (<u>Id.</u>)

AFS seeks to subject Vann and Aufiero to the court's jurisdiction as individual defendants based on the "absent co-conspirator" or "conspiracy theory" of personal jurisdiction.  (Doc. 47 at 18-19).  Under Pennsylvania law, the court may

assert personal jurisdiction over co-conspirator defendants when the plaintiff demonstrates that "substantial acts in furtherance of the conspiracy occurred in Pennsylvania and that non-forum co-conspirator was aware or should have been aware of those acts." Santana Prods., Inc., 14 F. Supp. 2d at 718; see also Arrington v. Colortyme, Inc., No. 12-264E, 2013 WL 5230728, at *9 (W.D. Pa. Sept. 17, 2013) (holding that plaintiff must plead with particularity defendant's involvement in the conspiracy and the overt acts in furtherance of which occurred in Pennsylvania and ultimately injured the plaintiff); Aluminum Bahrain B.S.C. v. Alcoa Inc., 866 F. Supp. 2d 525, 528 (W.D. Pa. 2012) (collecting cases).

The complaint asserts L&H helped Huber install a Virtual Private Network ("VPN") and e-mail connection on his AFS-issued laptop computer in furtherance of the conspiracy. (Doc. 1 ¶ 13). Thus, AFS argues that L&H "built and used an electronic tunnel" to send confidential information from AFS' Pennsylvania offices to L&H's offices in North Carolina. (Doc. 47 at 17-18). In his capacity as an AFS employee, Huber electronically accessed AFS' server in York, Pennsylvania to save numerous password-protected files regarding multiple AFS projects. (Doc. 1 ¶¶ 12, 58, 60, 96-97). According to the complaint, Huber and L&H used this confidential information to sabotage AFS' existing contract bids, including the Orbital bids, and divert prospective opportunities to L&H and INSYSMA. (Id. ¶¶ 54-57, 60-75, 81-95). In their individual capacities, Vann and Aufiero both participated in the on-site meeting at the MARS facility to discuss future upgrades to TELHS. (Id. ¶¶ 54, 56). Aufiero also exchanged e-mails with Huber regarding bidding on several projects

using AFS' confidential information.  (Id. ¶¶ 89, 95).  Lastly, L&H initiated

telephone calls to recruit key electrical engineers from AFS in York, Pennsylvania.

(Id. ¶¶ 13, 99-101).  These allegations sufficiently establish that Vann and Aufiero

had knowledge of and engaged in forum-based overt acts in furtherance of the

conspiracy.  Thus, AFS adequately alleges that Defendants intended to

misappropriate AFS' trade secrets from its York headquarters.

Vann and Aufiero assert that the court cannot maintain specific jurisdiction

over them for conduct allegedly undertaken in the exercise of their corporate

duties.  (Doc. 48 at 9-11).  Vann and Aufiero are correct that the court generally does

not have personal jurisdiction over an individual defendant whose only contacts

with the forum state are the result of his or her corporate capacity.  United Prods.

Corp. v. Admiral Tool & Mfg. Co., 122 F. Supp. 2d 560, 562 (E.D. Pa. 2000).

However, "in Pennsylvania, corporate officers and directors are liable for the

tortious acts the corporation commits under their direction or with their

participation."  Maleski by Taylor v. DP Realty Trust, 653 A.2d 54, 63 (Pa. Commw.

Ct. 1994) (citing Al–Khazraji v. St. Francis Coll., 784 F.2d 505 (3d Cir. 1986), aff'd,

481 U.S. 604 (1987)).  Thus, the corporate fiduciary shield does not apply when the

corporate officer is charged with committing a tort in his or her corporate capacity,

or violating a statutory scheme that provides for both personal and corporate

liability.  United Prods., 122 F. Supp. 2d. at 562; Nat'l Precast Crypt Co. v. Dy–Core

of Pa., Inc., 785 F. Supp. 1186, 1191 (W.D. Pa. 1992) ("A corporate agent may be held

personally liable for torts committed in the corporate capacity.").

