**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ADVANCED FLUID SYSTEMS, INC., | : | CIVIL ACTION NO. 1:13-CV-3087 |
| | : | |
| Plaintiff, | : | (Chief Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| KEVIN HUBER, INSYSMA | : | |
| (INTEGRATED SYSTEMS AND | : | |
| MACHINERY, LLC), LIVINGSTON & | : | |
| HAVEN, LLC, CLIFTON B. VANN IV, | : | |
| and THOMAS AUFIERO, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

Plaintiff Advanced Fluid Systems, Inc. ("AFS") filed the above-captioned

action seeking injunctive relief and compensatory and punitive damages based

upon violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, the Computer Fraud

and Abuse Act, 18 U.S.C. § 1030, and the Pennsylvania Uniform Trade Secrets Act,

12 PA. CONS. STAT. § 5301 *et seq.*, along with various common law claims.  Before the

court are two motions filed by Livingston & Haven, LLC ("L&H"), Clifton B. Vann

IV, and Thomas Aufiero, (Doc. 28), and Kevin Huber and Integrated Systems and

Machinery, LLC ("INSYSMA") (Doc. 33),[1] seeking dismissal of AFS's amended

complaint in its entirety.  In a memorandum and order (Docs. 53-54) dated May 7,

---

[1] Orbital Sciences Corporation ("Orbital") also filed a motion to dismiss.
(Doc. 32).  On May 21, 2014, AFS filed a stipulation of dismissal advising the court
that AFS has settled the action with Orbital alone and seeking dismissal with
prejudice of Orbital as a defendant.  (Doc. 37).  On May 22, 2014, the court approved
the stipulation and dismissed all claims against Orbital.  (Doc. 62).

2014, the court rejected defendants' arguments related to subject-matter

jurisdiction, personal jurisdiction, compulsory joinder, and transfer under 28 U.S.C.

§ 1404(a).  This memorandum will assess the parties' arguments under Federal Rule

of Civil Procedure 12(b)(6).  For the reasons that follow, the court will grant in part

and deny in part the motions.

## I.   <u>Factual Background and Procedural History</u>[2]

### A.   Parties

Plaintiff AFS is a Pennsylvania corporation that designs, assembles, and

installs hydraulic systems that use pressurized fluids to move heavy machinery for

complex operations.  (Doc. 65 ¶ 1).  Relevant to the instant action, AFS created the

Transporter/Erector/Launcher/Hydraulic System ("TELHS") for the Mid-Atlantic

Regional Spaceport ("MARS") on Wallops Island, Virginia, pursuant to a contract

with the Virginia Commercial Space Flight Authority ("VCSFA") dated September

30, 2009.  (<u>Id.</u>)  Under the TELHS contract, VCSFA hired AFS to "provide the

complete specification, engineering drawings, analyses, testing requirements,

operating descriptions, interfaces with other launch facility systems and all related

engineering and professional design services to develop the final and complete

design for the Antares' [sic] rocket['s] hydraulic motion control system."  (<u>Id.</u> ¶ 26).

---

[2] In accordance with the standard of review for a Rule 12(b)(6) motion to dismiss, the court will "accept all well-pleaded facts in the complaint as true and view them in the light most favorable" to AFS.  Carino v. Stefan, 376 F.3d 156, 159 (3d Cir. 2004).

Orbital is the developer of the Antares rocket and agreed to launch the rocket from the MARS facility upon construction of the facility and the purchase of certain hardware, including TELHS.  (Id. ¶ 25). AFS successfully designed, assembled, and installed TELHS at the MARS facility, and the first test launch of the Antares rocket took place in February 2013.  (Id. ¶¶ 29-31).  In the process of completing the contract, AFS generated substantial internal documentation, including thousands of engineering drawings and diagrams and proprietary software code, which are kept in password-protected electronic files on AFS's server.  (Id. ¶ 36).  VCSFA acquired "legal ownership to all inventions or works" created under the contract, but AFS remained in physical possession and control of the trade secrets and continued to used them in a confidential manner to fulfill its obligations.  (Id. ¶ 37). When necessary, AFS provided Orbital with certain confidential information to help integrate TELHS with the Antares rocket.  (Id.)

During AFS's performance of the TELHS contract, defendant Kevin Huber served as AFS's main point of contact with Orbital.  (Id. ¶ 44).  From November 2006 until October 26, 2012, AFS employed Huber as a full-time salesman and engineer.  (Id. ¶ 2).  Defendant Thomas Aufiero, the head of AFS's sales force and a key member of AFS's management team, hired and supervised Huber until Aufiero resigned from AFS in January 2011.  (Id. ¶¶ 40-41).  Aufiero is now the hydraulic sales manager for defendant L&H, a North Carolina company that also designs, assembles, and installs hydraulic fluid systems and competes with AFS in the national market.  (Id. ¶¶ 4, 6, 39).  In his capacity as a salesman and engineer, Huber

3

had access to AFS's confidential information, including complete sets of drawings, diagrams, and other documents generated in connection with numerous projects. (Id. ¶ 43).  Huber also had access to AFS's component and labor costs as well as AFS's quotes for all of its projects.  (Id. ¶¶ 43, 58).

On October 9, 2012, Huber announced his resignation from AFS and officially left his position on October 26, 2012.  (Id. ¶ 45).  When AFS finally retrieved Huber's company-issued laptop computer and cell phone, AFS determined that Huber had attempted to erase all data from both devices.  (Id. ¶¶ 45-46).  Upon restoring the deleted information, AFS ostensibly discovered that Huber was working with the L&H defendants as early as January 2012 while he was a full-time AFS employee. (Id. ¶ 47).

### B.   Conspiracy Among Defendants

AFS avers that defendants conspired to gain access to AFS's confidential information through Huber and to use that confidential information for the purpose of diverting business from AFS.  (Id. ¶¶ 10, 40).  According to AFS, Huber first accessed AFS's server and email system in November 2011 to send L&H photographs and videotapes of the Antares rocket test launches using TELHS.  (Id. ¶ 66).  In January 2012, L&H granted Huber access to L&H's private network through a Virtual Private Network ("VPN") connection and password.  (Id. ¶ 49). L&H also set up an email address for Huber in its internal email system.  (Id. ¶ 51). On April 12, 2012, Huber organized a secret meeting at the MARS facility with L&H, including Clifton Vann, president of L&H, and Aufiero.  (Id. ¶¶ 5, 52).

4

According to several deleted emails, the purpose of the meeting was to discuss future upgrades to TELHS.  (Id. ¶¶ 52-55).  In its pleadings, AFS sets forth detailed allegations regarding actions taken by defendants in furtherance of the conspiracy.

### C.    Stealing Confidential Information

AFS asserts that, beginning in September 2012, Huber accessed AFS's server and downloaded numerous files that did not correlate to any project on which he was working.  (Id. ¶ 56).  In October 2012, after he announced his resignation, Huber began saving significant amounts of confidential information to an external drive.  (Id. ¶ 58).  In particular, AFS discovered that Huber stored information about two of his past projects—the Passaic NJ Valley Sewer and New York Power projects— as well as a folder containing all pending AFS quotes.  (Id. ¶¶ 58, 92-93).  AFS alleges that Huber transmitted this confidential information to L&H.  (Id. ¶¶ 56, 58).

On October 18, 2012, Huber formed a company called INSYSMA with offices in New York and Connecticut.  (Id. ¶¶ 3, 57).  AFS claims that Huber duplicated at least four AFS drawings of engineering plans and re-signed them for INSYSMA with his own initials.  (Id. ¶ 64).  The INSYSMA website displays a photograph of a successful launch of the Antares rocket using TELHS on September 18, 2013.  (Id. ¶ 74).  The website does not attribute TELHS to AFS.  (Id.)  Rather, the website states that INSYSMA is currently working with Orbital in support of current and upcoming launches, thereby falsely implying to viewers that INSYSMA designed and installed TELHS.  (Id.)

Lastly, AFS asserts that, in February or March 2012, L&H attempted to recruit AFS's top electrical engineers, Tom Reiker and Larry Quickel. (Id. ¶¶ 95-97). L&H called Reiker in York, Pennsylvania and offered him a position, which Reiker declined. (Id. ¶ 95). Huber also spoke in person with Quickel, AFS's chief electrical engineer, on multiple occasions to entice him to leave AFS and join L&H. (Id. ¶ 96). In April 2013, after the successful launch of the Antares rocket, Huber called Reiker again to "congratulate" him, (id. ¶ 97), but Huber also informed Reiker that AFS would not be receiving any more upgrade work on the Antares rocket. (Id.) According to AFS, Reiker's congratulatory call was pretense to Huber's news of work stoppage, a transparent, second attempt to encourage Reiker to join L&H. (Id.)

### D.   Usurping Business Opportunities

In addition to stealing confidential information, AFS avers that the purpose of the alleged conspiracy was to divert AFS's business opportunities related to TELHS and other projects. (Id. ¶ 40). AFS details each of these attempts in its amended complaint.

### i.   *Business Related to TELHS*

AFS claims that, in September 2012, Huber submitted an unusually high bid on behalf of AFS for upgrades to TELHS's gripper arms. (Id. ¶ 60). According to AFS, Huber secretly and simultaneously submitted a substantially lower bid on behalf of L&H for the same project. (Id. ¶ 61). As a result, L&H and INSYSMA received Orbital's contract for the gripper arms upgrade. (Id. ¶ 67). When Orbital

6

later decided to move forward with a $4 million upgrade to the entire TELHS

system, (see id. ¶ 68), Huber sent Orbital an informal quote on behalf of L&H and

INSYSMA, as agent of the S3 Group at L&H.  (Id. ¶¶ 61-63, 69).  AFS alleges that

Jim Vaughn, president of AFS, repeatedly informed Orbital that AFS wanted to bid

on all upgrades and all training and maintenance contracts.  (Id. ¶ 71).

Unsurprisingly, L&H and INSYSMA were awarded the contract for the complete

TELHS upgrade.  (Id. ¶ 71).

As part of the complete upgrade, Huber contacted Maritime Hydraulic, a

cylinder manufacturer with whom AFS maintains a non-disclosure agreement.  (Id.

¶ 65).  Huber sought a quote on new cylinders.  (Id. ¶ 72).  Kim Carruthers, the

owner of Maritime Hydraulic, informed Huber that all information related to the

cylinders for TELHS was AFS's proprietary information.  (Id.)  Notwithstanding

this response, INSYSMA placed an order with Maritime Hydraulic for two new

cylinders for the TELHS upgrade.  (Id. ¶ 73).  According to the amended complaint,

the cylinders are now close to completion.  (Id.)  In light of these events, AFS alleges

that it has been shut out of all future work with Orbital at other launch sites as well

as VCSFA's plan to further develop the MARS facility for Orbital and other

commercial space clients.  (Id. ¶¶ 75-76; see also id. ¶¶ 22, 34, 38).