The court typically considers three factors prior to extending personal jurisdiction over corporate officers: (1) the officer's role in the corporate structure; (2) the quality of the officer's contacts with the forum state; and (3) the extent and nature of the officer's participation in the alleged tortious conduct. See United Prods. Corp., 122 F. Supp. 2d at 562; see also Gentex Corp. v. Abbott, 3:12-CV-02549, __ F. Supp. 2d __, 2013 WL 5596307, at *9 (M.D. Pa. Oct. 10, 2013); McMullen v. European Adoption Consultants, Inc., 129 F. Supp. 2d 805, 811-12 (W.D. Pa. 2001).

The complaint states that Vann is the President of L&H and Aufiero is the hydraulic sales manager for L&H. (Doc. 1 ¶¶ 5-6). It also asserts that Vann and Aufiero established minimum contacts with the Commonwealth of Pennsylvania as co-conspirators attempting to misappropriate trade secrets and divert business opportunities from AFS in York. (Id. ¶¶ 11, 13-14, 42). The complaint further states that Vann and Aufiero participated in and directed the tortious conduct aimed at AFS' York headquarters in their official capacities at L&H. (Id. ¶¶ 14, 54-57, 89, 99-101). Based on these allegations, the court rejects the corporate fiduciary shield defense.

The court is mindful that the minimum contacts test provides "few answers . . . in black and white" and that "[t]he greys are dominant and even among them the shades innumerable." Kulko v. Superior Court of Cal., 436 U.S. 84, 92 (1978) (quoting Estin v. Estin, 334 U.S. 541, 545 (1948)); see also O'Conner, 496 F.3d at 320 (stating that no "mechanical or quantitative tests" can be used to establish personal jurisdiction). Under the present circumstances, the court nonetheless concludes

26

that AFS has established a *prima facie* case of personal jurisdiction over Vann and Aufiero.  This result comports with "traditional notions of fair play and substantial justice."  <u>International Shoe Co.</u>, 326 U.S. at 316.  In appropriate cases, the court may evaluate "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies."  <u>Id.</u> (quoting <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 292 (1980)).  In the instant matter, however, Vann and Aufiero do not "present a compelling case that the presence of [] other considerations would render jurisdiction unreasonable."  <u>See</u> <u>Burger King Corp.</u>, 471 U.S. at 477.  In fact, Vann and Aufiero have made no attempt to present compelling circumstances.  Even if Vann and Aufiero face some inconvenience due to distance from their home state of North Carolina, the court finds that the interests of AFS, the forum state, and the interstate judicial system all favor the Commonwealth of Pennsylvania as a reasonable forum for both effective relief and efficient resolution of the dispute.  <u>See</u> <u>O'Conner</u>, 496 F.3d at 324-25 ("Pennsylvania may not be the best forum—it may not even be a convenient one.  But when minimum contacts exist, due process demands no more than a reasonable forum.").  Therefore, the court will maintain personal jurisdiction over Vann and Aufiero in this case.

### C.      Required Joinder of VCSFA

In addition to jurisdictional issues, Orbital seeks to dismiss the complaint

under Federal Rule of Civil Procedure 12(b)(7), arguing that VCSFA is both a

necessary and indispensable party who cannot be joined to the instant action.  In

deciding a Rule 12(b)(7) motion, the court must determine: (1) whether the absent

party is a necessary party; (2) if so, whether it is feasible to join the absent party to

the action; and (3) if the absent party cannot be joined, whether the absent party is

indispensable.  <u>Gen. Refractories Co. v. First State Ins. Co.,</u> 500 F.3d 306, 312 (3d

Cir. 2007); <u>Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,</u> 11 F.3d 399, 404

(3d Cir. 1993).  If the absent party is indispensable, the court must dismiss the

action.  <u>Gen. Refractories Co.,</u> 500 F.3d at 312; <u>Janney Montgomery Scott,</u> 11 F.3d at

404.