### ii.   *Other Business Opportunities*

AFS also alleges that defendants usurped several non-TELHS business

opportunities.  (Id. ¶ 77).  First, as early as November 2011, Huber emailed L&H

regarding plans for a potential bid on a U.S. Army TACOM Hydraulic Manifold and

suggested submitting the bid proposal through Rexroth, L&H's principal supplier and AFS's largest competitor.  (Id. ¶ 91).  Second, in December 2011, Huber and Aufiero at L&H exchanged emails regarding a U.S. Navy Hydraulic Test Stand project.  (Id. ¶¶ 85-86).  Huber subsequently sent numerous communications to the U.S. Navy as well as an independent engineering and testing laboratory on behalf of L&H.  (Id. ¶¶ 87-89).  Huber requested extensive information in support of a potential bid on the Navy Hydraulic Test Stand project from Harry Kahn Associates, who submitted a presentation under the mistaken impression that AFS had requested the information.  (Id. ¶ 90).

Finally, in June 2012, Huber sent L&H a detailed bid proposal for a U.S. Air Force Hydraulic Test Stand, listing Huber as the project manager for L&H.  (Id. ¶ 78).  Huber listed Orbital as a reference for L&H's capabilities and represented that L&H designed, fabricated, and installed TELHS on Wallops Island.  (Id. ¶¶ 80-81).  In addition, Huber sent the U.S. Air Force a document containing the start-up procedures for TELHS, which clearly states that the document was "originated by and is the property of Advanced Fluid Systems."  (Id. ¶ 82).  In an attempt "to disguise and misrepresent AFS's role," Huber informed the Air Force that AFS was merely a subcontractor that generated certain technical documents on behalf of L&H.  (Id.)  Thus, L&H and Huber, who acted as L&H's agent while a full-time AFS employee, prevented AFS from pursuing these business opportunities.  (Id. ¶ 84).

### E.     Procedural History

On December 24, 2013, AFS filed a complaint against defendants, alleging violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Pennsylvania Uniform Trade Secrets Act, 12 PA. CONS. STAT. § 5301 *et seq.*, in addition to various common law claims.  (Doc. 65). On February 14, 2014, AFS requested a preliminary injunction to prevent defendants from working on upgrades to TELHS and constructing additional hydraulic launch systems using AFS's alleged trade secrets.  (Doc. 29).  Defendants simultaneously filed the instant motions to dismiss.  (Docs. 28, 33).  The court denied the motions to dismiss on jurisdictional and compulsory joinder grounds and the motion to transfer, but reserved ruling on the motions to dismiss pursuant to Rule 12(b)(6).  (Docs. 53-54).  AFS filed the now operative amended complaint on May 29, 2014.  (Doc. 65).

## II.   <u>Legal Standard</u>

The court's jurisdiction in the instant matter is premised on both its power to decide questions of federal law and to hear claims by parties of diverse citizenship for amounts in controversy exceeding $75,000.  <u>See</u> 28 U.S.C. §§ 1331, 1332(a).  The court may also exercise supplemental jurisdiction over the state law claims because they are related to and share a common nucleus of operative facts with the federal law claims, thus forming part of the same case or controversy.  <u>See</u> <u>id.</u> § 1367; <u>also</u> <u>Lyon v. Whisman</u>, 45 F.3d 758, 759-60 (3d Cir. 1995) (quoting <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725 (1966)).

9

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009) (quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)); see also Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007) (quoting Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005)).  In addition to reviewing the facts contained in the complaint, the court may also consider "matters of public record, orders, exhibits to the complaint and items appearing in the record of the case." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court must conduct a three-step inquiry.  See Santiago v. Warminster Twp., 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the

factual and legal elements of a claim should be separated; well-pleaded facts must be accepted as true, while mere legal conclusions may be disregarded. Id.; see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 555 (requiring plaintiffs to allege facts sufficient to "raise a right to relief above the speculative level"). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. When the complaint fails to present a *prima facie* case of liability, courts should generally grant leave to amend before dismissing a complaint. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000).

## III. <u>Discussion</u>

Defendants set forth five principal arguments in their Rule 12(b)(6) motions. First, defendants assert that AFS cannot pursue a claim for misappropriation of trade secrets because it no longer owns the trade secrets at issue. Second, defendants argue that Pennsylvania's trade secret statute preempts AFS's common law claims for unjust enrichment, unfair competition, conversion, conspiracy, and aiding and abetting a breach of fiduciary duty. Third and fourth, respectively, defendants contend that AFS does not adequately allege claims under the federal Computer Fraud and Abuse Act or the Lanham Act. Finally, defendants argue that

11

AFS cannot maintain a common law claim for tortious interference with

contractual relations.  The court addresses each of these issues *seriatim*.

### A.      PUTSA and Trade Secret Ownership Requirements

In its amended complaint, AFS asserts a statutory claim for misappropriation

of trade secrets under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12

PA. CONS. STAT. § 5301 *et seq.*, averring that defendants willfully misappropriated,

retained, and used AFS's trade secrets, namely "drawings, diagrams, and

documentation" used in AFS's projects.  (Doc. 65 ¶¶ 98-102).  Defendants assert that

AFS cannot maintain a misappropriation claim because AFS assigned "legal

ownership to all inventions or works" created under the TELHS contract to

VCSFA.  (See Doc. 35 at 10-12, 15; Doc. 43 at 4-5).  According to defendants, this

assignment vitiates any interest AFS purportedly had in the subject trade secrets.

(See Doc. 35 at 10-12, 15; Doc. 43 at 4-5).  AFS responds that "ownership," in its

traditional sense, is not a prerequisite to a successful PUTSA claim.  (Doc. 47 at 23-

28).  The parties concede that few courts have spoken on the issue.  Neither the

Commonwealth's courts nor the Third Circuit Court of Appeals have addressed the

question.

The language of PUTSA itself offers little guidance with respect to whether a

plaintiff must prove ownership before a court may accord relief.  PUTSA defines

misappropriation to include "acquisition of a trade secret of another by a person

who knows or has reason to know that the trade secret was acquired by improper

means." 12 Pa. Cons. Stat. § 5302.  It further defines "trade secret" as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other person who can obtain economic value from its disclosure or use.
>
> 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Id. On its face, the statute does not ascribe defendants' suggested ownership limitation to its definition of "trade secret"; it merely proscribes misappropriation of the "trade secret *of another*." Id. (emphasis added).  Neither the commentary to the uniform law nor PUTSA's legislative history include any specific reference to legal ownership of the trade secrets as a prerequisite to a cause of action.[3] Cf. RMS Software Dev., Inc. v. LCS, Inc., No. 01-96-00824-CV, 1998 Tex. App. LEXIS 1053, at *10-11 (Tex. Ct. App. 1998) (holding that ownership is required when statute at issue clearly referenced protection of the secret by "the owner thereof" and required "the owner" to take measures to prevent the secret from becoming known "to persons other than those selected by the owner").

---

[3] In fact, the commentary to the uniform law contemplates multiple owners of a single trade secret, specifically observing that when "more than one person is entitled to trade secret protection with respect to the same information, only that one from whom misappropriation occurred is entitled to a remedy." Uniform Trade Secrets Act §§ 2, cmt. 3 (2005).

The parties thus turn to judicial interpretations of PUTSA (and its corresponding provisions as adopted by other jurisdictions) for support.  AFS directs the court to a decision of the Fourth Circuit Court of Appeals as support for its contention that ownership is not required to sustain a PUTSA claim.  In DTM Research, LLC v. AT&T Corp., 245 F.3d 327 (4th Cir. 2001), a Fourth Circuit panel affirmed the district court's conclusion that "fee simple ownership is not an element of" statutory misappropriation claims under the Maryland Trade Secrets Act, the language of which mirrors PUTSA.  Id. at 330-33.  DTM Research ("DTM") accused AT&T Corporation ("AT&T") of misappropriating DTM's trade secrets as disclosed to AT&T during contract negotiations for a data mining project. Id. at 329. Specifically, DTM offered its "Orca Blue" data mining process to AT&T and implemented a demonstration of Orca Blue in a limited test market in San Diego. Id. at 329-30.  DTM required all AT&T personnel evaluating Orca Blue to sign confidentiality agreements before disclosing its trade secrets.  Id.  After the demonstration, AT&T concluded that the price for Orca Blue was too high; it elected to use in-house services instead.  Id. at 330.  DTM brought suit, alleging that AT&T discontinued negotiations only after it had accessed DTM's trade secrets to enhance its own technology.  Id.  DTM asserted claims for, inter alia, misappropriation of trade secrets under the uniform act as adopted in Maryland.

AT&T defended the suit by asserting that DTM itself had misappropriated all or some of Orca Blue from the United States.  See id.  AT&T subpoenaed various government agencies and commercial entities in support of its defense, but the

14

United States intervened and moved to quash the subpoenas, asserting the state

secrets privilege.  <u>Id.</u>  When the court granted the motion to quash, AT&T moved

for summary judgment on the basis that the court's order prevented it from fairly

defending the claims against it.  <u>Id.</u>  The court denied that motion, but certified two

questions to the Fourth Circuit Court of Appeals.  Relevant to this action, the court

asked whether it correctly held "that fee simple ownership is not an element of . . .

a violation of the Maryland Trade Secrets Act."  <u>Id.</u>

The Fourth Circuit Court of Appeals agreed that fee simple ownership is not

a prerequisite to recovery for misappropriation.  <u>Id.</u> at 332-33.  Expounding upon

the nature and purpose of trade secret laws, the panel observed as follows:

> [T]he question of whether "fee simple ownership" is an
> element of a claim for misappropriation of a trade secret
> may not be particularly relevant in this context.  While
> trade secrets are considered property for various
> analyses, the inherent nature of a trade secret limits the
> usefulness of an analogy to property in determining the
> elements of a trade-secret misappropriation claim.  The
> conceptual difficulty arises from any assumption that
> knowledge can be owned as property.  The "proprietary
> aspect" of a trade secret flows, not from the knowledge
> itself, but from its secrecy.  It is the secret aspect of the
> knowledge that provides value to the person having the
> knowledge.  While the information forming the basis of a
> trade secret can be transferred, as with personal property,
> its continuing secrecy provides the value, and any general
> disclosure destroys the value.

<u>Id.</u> at 329 (internal citations omitted).  In other words, it is the possession of the

secret, not the possession of some abstract or academic legal right of ownership in

the secret, which is proprietary and which entitles the possessor to trade secret

protection.[4] See id.  Given this understanding of the inherent nature and value of

trade secrets, the court held that "one 'owns' a trade secret when one knows of it,

as long as it remains a secret."  Id.  The court concluded that DTM may prevail on

its claim if it demonstrates that: (1) it possesses secret information satisfying the

definition of trade secret and (2) AT&T misappropriated that information by

improper means.  Id.