Under Rule 19(a), the joinder of an absent party is necessary if feasible when:

(1) in that person's absence, the court cannot accord complete relief
among the existing parties; or (2) that person claims an interest relating
to the subject of the action and is so situated that disposing of the action
in the person's absence may: (I) as a practical matter impair or impede
the person's ability to protect the interest; or (ii) leave an existing party
subject to a substantial risk of incurring double, multiple, or otherwise
inconsistent obligations because of the interest.

FED. R. CIV. P. 19(a).  Orbital asserts that VCSFA is a necessary party because

VCSFA is the only other party to the TELHS contract with AFS "from which this

litigation stems."  (Doc. 42 at 10).  Without joining VCSFA, the instant action would

impair or impede VCSFA's ability to protect its interest in the TELHS trade secrets.

(<u>Id.</u> at 12).  Orbital would also be exposed to a substantial risk of inconsistent

obligations from a separate action by VCSFA for misappropriation of the same trade secrets.  (Id.)  Orbital acknowledges that it is not feasible to join VCSFA because the court will no longer possess subject-matter jurisdiction over this action. (Id. at 11).

The Eleventh Amendment precludes suits in law or equity commenced against a state by citizens of another state or foreign state.  U.S. CONST. amend. XI. The Supreme Court has also consistently held that a state is immune from suits by its own citizens in federal court.  See Edelman v. Jordan, 415 U.S. 651, 662-63 (1974); Hans v. Louisiana, 134 U.S. 1 (1890).

In 1995, Virginia's General Assembly passed the Virginia Commercial Space Flight Authority Act, which established VCSFA "as a public body corporate and as a political subdivision of the Commonwealth [of Virginia]."  VA. CODE ANN. § 2.2-2202.  "In the absence of express statutory or constitutional provisions waiving immunity, the Commonwealth and its agencies are immune from liability for the tortious acts or omissions of their agents and employees."  Baumgardner v. Sw. Va. Mental Health Inst., 442 S.E.2d 400, 401 (Va. 1994).  Sovereign immunity further extends to compulsory joinder of a state agency, regardless of whether such agency would be joined as an involuntary plaintiff or defendant.  See State of N.J. Dep't of Envtl. Protection v. Gloucester Envtl. Mgmt. Servs., Inc., 668 F. Supp. 404, 407 (D.N.J. 1987).  The Virginia Tort Claims Act provides a limited waiver of Virginia's sovereign immunity in its own state courts; however, "[s]uch waiver may not properly be construed as a waiver of immunity under the Eleventh Amendment to

29

the same or similar suits in federal court."  Reynolds v. Sheriff, City of Richmond,

574 F. Supp. 90, 91 (E.D. Va. 1983); see also 42 VA. CODE ANN. § 8.01-195.3; Creed v.

Virginia, 596 F. Supp. 2d 930, 938 (E.D. Va. 2009).  Therefore, assuming *arguendo*

that VCSFA is a necessary party, the Eleventh Amendment and its progeny bar the

compulsory joinder of VCSFA to the instant action.

      The court must next consider whether the action may still proceed "in equity

and good conscience" or whether VCSFA is an indispensable party requiring

dismissal of the action.  Under Rule 19(b), the four listed factors are "the most

important considerations" in determining whether to continue or dismiss a case.

Gen. Refractories Co., 500 F.3d at 319 (quoting Gardiner v. V.I. Water & Power

Auth., 145 F.3d 635, 640 (3d Cir. 1998)).  These factors are: (1) "the extent to which a

judgment rendered in the person's absence might prejudice that person or the

existing parties"; (2) "the extent to which any prejudice could be lessened or

avoided" by protective provisions in the judgment, shaping the relief, or other

measures; (3) "whether a judgment rendered in the person's absence would be

adequate"; and (4) "whether the plaintiff would have an adequate remedy if the

action were dismissed for non-joinder."  FED. R. CIV. P. 19(b).