Several courts have followed DTM in the thirteen years since the opinion

issued.  For example, in Metso Minerals Industries, Inc. v. FLSmidth-Excel LLC,

(E.D. Wis. 2010), plaintiff Metso Mineral Industries ("Metso"), was in the business

of manufacturing and selling high performance conical rock crushers.  Id. at 970.

Metso "sold all of the engineering, design information, and intellectual property

rights" for a particular model to a separate company located in France, but

reserved for itself the "non-exclusive, royalty-free right to continue to use the

technology for service and warranty repair for the products sold by Metso."  Id. at

971.  Metso brought suit against two former employees and its competitor, alleging

that the employees had conspired with the competitor to misappropriate  its trade

secrets and enhance the competition's conical rock crusher to Metso's detriment.

Id.  The defendants responded that because Metso did not "own" the trade secrets

---

[4] As a practical matter, the court notes that a contrary holding would
preclude any technical business for hire from protecting its know-how under
PUTSA.  By their very nature, such businesses grow from maintaining and building
upon their past contracts with their customers.  Requiring legal ownership of the
intellectual property stemming from these relationships would vitiate the purpose
of PUTSA.

at the time of the alleged misappropriation, Metso did not have standing to sue the defendants.[5]

The district court, like the <u>DTM</u> court, framed the question as presented to the court *sub judice*: whether the statute "requires that a plaintiff 'own' the trade secret in order to bring suit for the trade secret's misappropriation." <u>Id.</u> at 972.  To answer this question, the court first turned to the statutory language and noted that the phrase "of another" does not necessarily connote ownership.  <u>Id.</u> at 972-73 (observing that "the phrase 'of another' on its face simply describes the relationship between the misappropriator and the trade secret – namely, that the trade secret belongs to one other than the misappropriator").  Finding no helpful resolution in the language of the statute, the court turned to an analysis of caselaw in reaching its ultimate conclusion.

The <u>Metso</u> court ultimately applied <u>DTM</u>.  It rejected defendants' arguments that trade secret law must necessarily mirror patent infringement law, which precludes non-exclusive licensees from bringing an infringement suit.  <u>Id.</u> at 976-78. The court's analysis speaks compellingly to the nature of a trade secret claim, and the reason that traditional property law ownership concepts are rejected by trade secret law: it observed that "misappropriation of a trade secret is not only an intrusion on property, *it is also a breach of confidence*."  <u>Id.</u> at 977 (emphasis added)

---

[5] The <u>Metso</u> court considered the ownership issue to be jurisdictional and approached it from a standing perspective. This court has previously concluded that the parties' ownership arguments are more appropriately considered pursuant to Rule 12(b)(6) as part of the court's merits analysis.

(citing Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 481-82 (1974) ("The maintenance of standards of commercial ethics and encouragement of invention are the broadly stated policies behind trade secret law."); Abbott Labs. v. Norse Chem. Corp., 147 N.W. 2d 529, 533 (Wis. 1967) ("The basis of the doctrine of trade secret law is an attempt to enforce morality in business.")).  The Metso court thus held that Wisconsin's version of the uniform act "does not expressly require trade secret ownership in order to bring suit for misappropriation."  Id. at 978.

As the Metso court observed, several other courts have echoed DTM's holding.  Id. (citing Fast Capital Mktg., LLC v. Fast Capital LLC, No. H-08-2142, 2008 U.S. Dist. LEXIS 103988 (S.D. Tex. Dec. 24, 2008); DaimlerChrysler Serv. v. Summit Nat'l, No. 02-71871, 2006 U.S. Dist. LEXIS 32049 (E.D. Mich. May 22, 2006); Parking Co. v. Rhode Island Airport Corp., No. P.B. 2004-4189, 2005 R.I. Super. LEXIS 37 (R.I. Super. Ct. 2005); In re Cayman Island Firm of Deloitte & Touche, No. 04-01-00491-CV, 2001 Tex. App. LEXIS 6214 (Tex. Ct. App. Sept. 12, 2001)).  In DaimlerChrysler, the district court rejected a counterclaim defendant's argument that "the key concept is ownership, not physical possession," and cited DTM for the proposition that "for purposes of trade secrets law, the focus is appropriately on knowledge, or possession, of the trade secret, rather than on mere 'ownership' in the traditional sense of the word."  DaimlerChrysler, 2006 U.S. Dist. LEXIS 32049, at *21-27.  Because the defendant never physically possessed the code at issue and thus could not capitalize on its secrecy, the court dismissed its misappropriation counterclaim.  Id.  In Parking Co., the state court considered whether certain

18

financial data provided by a parking garage lessor to a lessee constituted a trade secret of the lessee when the leasing agreement designated that information as proprietary and confidential to the lessor.  Parking Co., 2005 R.I. Super. LEXIS, at *1-6.  The court adopted DTM, concluding that "it is possession, not ownership or title, which is the relevant inquiry." Id. at *11-14 (holding that because lessee "'possessed' the . . . financial data as soon as it was delivered . . . the data could be the subject of a trade secret misappropriation claim . . . independent of whether [the lessor] could be considered to have owned the data . . .").  At least two other courts have endorsed the DTM rationale.  See Fast Capital Mktg., 2008 U.S. Dist. LEXIS 103988, at *40-41 ("Courts confronting the question of whether possession or ownership is required in a trade secrets misappropriation claim have rejected the argument that traditional ownership is required to prevail."); In re Cayman Island Firm of Deloitte & Touche, 2001 Tex. App. LEXIS 6214, at *5-8 (holding with reliance on DTM that both possessors and owners of trade secrets may assert evidentiary trade secret privilege).  Suffice it to say that substantial authority weighs in favor of AFS's position.[6]

Defendants respond to the caselaw offered by AFS with reliance on the common law principles of ownership that marked the law of misappropriation

---

[6] The relevant language of the uniform state laws at issue in DaimlerChrysler and Parking Co. directly tracks the language of the PUTSA at issue here.  Compare MICH. COMP. LAWS § 445.1902(d); R.I. GEN. LAWS § 6-41-1(4) with 12 PA. CONS. STAT. § 5302.  New York and Texas had not adopted the uniform act at the time of their state court's respective decisions, which are based on common law definitions of the term "trade secret."

prior to the enactment of PUTSA.  (Doc. 48 at 4 (citing <u>Varo, Inc. v. Corbin Mfg. Co.</u>,

50 F.R.D. 376 (E.D. Pa. 1970)); Doc. 50 at 7-8 (citing <u>Choice-Intersil Microsystems,</u>

<u>Inc. v. Agere Sys., Inc.</u>, No. 02-8219, 2004 U.S. Dist. LEXIS 6688 (E.D. Pa. Apr. 12,

2004))[7]; <u>Gruenwald v. Advanced Computer Apps., Inc.</u>, 730 A.2d 1004, 1012-13 (Pa.

Super. Ct. 1999))).  Defendants urge the court to construe PUTSA with guidance

from Pennsylvania common law, which traditionally referenced legal "ownership"

when resolving misappropriation claims.  Many of these cases, and the principles

articulated therein, were rejected by <u>DTM</u> and its progeny.  These more recent

cases distinguish cursory references to "ownership" in common law cases after

comprehensive analysis of the hybrid-interest nature of trade secrets, concluding

that the knowledge-driven value of trade secrets compels a possession-based theory

of liability rather than a purely ownership-based theory.  <u>See</u> <u>DTM</u>, 245 F.3d at 329

("The "proprietary aspect" of a trade secret flows, not from the knowledge itself,

but from its secrecy."); <u>Metso</u>, 733 F. Supp. 2d at 977 ("[M]isappropriation of a trade

secret is not only an intrusion on property, *it is also a breach of confidence*.").

This court finds the <u>DTM</u> distinction to be well-reasoned and compelling.

The <u>DTM</u> court's holding appropriately contemplates the inherently hybrid nature

of proprietary rights in trade secrets, and it is entirely consistent with legislative

---

[7] The court notes with interest that <u>Choice-Intersil</u> was decided with reliance
on <u>Avtec Sys. v. Peiffer</u>, 67 F.3d 293 (4th Cir. 1995).  The court in <u>Avtec</u> summarily
applied copyright ownership principles in reviewing Avtec's trade secret
misappropriation claim.  The decision, to the extent it can be construed as holding
that trade secret claims are governed by the same ownership principles as
copyright claims, has been superseded by the Fourth Circuit's decision in <u>DTM</u>.

policy considerations undergirding trade secret misappropriation laws.  Such laws are intended to encourage ethical business practices while preserving obvious interests in confidentiality or controlled disclosure.  See Kewanee Oil Co., 416 U.S. at 481-82; Abbott Labs., 147 N.W. 2d at 533.  Viewed in this light, the court's focus is less on the existence of formal ownership rights and more appropriately on the nature of plaintiff's interest in the trade secret and the relationship between the plaintiff and the misappropriator.  See, e.g., Metso, 733 F. Supp. 2d at 976-78 (couching entitlement to recovery in terms of the injury suffered by "the victim of such a breach of confidence").  Consequently, the court rejects defendants' position that traditional, common law ownership concepts necessarily mold the post-PUTSA litigation landscape.[8]

---

[8] The court also rejects defendants' reliance on another post-PUTSA case: Transportation Compliance Associates, Inc. v. Hammond, No. 2:11-cv-1602, 2012 U.S. Dist. LEXIS 57844 (E.D. Pa. Apr. 25, 2012). (Doc. 50 at 7). In Hammond, the district court concluded that "there can be no misappropriation of defendant's trade secrets if he did not *own* the trade secrets at issue." Id. at *8. The decision cursorily adopts an ownership approach without any discussion of the nature of trade secrets or the source of their value. Id. The case relied upon by the court, Mettler-Toledo, Inc. v. Acker, 908 F. Supp. 240 (M.D. Pa. Nov. 21, 1995), did not turn on an ownership inquiry: the court rendered a decision in the defendant's favor because it concluded that the confidential information allegedly taken by him was not, in fact, a trade secret; rather, the information was publicly accessible. See Mettler-Toledo, 908 F. Supp. at 247-48 (concluding that Mettler-Toledo had "no protectible interest in the customer information at issue . . . [because] a good deal of the information can be obtained from sources available to the public generally."). Indeed, Mettler-Toledo's conclusion serves to reinforce this court's *ratio decidendi*: that the value of trade secrets is derived from their secrecy as opposed to one's legal ownership thereof.  Hence, the court declines to adopt the Hammond decision.