      Turning to the first two factors, the court notes that the issue of prejudice to

the absent or existing parties overlaps with the Rule 19(a) analysis.  Gen.

Refractories Co., 500 F.3d at 320; Gardiner, 145 F.3d at 641 n.4.  Therefore, the court

will assess the Rule 19(b) factors using the Rule 19(a) framework.  The parties do

not dispute that VCSFA has an interest relating to the subject of the action, namely

legal ownership of the TELHS trade secrets.  Despite VCSFA's interest in TELHS, the court may accord complete relief among the existing parties without the joinder of VCSFA.  (See Doc. 47 at 59).  Notably, AFS alleges several independent torts based solely upon Defendants' conduct towards AFS.  These claims do not implicate the relationship between VCSFA and AFS, or VCSFA and Defendants. See Kuhn Constr. Co. v. Ocean & Coastal Consultants, Inc., 723 F. Supp. 2d 676, 687 (D. Del. 2010) ("Because the elements of negligent misrepresentation rely upon the defendants' actions, and not upon the relationship between the defendants and [their absent principal], complete relief can be granted on this count without [the absent principal].").

Orbital contends that the possibility of prejudice still exists because VCSFA cannot protect its interest in the TELHS trade secrets and Orbital will be exposed to duplicative claims by VCSFA in another forum with a risk of inconsistent outcomes.  (Doc. 42 at 12-13; Doc. 49 at 6).  Under Rule 19(a)(2)(i), with respect to the absent party's ability to protect its alleged interests, the moving party must show that "some outcome of the federal case that is reasonably likely can preclude the absent party with respect to an issue material to the absent party's rights or duties under standard principles governing the effect of prior judgments." Janney Montgomery Scott, 11 F.3d at 409.  Simply put, the court is required to join an absent party only when the effect of its judgment on the absent party is direct and immediate under the rules of claim or issue preclusion.  Id. at 407-09.

Orbital's bald assertion that VCSFA's interests will be impaired or impeded is insufficient to meet this burden.  Based on the current record, there is no indication that VCSFA has filed a suit mirroring this case against Defendants, and the parties have not notified the court of any such development.  At this stage, any prejudicial effect of a judgment based on the possibility of some future lawsuit that may or may not be filed regarding VCSFA's interests is pure speculation.  See Kuhn, 723 F. Supp. 2d at 691-92 (denying Rule 12(b)(7) motion for lack of prejudice when plaintiff had not yet filed suit against third party principal to defendant agent).

The court must also consider whether the existing parties would be subject to the risk of multiple or inconsistent obligations similar to Rule 19(a)(2)(ii).  However, as the court noted above, VCSFA has not yet filed any claim against Defendants. The possibility of an inconsistent ruling is also pure speculation.  See id. at 692 ("Again, the possibility of an inconsistent finding against [third party] and defendants is pure speculation, as no claim has yet been filed against [the third party]."); cf. Angst v. Royal Maccabees Life Ins. Co., 77 F.3d 701, 705-06 (3d Cir. 1996) (finding need to protect defendants from "needless multiple litigation" when all the necessary parties were already parties to a state court action).  Thus, the court concludes that the record does not support a finding of prejudice to VCSFA or the existing parties.

The third factor under Rule 19(b) requires the court to determine whether a judgment rendered in the absence of the non-party will be adequate.  The Third

Circuit has interpreted the third factor to include two main considerations: (1) whether the requested relief will provide an adequate remedy for the plaintiff, and (2) whether the action satisfies the "public stake in settling disputes by wholes, whenever possible."  Gen. Refractories Co., 500 F.3d at 320-21 (quoting Patterson, 390 U.S. at 111).  AFS alleges that Defendants committed numerous torts against AFS by targeting AFS' server, stealing AFS' trade secrets, and using the trade secrets to divert AFS' business opportunities.  Although the parties agree that VCSFA has legal ownership of some of the alleged trade secrets, AFS' claims are not predicated on its relationship with VCSFA.  Rather, AFS seeks injunctive relief and compensatory and punitive damages solely for Defendants' tortious conduct towards AFS.  For these reasons, the court finds that the requested relief will provide AFS with an adequate remedy and resolve the entire dispute.