Defendants also direct the court to <u>BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.</u>, No. 09-00181 DAE-KSC, 2011 U.S. Dist. LEXIS 56665 (D. Haw. May 25, 2011).  Preliminarily, the court notes that the <u>BlueEarth</u> court did "not resolve the issue of whether an individual must be an owner to pursue" a misappropriation claim as defendants seem to suggest.  <u>Id.</u> at *62.  Instead, the court distinguished <u>DTM</u>, <u>Metso</u>, and <u>DaimlerChrysler</u> on the basis that the claimants in those decisions lawfully possessed, or averred that they possessed, the trade secrets at issue; the court held that "at the very least a plaintiff must be a lawful possessor of the trade secrets or confidential information."  <u>Id.</u> at *62 (quoting <u>DTM</u>, 245 F.3d at 331; <u>DaimlerChrysler</u>, 2006 U.S. Dist. LEXIS 32049, at *8; <u>Metso</u>, 733 F. Supp. 2d at 970-71).  The <u>BlueEarth</u> court rejected plaintiff's trade secret misappropriation claim because it failed to satisfy even the minimum requirement of lawful possession of the trade secrets.  <u>See id.</u> at *63 (concluding that misappropriation claim failed when plaintiff "was no longer legally in possession of the trade secrets because it had transferred, without reservation, all of the relevant confidential information and trade secrets to [the defendant]").

The <u>Blue Earth</u> decision is immediately distinguishable from the matter *sub judice* in that AFS alleges that it remains in possession of and continues to use the trade secrets.  Indeed, AFS continues to possess and use the trade secrets "in a confidential manner," allowing access to the intellectual property only as necessary in connection with Orbital's integration of the TELHS system.  (Doc. 65 ¶ 37).  AFS maintains all documentation and information related to the TELHS system on its

internal servers in password-protected files.  (Id. ¶ 36).  AFS alleges that it permissibly used the trade secrets throughout completion of its TELHS obligations. (Id. ¶ 37).  As the DTM court observed, although "information forming the basis of a trade secret can be transferred," as it was here, it is the information's continuing secrecy that offers value—and a cause of action—to its possessor.  DTM, 245 F.3d at 332.  Given AFS's allegations of continued use, possession, and protection of its trade secrets, defendants' reliance on BlueEarth is misplaced.

In sum, the court adopts the Fourth Circuit's decision in DTM, joining the several district courts across the country which have directly addressed the issue. The court concludes that ownership, in the traditional sense, is not prerequisite to a trade secret misappropriation claim.  See DTM, 245 F.3d at 332-33; Metso, 733 F. Supp. 2d at 976-78; DaimlerChrysler, 2006 U.S. Dist. LEXIS 32049, at *21-27; see also Fast Capital Mktg., LLC, 2008 U.S. Dist. LEXIS 103988, at *40-41; In re Cayman Island Firm of Deloitte & Touche, 2001 Tex. App. LEXIS 6214, at *5-8.  It is enough, as the Fourth Circuit held in DTM, that plaintiffs demonstrate lawful possession of a trade secret in order to maintain a misappropriation claim.  DTM, 245 F.3d at 332. AFS has pled facts satisfying this burden and, therefore, the court will deny

defendants' motions as to this issue.[9]

### B.    PUTSA Preemption

In the alternative, defendants argue that, if the court does not dismiss AFS's statutory misappropriation claim, it must dismiss Counts V, VI, VII, VIII, IX, and X of AFS's amended complaint because PUTSA preempts AFS's common law tort claims.  (See Doc. 43 at 13-14).  AFS responds that it is premature at this juncture to dismiss its common law tort claims on the assumption that trade secret misappropriation forms the entire basis of each claim.  (Doc. 47 at 55-57).

The parties ostensibly agree that PUTSA expressly "displaces conflicting tort, restitutionary and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret." 12 PA. CONS. STAT. § 5308(a).  The Act excepts only three categories of claims from the scope of its preemption power: contractual and criminal remedies, "whether or not based upon misappropriation of a trade secret," and other civil remedies "not based upon misappropriation of a trade secret."  Id. § 5308(b).  Consequently, any tort claims which have their basis in the alleged misappropriation of a trade secret are preempted as a matter of law. Id. § 5308(a).

---

[9] Defendants also contend that AFS failed to take reasonable steps to protect the secrecy of its proprietary information.  (See Doc. 35 at 16).  PUTSA defines the "trade secrets" as information which, *inter alia*, "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  12 PA. CONS. STAT. § 5302.  Because the amended complaint plainly alleges that AFS maintained its trade secrets in password-protected electronic files on an internal server and granted access to Orbital only as needed for purposes of integrating the TELHS system, (Doc. 65 ¶¶ 36-37), the court rejects this argument.

Courts within the Third Circuit have construed PUTSA as preempting common law tort claims for breach of fiduciary duty and confidentiality, civil conspiracy, unfair competition, unjust enrichment, and conversion when the court determines that the misappropriated information is indeed a trade secret. See, e.g., Kimberton Healthcare Consulting v. Primary PhysicianCare, Inc., No. 11-4568, 2011 U.S. Dist. LEXIS 139980, at *10-11 (E.D. Pa. Dec. 6, 2011) (unfair competition, conversion, misappropriation); Hecht v. Babyage.com, No. 10-724, 2010 U.S. Dist. LEXIS 106895, at *10-14 (M.D. Pa. Oct. 6, 2010) (breach of duty of loyalty, breach of fiduciary duty, unfair competition); Ideal Aerosmith, Inc. v. Acutronic USA, Inc., No. 07-1029, 2008 U.S. Dist. LEXIS 33463, at *6 (W.D. Pa. Apr. 23, 2008) (civil conspiracy and unfair competition). This court recently addressed the scope of PUTSA preemption in Cunningham Lindsey v. Bonanni, No. 13-2528, 2014 U.S. Dist. LEXIS 55450 (M.D. Pa. Apr. 22, 2014) (Conner, C.J.), observing that the rule of preemption assumes two overlapping contingencies: first, that plaintiff's tort claims *only* involve trade secrets and, second, that the allegedly misappropriated information is properly classified as a trade secret. Id. at *10-11 (citing Youtie v. Macy's Retail Holding, Inc., 653 F. Supp. 2d 612, 620 (3d Cir. 2009)). As in Cunningham, the court cannot conclude that either contingency is satisfied at this preliminary stage.

Preemption exists only to the extent that plaintiff's common law tort claim is "based on the same conduct that is said to constitute a misappropriation of trade secrets." Youtie, 653 F. Supp. 2d at 619 (collecting cases); Hecht, 2010 U.S. Dist.

LEXIS 106895, at *10-11 (same) (citing <u>Hecny Transp., Inc. v. Chu</u>, 430 F.3d 402, 405 (7th Cir. 2005) ("An assertion of trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the customer list were a public record.")).  Based upon the pleadings, many of AFS's tort claims allege conduct beyond misappropriation of trade secrets.  For example, in support of its unfair competition claim, AFS alleges not only that defendants collectively misappropriated its trade secrets, but also that defendants conspired with Huber to use his position with AFS to defendants' benefit and AFS's detriment.  (Doc. 47 at 56; <u>see</u>, <u>e.g.</u>, Doc. 65 ¶ 49 (L&H defendants assisted Huber in setting up a VPN connection between L&H's network and AFS's computer; ¶¶ 60-61 (defendants intentionally foiled AFS's opportunities to bid on and receive substantial contracts through Huber's continued AFS association)).  Unfair competition contemplates conduct beyond misappropriation of a competitor's goods, and includes, *inter alia*, "misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information."  <u>Synthes (USA) v. Global Med., Inc.</u>, 2005 U.S. Dist. LEXIS 19962, at *8 (E.D. Pa. Sept. 14, 2005).  Many of the same allegations support AFS's tort claims for breach of fiduciary duty, breach of the duty of loyalty, aiding and abetting said breach, and civil conspiracy.  Each of the challenged counts involve conduct by the defendants which, assumed true, falls outside of the scope of PUTSA's preemption clause.  <u>See</u>, <u>e.g.</u>, <u>Hecht</u>,  2010 U.S. Dist. LEXIS 106895, at *12-13 (preemption inappropriate when claims "would constitute the named torts

26

even if the conduct involved information that  did not constitute a trade secret within the meaning of PUTSA").  Consequently, the court cannot conclude that Counts V through X are preempted by PUTSA in the context of defendants' Rule 12(b)(6) motions.

Defendants' arguments also fail the second preemption contingency.  The record at present does not establish whether all of the information purportedly taken by defendants does, in fact, constitute trade secrets.  The parties ostensibly assume, for purposes of Rule 12(b)(6), that the documents taken were trade secrets as defined by statute.  As in Cunningham, the court is disinclined to make such a determination without the benefit of a fully developed record.  See Alpha Pro Tech, Inc. v. VWR Int'l LLC, No. 12-1615, 2013 U.S. Dist. LEXIS 167762, at *54 (E.D. Pa. Nov. 25, 2013) (PUTSA "does not preempt common law tort claims when it has yet to be determined whether the information at issue constitutes a trade secret.") (quoting Cenveo Corp. v. Slater, No. 06-2632, 2007 U.S. Dist. LEXIS 9966, at *3 (E.D. Pa. Feb. 12, 2007)); Hecht, 2010 U.S. Dist. LEXIS 106895, at *13 ("To prevail under the terms of the PUTSA, the . . . plaintiff would have to demonstrate the existence of a trade secret, and that determination requires discovery.").  Indeed, to dismiss common law tort claims on preemption grounds only to later determine that the documents were not in fact trade secrets would deprive AFS of an otherwise deserved remedy. See Kimberton, 2011 U.S. Dist. LEXIS 139980, at *15 (preemption

rulings at Rule 12 stage "risk[] leaving the claimant without a remedy for information he proves has been stolen").[10]

###    C.    The Computer Fraud and Abuse Act

In Count II, AFS asserts claims against Huber for violation of Sections 1030(a)(2)(C) and 1030(a)(5)(A) through (C) of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.  (Doc. 65 ¶¶ 103-113).  AFS further asserts that "L&H and Orbital aided, abetted and conspired with Huber" in violation of Section

---

[10] Many of our sister courts have determined that resolution of PUTSA preemption challenges at the Rule 12(b)(6) stage is premature.  Kimberton Healthcare, 2011 U.S. Dist. LEXIS 139980, at *14 ("The vast majority of courts to have addressed whether PUTSA preempts common law tort claims on a motion to dismiss have determined that such a determination is inappropriate in such circumstances.") (citing, *inter alia*, Council for Educ. Travel v. Czopek, No. 04-MD-1616, 2011 U.S. Dist. LEXIS 9923, at *7 (M.D. Pa. Sept. 2, 2011); EXL Labs. v. Egolf, No. 10-6282, 2011 U.S. Dist. LEXIS 25295, at *7-8 (E.D. Pa. Mar. 11, 2011); Hecht, 2010 U.S. Dist. LEXIS 106895, at *5; Partners Coffee Co. v. Oceana Servs. & Prods. Co., No. 09-236, 2009 U.S. Dist. LEXIS 113209, at *11 (W.D. Pa. Dec. 4, 2009); Ideal Aerosmith, 2008 U.S. Dist. LEXIS 33463, at *16-18 ; Weiss v. Fiber Optic Designs, Inc., No. 06-5258, 2007 U.S. Dist. LEXIS 83585, at *1 (E.D. Pa. Nov. 9, 2007)).  The court concurs with the essential *ratio decidendi* of these cases.  Defendants' preemption argument must await summary judgment.