Application of the fourth factor to the instant case yields the most compelling basis for rejection of Orbital's Rule 12(b)(7) motion.  If the court were to dismiss this action for failure to join VCSFA, AFS would be deprived of a forum in which to bring its claims against Defendants.  As previously discussed, VCSFA is protected from involuntary joinder to any action in both state and federal courts as a result of sovereign immunity.  Based on the analysis of the Rule 19(b) factors, the court concludes that VCSFA is not an indispensible party and that the instant action may proceed "in equity and good conscience" with the existing parties.

33

### D.    Transfer under Section 1404(a)

Alternatively, Orbital moves to transfer the instant action to the U.S. District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a).  (Doc. 42 at 22-24).  Section 1404(a) provides for the transfer of an action to another forum based on "the convenience of the parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a).  This standard takes into account both the "private interests" of the parties and the "public interest" in the fair and efficient administration of justice.  Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09 (1947).

To evaluate a Section 1404(a) motion, the court must first determine whether the action could have been brought in the proposed transferee forum.  See Jumara, 55 F.3d at 879; High River Ltd. P'ship v. Mylan Labs., Inc., 353 F. Supp. 2d 487, 492 (M.D. Pa. 2005).  Venue is proper in "a judicial district in which any defendant resides" if all defendants are reside in the same state, or in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b).  Orbital argues that the Eastern District of Virginia would be an appropriate venue in this case because all of the parties to this action are subject to its jurisdiction and most of the evidence associated with TELHS is located in Virginia.  (Doc. 42 at 24).  AFS does not dispute this argument.

Assuming *arguendo* that venue is proper in the Eastern District of Virginia, the court must then weigh "all relevant factors" to determine "whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." Jumara, 55 F.3d at 879 (citation omitted).

34

The court considers the following private interest factors: (1) the plaintiff's choice of forum; (2) the defendant's forum preference; (3) where the claims arose; (4) convenience of the parties as indicated by their physical and financial condition; (5) convenience of the witnesses (to the extent that they may be unavailable for trial in one of the fora); and (6) location of books and records. Id. As a general rule, "a plaintiff's choice of forum is a paramount consideration in any determination of a transfer request, and that choice should not be lightly disturbed." Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970) (internal quotations and citation omitted); see also Lony v. E.I. du Pont de Nemours & Co., 886 F.2d 628, 633 (3d Cir. 1989) ("[G]reat deference is accorded a plaintiff's choice of forum.").

The court first notes that AFS' choice of venue is clearly proper because AFS alleges that the present claims arose at its corporate headquarters located in the Middle District of Pennsylvania. (Doc. 47 at 64-65). Second, despite Orbital's preference for the Eastern District of Virginia, none of the other five defendants are residents of Virginia, nor will the other defendants reap the benefits of greater convenience from such a transfer. Both factors thus counsel against transfer.

The crux of the parties' arguments is whether the claims arose and the related evidence is located in the Middle District of Pennsylvania or the Eastern District of Virginia. AFS argues that the Middle District of Pennsylvania is most relevant to this action because, as noted above, AFS' claims are based on the misappropriation of its trade secrets from its headquarters in York. (Id. at 64-66). In contrast, Orbital contends that this action stems from the TELHS contract.

35

Therefore, the location of Orbital's corporate headquarters and TELHS, as well as the choice of law and venue provisions in the TELHS contract weigh in favor of transfer to the Eastern District of Virginia.  (Doc. 42 at 23-24).  Upon reviewing the complaint, the court finds that the instant action is based on the misappropriation of trade secrets from AFS' headquarters in York, Pennsylvania and not the TELHS contract.  As a result, the provisions of the TELHS contract and the physical location of TELHS have no bearing on the court's decision to transfer this action.