1030(b).[11]  (Id. ¶ 112).

The CFAA prohibits seven types of computer crimes involving unauthorized access to computers (or access in excess of authorization) which results in obtaining information from or damaging the computer.  See 18 U.S.C. § 1030(a)(1)-(7).  CFAA violations can expose defendants to both criminal and civil liability.  Id. §§ 1030(c), 1030(g).  The Third Circuit has observed that employers "are increasingly taking advantage of the CFAA's civil remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system."  P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC, 428 F.3d 504, 510 (3d Cir. 2005) (citations omitted).  The statutory provisions relevant to the instant litigation impose liability against whoever:

---

[11] Vann and Aufiero argue that the amended complaint does not set forth any specific allegations against them for violations of the CFAA. (Doc. 35 at 17-18).  To the contrary, AFS alleges that Vann and Aufiero, as principals of L&H, instigated, encouraged, and/or directed all of Huber's actions.  (See Doc. 65 ¶ 13 (Vann and Aufiero "directed the illegal actions" of Huber).  Thus, these defendants may be held liable as participants in the CFAA violations.  See Synthes, Inc. v. Emerge Med., Inc., No. 11-1566, 2012 U.S. Dist. LEXIS 134886, at *59-61 (E.D. Pa. Sept. 19, 2012) (concluding that former employee could be held liable for CFAA violation when he induced others to access his former employer's computers).  In the same vein, AFS alleges that Huber owns INSYSMA, forming it and using it for the purpose of diverting work from AFS to Huber, INSYSMA, and L&H.  (Doc. 65 ¶ 3 ("Defendant INSYSMA is a company which [Huber] secretly formed while he was a full time employee of AFS.").  Accordingly, the court concludes that the amended complaint contains sufficient allegations which, if proven, would establish that INSYSMA took part in a potential CFAA violation.

(2)     intentionally accesses a computer without
authorization or exceeds authorized access, and
thereby obtains—

. . .

(C) information from any protected computer;

[or] . . .

(5)     (A) knowingly causes the transmission of a
program, information, code, or command, and as a
result of such conduct, intentionally causes damage
without authorization, to a protected computer;

(B) intentionally accesses a protected computer
without authorization, and as a result of such
conduct, recklessly causes damage; or

C) intentionally accesses a protected computer
without authorization, and as a result of such
conduct, causes damage and loss.

18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(5)(A)-(C).  To state a civil claim for violations of

the CFAA, AFS must allege:  (1) damage or loss "to 1 or more persons during any

1–year period . . . aggregating at least $5,000 in value"; (2) caused by; (3) violation of

one of the substantive provisions of §§ 1030(a) or (b).  Sealord Holdings, Inc. v.

Radler, No. 11-6125, 2012 U.S. Dist. LEXIS 29878, at *11-12 (E.D. Pa. Mar. 6, 2012);

also 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), 1030(g).

Defendants move to dismiss the CFAA claims, contending that AFS does not

allege sufficient facts to establish that:  (1) L&H "accessed" a protected computer[12]

in violation of a provision of Section 1030(a); (2) L&H aided, abetted and conspired

with Huber in violation of Section 1030(b); (3) Huber accessed a protected computer

in excess of his authorization; and (4) AFS suffered economic damage or loss in

excess of $5,000.

### 1. *L&H*

L&H asserts that the amended complaint does not include any allegations

that it accessed a protected computer; rather, the amended complaint alleges that

Huber accessed AFS's protected computer and forwarded the information obtained

to L&H.  (Doc. 35 at 17-18).  In essence, L&H posits that because it was merely an

end user of information unlawfully accessed by another, the CFAA does not

contemplate a cause of action against it.  The court disagrees.

---

[12] The CFAA defines a "protected computer" as a computer:

> (A) exclusively for the use of a financial institution or the United States Government, or, in the case of a computer not exclusively for such use, used by or for a financial institution or the United States Government and the conduct constituting the offense affects that use by or for the financial institution or the Government; or

> (B) which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States.

18 U.S.C. § 1030(e)(2).

L&H relies heavily upon a recent decision issued by the district court for the Eastern District of Pennsylvania, Dresser-Rand Co. v. Jones, 957 F. Supp. 2d 610 (E.D. Pa. 2013), in support of its motion to dismiss.  (See Doc. 35 at 17-18).  In Dresser-Rand, the court held that the CFAA only imposes civil liability on the individual who improperly accesses a protected computer and does not impose liability upon third parties who come into possession of the improperly obtained information.  Id. at 614-15 (holding that what "happens to the data subsequent to being taken from the computers is not encompassed in the purview of the CFAA").  Dresser-Rand is distinguishable from the instant action.

Contrary to L&H's assertions, the amended complaint does not allege that it was merely a passive recipient of information improperly obtained by Huber.  Indeed, the amended complaint states that L&H knowingly instigated and conspired with Huber to access AFS's protected computer.  (See Doc. 65 ¶¶ 106, 112).  L&H's access to AFS's protected computer was not direct access, but it acquired access through Huber.  The plain language of the CFAA requires only "access"—"no modifying term suggesting the need for 'personal access' is included."  Synthes, 2012 U.S. Dist. LEXIS 134886, at *58.  Some courts have defined "access" with reference to its common meaning, defining the term as "gaining admission to."  Id. (citing, inter alia, WEC Carolina Energy Solutions LLC v. Miller, 687 F.3d 199, 204 (4th Cir. 2012) ("'[A]ccess' means '[t]o obtain, acquire,' or '[t]o gain admission to.'")).  The court joins those before it which have held that the act of inducing another to access a protected computer that he or she is otherwise

32

not authorized to use constitutes "access" within the meaning of the CFAA. See id. at *58-59 (defendant subject to CFAA liability when he directed, induced, or encouraged others to access plaintiff's computer systems); Se. Mech. Servs., Inc. v. Brody, No. 8:08-1151-T-30EAJ, 2008 U.S. Dist. LEXIS 112332, at *14 (M.D. Fl. Oct. 15, 2008) (evidence that defendants implicitly induced others to access computers and supply information was sufficient to allege access); Binary Semantics, Ltd. v. Minitab, Inc., No. 07-1750, 2008 U.S. Dist. LEXIS 28602, at *15 (M.D. Pa. Mar. 20, 2008) (when employee of the plaintiff company acted at the direction of defendant in accessing plaintiff's protected computer to steal trade secrets, defendant could be held liable for the CFAA violation)).

AFS avers that L&H installed a VPN profile on AFS's protected computer which allowed Huber to initiate a "point-to-point connection" between the protected computer and L&H's network.  (Doc. 47 at 34-35).  To the extent L&H disputes that it required access to AFS's protected computer to set up the VPN profile, the court must accept the truth of the detailed allegations in the amended complaint.  See, e.g., Santiago, 629 F.3d at 130-31.  Thus, even if direct access was a prerequisite to CFAA liability, the allegations in the amended complaint properly establish the element of "access" under the CFAA.

L&H persuasively argues that AFS fails to state a valid claim under Section 1030(b).  The CFAA does not create a cause of action for aiding and abetting.  See Flynn v. Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP, No. 3:09-CV-00422, 2011 U.S. Dist. LEXIS 77217, at *7-9 (D. Nev. July 15, 2011); see also

18 U.S.C. § 1030(b) (creating a cause of action against "whoever conspires to commit or attempts to commit" an offense under § 1030(a), but making no mention of aiding and abetting liability).  In <u>Flynn</u>, the court explained that the plain language of Section 1030 only creates liability for "a primary violator, a person who attempts a primary violation, and a co-conspirator of a primary violator.  Section 1030 does not provide for aiding and abetting liability."  <u>Flynn</u>, 2011 U.S. Dist. LEXIS 77217, at *8.  The court concurs with the statutory construction analysis and conclusions of the <u>Flynn</u> court.  To the extent AFS attempts to state a claim for aiding and abetting pursuant to Section 1030, that claim will be dismissed.

Notably, however, the amended complaint also alleges that L&H knowingly instigated and conspired with Huber to access AFS's protected computer.  (Doc. 65 ¶¶ 106, 112).  Defendants contend that AFS simply makes legal conclusions and that the facts alleged in the amended complaint do not support this claim.  The court disagrees.  As noted *supra*, AFS has sufficiently set forth detailed allegations that L&H conspired with Huber to gain access to confidential information stored on AFS's server and use the information to divert AFS's business.  Accordingly, the court will deny the motions to dismiss Count II on these grounds.

### 2.   *Access in Excess of Authorization*

Huber moves to dismiss the CFAA claims on grounds that AFS cannot show that he accessed the protected computer either "without authorization" or that he "exceeded authorized access."  <u>See</u> 18 U.S.C. § 1030.  The CFAA defines "exceeds authorized access" as accessing a computer "without authorization" and using

34

"such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." Id. § 1030(e)(6). The statute does not define the term "without authorization." Application of precedent is problematic in that there is a split of authority regarding interpretation of this phrase.

Under the narrow view adopted by the Fourth and Ninth Circuits, an employee granted access to a computer in connection with his employment is "authorized" to access that computer under the CFAA regardless of his or her intent or whether internal policies limit the employee's *use* of the information accessed. See Dresser-Rand, 957 F. Supp. 2d at 615 (citing WEC Carolina Energy Solutions, 687 F.3d at 205-06; United States v. Nosal, 676 F.3d 854, 857-59 (9th Cir. 2012) (*en banc*); LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1132-35 (9th Cir. 2009)). A majority of circuit courts have taken a broader view of "without authorization," concluding that an employee who is granted access to a computer in connection with his or her employment may exceed his or her authority by "misusing the information on the computer, either by severing the agency relationship through disloyal activity, or by violating employer policies and/or confidentiality agreements." Id. at 616 (citing United States v. John, 597 F.3d 263, 271-73 (5th Cir. 2010); United States v. Rodriguez, 628 F.3d 1258, 1263 (11th Cir. 2010); Int'l Airport Ctrs. LLC v. Citrin, 440 F.3d 418, 420-21 (7th Cir. 2006); Ef Cultural Travel Bv v. Explorica, 274 F.3d 577, 582 (1st Cir. 2001)).

The Third Circuit has yet to address the meaning of "without authorization." District courts in Pennsylvania have largely adopted the narrow interpretation.