As to the convenience of witnesses, Orbital argues that many of its employees will likely be witnesses, but none of its employees reside or work in Pennsylvania.  (Id.)  In order to demonstrate inconvenience, however, Orbital must "specify the key witnesses to be called and make a general statement of what their testimony will cover."  Hillard, 76 F. Supp. 2d at 571; see also Rosen v. Fid. Fixed Income Trust, 1995 WL 560037, at *4 (E.D. Pa. Sept. 20, 1995) ("The moving party must show the number of witnesses involved, the location of witnesses, the materiality of the testimony, and the importance of the witnesses to [its] business.").  The court finds that Orbital entirely fails to meet its burden.  Orbital does not provide any estimate of the number of witnesses, any names of specific witnesses, or any information regarding their testimony.  Moreover, as the court previously stated, bald assertions of inconvenience are insufficient to justify transfer under Section 1404(a).  See Constr. Specialists, Inc. v. Ed Flume Building Specialists, Ltd., No. 4:05CV1863, 2006 WL 42181, at *4-5 (M.D. Pa. Jan. 6, 2006).  Accordingly, the factor regarding inconvenience to witnesses weighs against transfer.

36

Lastly, the location of books and records is a neutral factor in this case. "[T]he technological advances of recent years have significantly reduced the weight of this factor." Lomanno v. Black, 285 F. Supp. 2d 637, 647 (E.D. Pa. 2003) (citation omitted). The court notes that there is no indication that the relevant records and documents cannot be transmitted electronically. See id.

Thus, at most, Orbital argues that its own convenience should take precedence over not only AFS' choice of forum, but also the convenience of all of its co-defendants. A Section 1404(a) transfer is not appropriate merely to shift inconvenience to other parties. Murphy v. Trans Union, LLC, No. 12-499, 2012 WL 3536322, at *4 (E.D. Pa. Aug. 15, 2012); Residex Corp. v. Farrow, 374 F. Supp. 715, 722 (E.D. Pa. 1974), aff'd, 556 F.2d 567 (3d Cir. 1977). On balance, the court concludes that the private factors do not support transferring the instant action to the Eastern District of Virginia.

Turning to the public interest factors, the court will consider: (1) the enforceability of the judgment; (2) practical considerations in conducting trial; (3) relative administrative difficulty in the two fora resulting from court congestion; (4) local interest in deciding local controversies at home; (5) public policies of the two fora; and (6) the court's familiarity with the applicable state law in diversity cases. Jumara, 55 F.3d at 879-80. None of the first three factors affect the court's decision. There is no concern regarding the enforceability of this court's judgments, nor is there a significant difference in court congestion or expense between the two fora. (See Doc. 47 at 73-74). Orbital also does not contend that the

37

public policies of the two fora support a change in venue.  With respect to the local interest, however, Pennsylvania clearly has a strong public interest in adjudicating the claims of its residents arising from alleged tortious conduct within its borders. (See id. at 73).  Moreover, the court notes that eight of the ten claims in the instant action are based on Pennsylvania law and the remaining two claims arose under federal law.  (See id.)  Although four of the six public factors do not affect the court's conclusion, the court finds that the local interest and familiarity with the applicable state law both weigh against transfer.

Upon balancing all of the relevant private and public factors, the court concludes that the Eastern District of Virginia is not a more convenient forum for the instant action.  The court will therefore deny Orbital's motion to transfer pursuant to 28 U.S.C. § 1404(a).

## IV.   <u>Conclusion</u>

For all of the foregoing reasons, the court will deny Defendants' motions to dismiss (Docs. 28, 32, 33) in part and reserve ruling on the remaining issues.

An appropriate order follows.


   /S/ Christopher C. Conner
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:      May 7, 2014