See Dresser-Rand, 957 F. Supp. 2d at 616 & n.8 (collecting cases); see also Carnegie Strategic Design Eng'rs, LLC v. Cloherty, No. 13-1112, 2014 U.S Dist. LEXIS 28654, at *30 (W.D. Pa. Mar. 6, 2014) ("The scope of the CFAA does not extend to employees who were authorized to access the data in question, but did so in bad faith or to the future detriment of his former employer because [the court] interprets the term 'authorization' narrowly and finds that it does not extend to the improper use of information validly accessed."); Consulting Prof'l Res., Inc. v. Concise Techs. LLC, No. 09-1201, 2010 U.S. Dist. LEXIS 32573, at *14-19 (W.D. Pa. Mar. 9, 2010) ("While disloyal employee conduct might have a remedy in state law, the reach of the CFAA does not extend to instances where the employee was authorized to access the information he later utilized to the possible detriment of his former employer."); Brett Senior & Assoc., P.C. v. Fitzgerald, No. 06-1412, 2007 U.S. Dist. LEXIS 50833, at *9-10 (E.D. Pa. July 13, 2007) (rejecting argument that employee's access to protected computer was unauthorized or exceeded authorized access because it is the "unauthorized procurement or alteration of information, not its misuse or misappropriation," that CFAA proscribes).  The court finds no reason to depart from the persuasive decisions of its sister courts, which are based upon the plain language of the statute, congressional intent, and a fair and balanced evaluation of circuit court opinions.  The court holds that the CFAA prohibits unauthorized *access* to information rather than unauthorized *use* of such information.  See 18 U.S.C. § 1030(a).  The parties do not dispute that Huber was authorized to access the computer during the course of his employment with AFS.

36

(Doc. 43 at 6-7; Doc. 47 at 36-37).  To the extent that Huber misappropriated information from AFS's servers and computer system while he was employed and had access thereto, AFS's CFAA claim against Huber must be dismissed.

The court's holding is limited in one significant respect.  AFS alleges not only that Huber misused his access authorization during his employment, but also that Huber continued to unlawfully access AFS information through his company-issued laptop subsequent to leaving employment with AFS on October 26, 2012.  (Doc. 65 ¶¶ 42, 45, 58).  Such claims fall squarely within the ambit of the narrow approach to authorization adopted by the court herein.  See, e.g., Synthes, 2012 U.S. Dist. LEXIS 134886, at *64-65 (declining to dismiss CFAA claim when complaint alleged that the defendant accessed former employer's computers subsequent to termination of his employment).  To the extent AFS alleges that Huber continued to access its computers after he left AFS's employ, the court will deny defendants' motions to dismiss.

### 3.    *Economic Damages or Loss in Excess of $5,000*

Huber also contends that AFS fails to allege cognizable damages for which a civil remedy is available under the CFAA.  (Doc. 43 at 8-9).  Section 1030(g) requires AFS to show that it sustained economic damage or loss "aggregating at least $5,000

in value" as a result of the defendants' violation.[13]  18 U.S.C. § 1030(g).  In order to

state a claim under Section 1030(a)(5)(A), AFS must plead the additional element of

"unauthorized damage."  Consulting Prof'l Res., 2010 U.S. Dist. LEXIS 32573, at

*19 ("[A] violation of (a)(5)(A) is not determined by unauthorized access, rather, it is

predicated on unauthorized damage.").

The CFAA defines "damage" as "any impairment to the integrity or

availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).  It

defines "loss" as "any reasonable cost to any victim, including the cost of

responding to an offense, conducting a damage assessment, and restoring the data,

program, system, or information to its condition prior to the offense, and any

revenue lost, cost incurred, or other consequential damages incurred because of

interruption of service."  Id. § 1030(e)(11).  Courts within the Third Circuit have held

that to fall within the statutory definition of "loss," the alleged loss "must be related

to the impairment or damage to a computer or computer system." Brooks v. AM

Resorts, LLC, 954 F. Supp. 2d 331, 337-38 (E.D. Pa. 2013) (citing Sealord Holdings,

2012 U.S. Dist. LEXIS 29878, at *4; Fontana v. Corry, No. 10-1685, 2011 U.S. Dist.

LEXIS 115693, at *7 (W.D. Pa. Aug. 30, 2011)).  The CFAA's definition of loss

---

[13] AFS argues that Section 1030(g) permits civil actions broadly for compensatory damages and equitable relief.  (Doc. 47 at 40).  This argument is inapposite.  AFS may seek compensatory damages or equitable relief, including an injunction or an accounting, if and only if AFS meets the pleading requirements for a civil cause of action under the CFAA.  According to Huber, AFS does not adequately plead the element of economic damages or loss exceeding $5,000 in a one-year period.  (Doc. 43 at 8-9).

includes lost revenue incurred because of an interruption of service, see 18 U.S.C. § 1030(e)(11), but does not include claims for lost business opportunities, damaged reputation, and other missed revenue opportunities. Advantage Ambulance Grp., Inc. v. Lugo, No. 08-3300, 2009 U.S. Dist. LEXIS 26465, at *10-13 (E.D. Pa. Mar. 30, 2009) (dismissing claim prefaced on future lost revenue due to dissemination of trade secrets accomplished by unauthorized access); Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio, No. 09-2751, 2010 U.S. Dist. LEXIS 113215, at *6 (E.D. Pa. Oct. 22, 2010) (holding that damages related to integrity of bank funds as opposed to integrity of data did not allege damage or loss for purpose of CFAA); Eagle v. Morgan, No. 11-4303, 2011 U.S. Dist. LEXIS 147247, at *22-25 (E.D. Pa. Dec. 22, 2011) (finding that allegations of loss of business relations are "precisely the type of damages that courts repeatedly have deemed beyond the purview of the CFAA"); Consulting Prof'l Res., 2010 U.S. Dist. LEXIS 32573, at *19-22 (holding that a "decrease in the competitive value of [plaintiff]'s confidential information does not satisfy the damage requirement of § 1030(a)(5)(A)").

In its amended complaint, AFS avers that Huber's improper conduct "caused damage to AFS in an amount aggregating more than $5,000 during a one-year period." (Doc. 65 ¶ 111).  The amended complaint does not state that the improper conduct impaired the integrity or availability of AFS's data, programs, or system, nor does it include allegations that AFS incurred any costs in responding to the conduct, conducting a damage assessment, or restoring any data, programs, or the system to its prior condition.  See Carnegie Strategic Design Engineers, 2014 U.S.

Dist. LEXIS 28654, at *13-14 (denying motion to dismiss when plaintiff claimed loss of more than $5,000 for retaining a computer forensic expert to investigate and mitigate the defendant's data breach).  AFS's conclusory allegations, reflecting only a formulaic recitation of the statutory loss element, are insufficient to satisfy federal pleading requirements.  The court is compelled to dismiss AFS's CFAA claims for failure to plead damages properly.  This failure notwithstanding, AFS represents that it has retained an expert to conduct an analysis of the protected computer and a forensic accounting.  (See Doc. 47 at 40-41 & n.2).  Therefore, the court will dismiss AFS's CFAA claims without prejudice and will allow AFS to file a second amended complaint properly alleging damages in accordance with the CFAA.[14]

### D.     Lanham Act

The Lanham Act provides, in pertinent part, as follows:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin,

---

[14] In its opposition brief, AFS asserts that defendants should also be liable under Section 1030(a)(4) for obtaining something of value through unauthorized access to a protected computer with the intent to defraud.  (Doc. 47 at 32, 37).  The amended complaint does not allege a violation of Section 1030(a)(4).  (See Doc. 50 at 2).  "[I]t is axiomatic that the complaint may not be amended by [a] brief[] in opposition to a motion to dismiss."  Pennsylvania v. Proctor, No. 1:12-CV-1567, 2013 WL 3784253, at *4 (M.D. Pa. July 18, 2013) (quoting Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988)).  To hold otherwise would contravene the pleading requirement that AFS provide defendants with fair notice of the claims against them.  See Twombly, 550 U.S. at 555.  Nonetheless, given the court's leave to amend for damages, the court will also allow AFS to amend Count II of its pleading to assert a claim under Section 1030(a)(4).

false or misleading description of fact, or false or misleading representation of fact, which –

> (A)   is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B)   in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, commercial activities,

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  In Count III of its amended complaint, AFS asserts a claim pursuant to § 1125(a)(1) against all defendants, alleging that they "have falsely attributed to themselves the design, manufacture and installation of the Antares lift and launch retract system."  (Doc. 65 ¶ 115).  AFS's Lanham Act claims appear to take two forms: false advertising and false designation of origin.  (Id.)  Raising an argument similar to their PUTSA ownership defense, defendants contend that AFS has no remedy in the Lanham Act for misuse of a trademark or design that it does not own.  (Doc. 35 at 19-20; Doc. 43 at 10).  Both AFS and defendants conflate AFS's advertisement and designation claims in their arguments.  The court addresses AFS's claims, and the defendants' respective challenges thereto, individually.

### 1.    *Scope of Statutory Remedy*

As a threshold matter, defendants contend that AFS lacks "standing" to

bring a Lanham Act claim because AFS admits assigning the TELHS system and

associated intellectual property to the VCSFA.  (See Doc. 35 at 19-20; Doc. 43 at

10).  Defendants blend two similar, but distinct, inquiries: (1) whether AFS has

constitutional or prudential standing to assert a Lanham Act claim, and (2)

whether AFS is among the class of persons which Congress sought to vest with a

civil remedy under the Lanham Act.  In Lexmark Int'l, Inc. v. Static Components,

Inc., __ U.S.__, 134 S. Ct. 1377 (2014), the Supreme Court concluded that the

question of whether a plaintiff falls within the class sought to be protected by §

1125(a) is not one of standing at all; rather, the Court held, the question is one of

statutory scope.  Id. at 1386-88.  The clear guidance of Lexmark quickly defeats

defendants' standing argument.

Lexmark International produces the only toner cartridges which work with

the company's printers.  Id. at 1383.  Once Lexmark's cartridges enter the market,

"remanufacturers" can acquire and refurbish the empty cartridges for resale in

competition with those sold by Lexmark.  Id.  In an effort to maintain its market

share, Lexmark developed a "prebate" program to encourage customers to

purchase directly from it, offering discounted cartridges to customers who agreed

to return used cartridges to the company.  Id.  Lexmark installed a microchip in its

discounted cartridges in order to deactivate them when empty.  Id.  Defendant

Static Control, a maker of component parts for refurbished Lexmark cartridges,

developed a similar microchip, and Lexmark sued for copyright infringement.  Id.

Static Control counterclaimed for false advertising in violation of § 1125(a), alleging

that Lexmark had undertaken a mass lettering campaign advising its customers

that it is illegal to purchase Static Control's refurbished cartridges.  Id.

The parties framed the issue of whether Static Control had a cause of action

under the Lanham Act as one of "prudential standing."  Id. at 1386.  The Court

found, however, that Static Control had sufficiently alleged lost sales and damages

to its business, satisfying the injury-in-fact requirement and establishing standing

for purposes of Article III jurisdiction.  Id. (quoting Lujan v. Defenders of Wildlife,

504 U.S. 555, 560 (1992)).  The Court observed that the question before it was one of

congressional intent and statutory interpretation, tasking it to decide whether

Static Control "falls within the class of plaintiffs whom Congress has authorized to

sue under § 1125(a)."  Id. at 1387.  The Court noted that the language of the statute

is ostensibly broad, permitting "any person who believes that he or she is likely to

be damaged" to bring suit.  Id. (quoting § 1125(a)).  Given the "unlikelihood that

Congress meant to allow all factually injured plaintiffs to recover," id. at 1388

(quoting Holmes v. Secs. Invs. Protection Corp., 503 U.S. 258, 266 (1992)), the Court

rejected such an expansive reading, instead holding that the breadth of Section

1125(a)'s authorization is tempered by two established judicial considerations: the

statutory zone of interests and proximate cause.

A comprehensive discussion of congressional intent followed.  Ultimately, the

Court concluded that those plaintiffs who fall within the statutory zone of interests

*and* establish proximate causation are authorized to bring suit under Section 1125(a). Id. at 1388-91.  The Court held that plaintiffs fall within the statutory zone of interests for purposes of Section 1125(a) when they "allege an injury to a commercial interest in reputation or sales." Id.  Regarding proximate cause, the Court held that plaintiffs "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." Id. at 1391. Thus, to maintain a cause of action under Section 1125(a), "a plaintiff must plead (and ultimately prove), an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." Id. at 1395. Concluding that Static Control had alleged a decrease in sales as a direct result of Lexmark's false representations to consumers, the Court held that Static Control falls within the class of persons and entities authorized to bring a Section 1125(a) claim. Id.

This court concludes that AFS's allegations fall squarely within the two-prong test articulated by the Court in Lexmark.  AFS alleges that it suffered an injury to its commercial interest in its reputation and a decrease in sales as a result of defendants' misrepresentation that defendants, and not AFS, designed and installed TELHS at Wallops Island.  (E.g. Doc. 65 ¶¶ 74-75 (INSYSMA's website and defendants' concerted misrepresentations caused defendants to obtain contracts that AFS was eligible for).  AFS also alleges that, but for the misdesignation and deceptive advertising of TELHS's origin, AFS would have continued to receive upgrade contracts from VCSFA and new contracts from other potential customers.

44

(See id. ¶ 76).  AFS sufficiently alleges that it falls within the scope of entities

authorized to bring suit under Section 1125(a).[15]

## 2.   *False Advertising*

Having concluded that AFS falls within the class of persons authorized to

bring a Section 1125 claim, the court turns to the merits of AFS's allegations.  To

prevail on its claim for false advertising, AFS must plead that: (1) defendants made

false or misleading statements about their own products or AFS's products; (2)

"there is actual deception or at least a tendency to deceive a substantial portion of

the intended audience"; (3) "the deception is material in that it is likely to influence

purchasing decisions"; (4) "the advertised goods traveled in interstate commerce";

and (5) "there is a likelihood of injury to the plaintiff in terms of declining sales, loss

of good will, etc."  Alpha Pro Tech, Inc., 2013 U.S. Dist. LEXIS 167762, at *63-64

---

[15] Defendants cite to a handful of district court cases which have observed in passing that false designation or advertising claims require trademark ownership as a prerequisite element to Section 1125(a) liability.  (See Doc. 43 at 10 (citing Brown & Brown, Inc. v. Cola, 745 F. Supp. 2d 588, 610 (E.D. Pa. 2010) (holding that Section 1125(a) plaintiff must prove that "it has a valid and legally protectable mark"); Doc. 50 at 11 (same)).  The Supreme Court has observed that Section 1125(a) is not limited to remedying trademark violations; instead, it proscribes a broader range of anticompetitive behavior.  See Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28-29 (2003) ("While much of the Lanham Act addresses the registration, use, and infringement of trademarks and related marks, [Section 1125(a)] is one of the few provisions *that goes beyond trademark protection*." (emphasis added)); but see id. (cautioning that "[Section 1125(a)] does not have boundless application as a remedy for unfair trade practices . . . [and] can never be a federal 'codification' of the overall law of unfair competition").  See also Marci's Fun Food, LLC v. Shearer's Foods, Inc., No. 2:10-188, 2010 U.S. Dist. LEXIS 107866, at *13 (W.D. Pa. Oct. 8, 2010) (quoting Dastar, 539 U.S. at 28-29).  Plainly, defendants' argument that AFS is required to plead a trademark as a prerequisite to a Section 1125(a) claim is without merit.

(citing <u>Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.</u>, 653 F.3d 241, 248 (3d Cir. 2011)).

Courts routinely limit what constitutes an "advertisement" for purposes of a Section 1125(a) claim to "commercial advertising," consistent with the statutory language. See 15 U.S.C. § 1125(a)(1)(B). Numerous district courts have concluded that purely private communications and other messages that are not publicly disseminated are not "advertising" or "promotion" as contemplated by Section 1125(a)(1)(B). See, e.g., Nw. Strategies, Inc. v. Buck Med. Servs., 927 F. Supp. 1343, 1346 (W.D. Wash. 1996) (rejecting claim when false statement in bid proposal was "not disseminated in interstate commerce"); H&R Indus., Inc. v. Kirshner, 899 F. Supp. 995, 1005 (E.D.N.Y. 1995) (holding advertisement must be "disseminated sufficiently to the relevant purchasing public"); Garland Co. v. Ecology Roof Sys. Corp., 895 F. Supp. 274, 279 (D. Kan. 1995) (concluding that "'commercial advertising or promotion' involves a notion of public dissemination"); see also Johnson Controls, Inc. v. Exide Corp., 152 F. Supp. 2d 1075, 1081-82 (N.D. Ill. 2001) ("Numerous courts have held . . . that misrepresentations made to a single customer in the context of negotiating a transaction cannot constitute 'advertising' or 'promotion' in the statutory sense.") (citing Garland, 895 F. Supp. at 279). The court finds these decisions persuasive and entirely consistent with the express language of the Lanham Act. 15 U.S.C. § 1125(a)(1)(B) (prohibiting false "commercial advertising"). To the extent AFS premises its false advertising claim on the

46

singular and private communication between Huber, on behalf of L&H, and the Air Force, (see Doc. 65 ¶¶ 80-81), the claim must be dismissed.

AFS also asserts that Huber and INSYSMA engaged in false advertising violative of the Lanham Act by displaying a photograph of TELHS on the INSYSMA website without attributing the system's design to AFS.  (Doc. 65 ¶ 74). An internet website is a broad advertising medium, offering wide-ranging and instantaneous dissemination of the false information.  It clearly satisfies the narrow version of "advertising" adopted by the court above.  The website, in its ambiguity, invites the logical inference that defendants, not AFS, designed and installed TELHS.  (See id.)  A statement need not be direct and false in order to fall within the ambit of Section 1125(a)(1)(B), and defendants who intentionally create false impressions may be liable under the Lanham Act.  Alpha Pro Tech, Inc., 2013 U.S. Dist. LEXIS 167762, at *64 (noting that the Act does not require that statements be "literally false" and that liability "arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers") (citations omitted); Ames Pub. Co. v. Walker-Davis Pubs., Inc., 372 F. Supp. 1, 26 (E.D. Pa. 1974) (liability is not limited to descriptions, "but extends to instances where the defendant creates a false impression").  Defendants have offered no challenge to AFS's website-based false advertising claim in either their principal or reply briefs.  Accordingly, the court will deny defendants' motions to dismiss the Lanham Act false advertising claim to the extent it pertains to the INSYSMA website.  The amended complaint's allegations with respect to the

INSYSMA website implicate only INSYSMA and Huber.  Therefore, the court will dismiss the false advertising claims as to L&H, Vann, and Aufiero.

### 3.    *False Designation of Origin*

AFS's claim for false designation also largely survives defendants' Rule 12(b)(6) motions. To state a false designation claim pursuant to 15 U.S.C. § 1125(a) of the Lanham Act, AFS must allege: (1) that defendants used a false designation of origin; (2) that the use of the false designation of origin occurred in interstate commerce in connection with goods or services; (3) that the false designation is likely to cause confusion, mistake or deception as to the origin, sponsorship or approval of AFS's goods and services by another person; and (4) that AFS has been or is likely to be damaged as a result.  See AT&T Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1428 (3d Cir. 1994).  False designation of origin claims often take one of two forms: "passing off" claims and "reverse passing off" claims. The Supreme Court distinguished the two claims as follows:  "Passing off (or palming off, as it is sometimes called) occurs when a producer misrepresents his own goods or services as someone else's.  Reverse passing off, as its name implies, is the opposite: The producer misrepresents someone else's goods or services as his own."  Dastar, 539 U.S. at 28 n.1 (citations omitted).  Based upon the pleadings, it appears that AFS's claim is one for "reverse passing off."

AFS grounds its false designation claim, like its false advertising claim, on defendants' representations to prospective consumers and the general public that it designed and manufactured the TELHS system installed at Wallops Island.  AFS

48

contends that Huber and INSYSMA have misdesignated and marketed the TELHS system on their website as their own product. (Doc. 65 ¶¶ 74-75). AFS alleges that defendants have accomplished this by placing a photograph of the TELHS system on their website and failing to attribute the system to AFS, implicitly branding the TELHS system as their own. (Id.)

In addition to the ownership arguments addressed *supra*, defendants contend that AFS has failed to establish that any alleged misdesignation is "likely to cause confusion" among target audiences. (Doc. 43 at 11). Defendants argue that the TELHS system is complex and expensive and, consequently, potential consumers exercise heightened care in making purchasing decisions. Defendants posit that, given this heightened scrutiny, "it may be presumed that it is, in fact, unlikely that [AFS's] customers or potential customers would be confused by [defendants'] use of [AFS's] mark or marks. . . ." (Doc. 43 at 11 (citing Checkpoint Sys. v. Check Point Software Techs., Inc., 269 F.3d 270, 280- 81 (3d Cir. 2001)). AFS has failed to respond to this argument in its opposition papers, but the court is disinclined to grant defendants' motions on this basis at the Rule 12 stage. AFS's amended complaint, with all inferences drawn in its favor, could fairly be construed as alleging not only that defendants created a likelihood of confusion, but also that the confusion was realized in that potential consumers chose the defendants' services over those of AFS. These facts, if true, establish that confusion was likely and, in fact, became reality. The court will deny defendants' motion to dismiss AFS's false designation claim. However, AFS has again limited its allegations

49

regarding the website to the conduct of Huber and INSYSMA.  Hence, the false designation claim will be dismissed as to L&H, Vann, and Aufiero.[16]

### 4.   *Damages*

Huber lastly contends that AFS fails to allege that it suffered any damages as a result of alleged Lanham Act violations.  Both false advertising and false designation claims required a plaintiff to plead a likelihood of commercial injury to the plaintiff flowing from the false representation or designation.  Pernod Ricard USA, 653 F.3d at 248 (requiring plaintiff to plead a "likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." in support of false advertising claim); AT&T, 42 F.3d at 1428 (in false designation case, plaintiff must plead that he or she "has been or is likely to be damaged as a result" of violation).  Defendants assert that AFS fails to allege that L&H was awarded the Air Force bid based on any misrepresentation and that AFS consequently did not allege damages flowing from false advertisement.  (Doc. 48 at 18).  Even if the court were to find that no injury flowed from defendants' misrepresentations in keeping the Air Force bid from AFS's attention, AFS nonetheless alleges additional misrepresentations and damages flowing from defendants' Lanham Act violations.  Specifically, AFS alleges that the purposeful ambiguity on INSYSMA's website was intended to—and did—successfully divert business from AFS to the various defendants.  (Doc. 65 ¶

_____

[16] Given the court's leave to amend AFS's CFAA claim, the court will also grant AFS leave to amend its pleading with respect to the Lanham Act claims against L&H, Vann, and Aufiero.

75).  The amended complaint also permits an inference that some or all of the

missed business opportunities cited by AFS resulted from the false advertisements

and false designations of the TELHS system's origin.  (<u>Id.</u>)  For purposes of Rule 12,

AFS has satisfied the damages element of each Lanham Act claim.  The court will

deny defendants' motion to dismiss on this basis.

> ### E.    Tortious Interference with Contractual Relationships

Defendants seek dismissal of AFS's claim under Pennsylvania common law

for tortious interference with contractual relationships.  To prevail on a tortious

interference claim under Pennsylvania law, a plaintiff must plead:

> (1) the existence of a contractual or prospective
> contractual or economic relationship between the plaintiff
> and a third party; (2) purposeful action by the defendant,
> specifically intended to harm an existing relationship or
> intended to prevent a prospective relation from
> occurring; (3) the absence of privilege or justification on
> the part of the defendant; (4) legal damage to the plaintiff
> as a result of the defendant's conduct; and (5) for
> prospective contracts, a reasonable likelihood that the
> relationship would have occurred but for the defendant's
> interference."

<u>Acumed LLC v. Advanced Surgical Servs., Inc.</u>, 561 F.3d 199, 212 (3d Cir. 1999);

<u>see</u> <u>also</u> <u>Glenn v. Point Park College</u>, 272 A.2d 895, 898 (Pa. 1971).  Defendants

collectively challenge the sufficiency of AFS's allegations with respect to the first,

third, and fifth elements.

> ### 1.    *Actual or Prospective Contractual Relations*

The first and third elements require a plaintiff to establish either the current

existence of a contractual or economic business relationship or, in the case of

prospective relationships, a reasonable likelihood that the relationship would have occurred.  <u>Acumed LLC</u>, 561 F.3d at 212; <u>Glenn</u>, 272 A.2d at 898.  Defendants contend that AFS has failed to establish anything beyond the "mere hope" of future contractual relationships and has not established existing contractual relationships sufficient to satisfy the first element of its claim.  (<u>See</u> Doc. 35 at 22-23; Doc. 43 at 12-13).  The court disagrees.

AFS alleges that it had a contractual relationship with supplier Maritime Hydraulic, a cylinder manufacturer with whom AFS has a non-disclosure agreement.  (Doc. 65 ¶¶ 73-75).  AFS further alleges that defendants falsely represented to Maritime that Orbital owned all of AFS's proprietary information, including rights to all AFS designs, and succeeded in encouraging Maritime to violate the existing non-disclosure agreement with AFS and provide a quote to INSYSMA.  (<u>Id.</u>)  To the extent defendants assert that AFS fails to allege existence of and intentional interference with an existing contract, they are simply incorrect.

Defendants underscore the tenuity of AFS's alleged prospective relationships.  In support of this claim, AFS asserts that it had a reasonable expectation of continued contractual relationships with VCSFA in light of its successful performance of its existing contractual relationship.  (Doc. 65 ¶ 22 ("Historically,  AFS has received substantial revenue from upgrading and servicing hydraulic systems after they are placed in the field.")).  AFS also contends that it had a reasonable expectation to be awarded contracts with the Air Force, Navy, and Army and that defendants intentionally interfered with those relationships.  (<u>See</u>

id. ¶¶ 77-84 (Huber and L&H diverted Air Force bid to L&H and deprived AFS of opportunity to bid); ¶¶ 85-90 (same, in context of Navy bid); ¶ 91 (same, in context of Army bid)).[17]  The amended complaint alleges that Huber, at the direction of the other defendants, intentionally diverted these prospective projects from AFS to L&H or INSYSMA.  (See id. ¶ 13).

The court concludes that, for purposes of Rule 12(b)(6), AFS sufficiently alleges a reasonable expectation of realizing these prospective contracts.  The courts of the Commonwealth have held that "prospective contractual relations" contemplate something "more than a mere hope there will be a future contract" but "less than [an existing] contractual right."  Acumed, 561 F.3d at 213 (citing Phillips v. Selig, 959 A.2d 420, 428 (Pa. Super. Ct. 2008)).  One Pennsylvania court has cogently rejected defendants' proof of certainty position, observing:

> It is true that there could be no guarantee of [the prospective contractor's] reaction to any offer that might be submitted, and it of course was under no compulsion to deal with either appellants or appellee.  But anything that is prospective in nature is necessarily uncertain.  We are not here dealing with certainties, but with reasonable

---

[17] The amended complaint also makes reference to two public works projects in New York and New Jersey which belonged to AFS.  AFS alleges that both projects were located in Huber's territory, that both generated substantial revenue for AFS, and that Huber stored information regarding these projects on an external hard drive which he did not return to AFS. (Doc. 65 ¶¶ 92-94).  The amended complaint offers no other allegations establishing that defendants interfered with these existing relationships. (See id.)  The court is therefore compelled to grant defendants' motion to dismiss AFS's tortious interference claim to the extent it relates to the New York and New Jersey projects without prejudice to AFS's right to amend these claims in any amended pleading it may file.

> likelihood or probability.  This must be something more
> than a mere hope or the innate optimism of the salesman.

Glenn, 272 A.2d at 898-99.  Here, according to the amended complaint, AFS's own

employee was contacted by and solicited AFS's prospective clients and diverted the

business from AFS to defendants.  (Doc. 65 ¶¶ 78-80 (Huber, while employed with

AFS, was in contact with Air Force and diverted Air Force bid to L&H); ¶¶ 85-90

(same, in the context of a Navy bid); ¶ 91 (same, in context of an Army bid).  AFS

alleges that it had traditionally experienced a record of "success in bidding on

similar projects."  (Id. ¶ 121).  Further, with respect to the TELHS contract, AFS

alleges that it performed the initial contract with great success and historically had

received upgrade contracts when its principal project was successful.  (See id. ¶ 22

("AFS  has received substantial revenue from upgrading and servicing hydraulic

systems after they are placed in the field."); see also ¶ 118).  For purposes of Rule

12(b)(6), the court concludes that AFS sufficiently states a reasonable likelihood

that, but  for defendants' collective diversionary tactics, it would have had an

opportunity to bid on and receive the Air Force, Navy, and Army contracts.[18]

Defendants'

---

[18] In any event, given the necessarily subjective nature of a reasonable
expectations inquiry, resolution of this issue most appropriately awaits a more
developed record.

motion will be denied on this ground.[19]

### 2.    *Privilege or Justification*

Pennsylvania law also requires tortious interference plaintiffs to prove that defendants' interference with existing or prospective contracts was not justified or privileged under the circumstances. Acumed, 561 F.3d at 214 (citing Triffin v. Janssen, 626 A.2d 571, 574 n.2 (Pa. Super. Ct. 1993)). Pennsylvania has adopted the Restatement (Second) of Torts with respect to justification in tortious interference cases and "recognizes that competitors, in certain circumstances, are privileged in the course of competition to interfere with others' prospective contractual relationships." Id. at 215 (citing Gilbert v. Otterson, 550 A.2d 550, 554 (Pa. Super. Ct. 1988)). The scope of the privilege is not precisely defined; instead, courts typically query whether the defendant's actions "are sanctioned by the 'rules of the game'" adopted by society and fall within the "area of socially acceptable conduct which the law regards as privileged." Empire Trucking Co. v. Reading Anthracite Coal Co., 71 A.3d 923, 935-36 (Pa. Super. Ct. 2013) (observing that the nature of the

---

[19] Defendants cite Acumed as support for their contention that AFS's "mere hopes" of receiving Air Force, Navy, and Army contracts are too attenuated to support its tortious interference claim. Acumed is distinguishable for three crucial reasons. First, that case was decided by a jury on a full record, permitting a more comprehensive inquiry into the reasonable likelihood question. Acumed, 561 F.3d at 209. Second, the defendant presented evidence that the sales territory at issue was covered by only one other primary seller, but saturated with secondary sellers, removing any reasonable probability that the plaintiff would have made sales but for defendant's interference. Id. at 213-14. Third, and most critically, the court concluded that, regardless of the likelihood of plaintiffs realizing the prospective contracts, plaintiffs had presented no evidence of wrongful conduct by the defendant, precluding tortious interference liability entirely. Id. at 214-16.

defendant's conduct is "at the heart of" tortious interference inquiries) (citing

Phillips, 959 A.2d at 430).  When a defendant employs "wrongful means" to interfere

with a prospective contract, the privilege does not apply.  Acumed, 561 F.3d at 215.

In other words, a defendant cannot be held liable if the conduct underlying the

interference claim is not separately actionable in tort.  Id. at 215-16 (requiring

plaintiff to demonstrate "that a defendant engaged in conduct that was actionable

on a basis independent of the interference claim").

AFS has accomplished exactly that.  AFS alleges that defendants' actions

went beyond fair competition and were unlawful from the outset.  According to

AFS, Huber, at the other defendants' behest and encouragement, intentionally

foiled AFS's chances at receiving certain contracts.  For example, AFS contends

that, in September 2012, while contemporaneously working with defendants and as

a faithless employee of AFS, Huber submitted an unusually high bid on behalf of

AFS for upgrades to TELHS's gripper arms and submitted a substantially lower bid

on behalf of L&H for the same project.  (Doc. 65 ¶¶ 60-61).  As a direct result of

Huber's conduct, L&H and INSYSMA received the contract for the upgrade over

AFS.  (Id. ¶ 67).  AFS alleges that Huber, while working for AFS, diverted Air Force,

Army, and Navy bids to L&H, which otherwise would have been awarded to AFS.

(Doc. 65 ¶¶ 78-91).  The court has already concluded *supra* that these allegations, if

true, are separately actionable.  Under the circumstances, these facts preclude

application of the fair competition privilege in the present procedural posture.  The

court will deny defendants' motion on this basis.

**IV.**   **Conclusion**

For all of the foregoing reasons, the court will grant in part and deny in part

defendants' motions to dismiss (Docs. 28, 33) as fully explained herein.  An

appropriate order follows.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:      June 18, 2014