# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ADVANCED FLUID SYSTEMS, INC.,** | : | **CIVIL ACTION NO. 1:13-CV-3087** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **KEVIN HUBER, INSYSMA** | : | |
| **(INTEGRATED SYSTEMS AND** | : | |
| **MACHINERY, LLC), LIVINGSTON &** | : | |
| **HAVEN, LLC, CLIFTON B. VANN IV,** | : | |
| **and THOMAS AUFIERO,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Advanced Fluid Systems, Inc. ("AFS"), commenced this civil action alleging that the collective defendants—a former employee and several of AFS's competitors—colluded to misappropriate AFS's trade secrets and deprive AFS of valuable business opportunities. All parties have zealously litigated this case, proceeding through multi-faceted Rule 12 motion practice, substantial discovery, and thorough summary judgment presentations. The case culminated in a six-day bench trial in September 2017, after which the court issued a 54-page memorandum opinion and awarded $3,096,009 in compensatory, exemplary, and punitive damages to AFS. All parties now seek post-trial relief pursuant to various Federal Rules of Civil Procedure.

# I. __Factual Background and Procedural History__[1]

The key players in this case are by now familiar. AFS manufactures, distributes, and installs hydraulic components and hydraulic systems. __Advanced Fluid Systems, Inc. v. Huber__, 295 F. Supp. 3d 467, 470 (M.D. Pa. 2018). Dan Vaughn is AFS's vice president and engineering manager, and his father, Jim Vaughn, is founder and president of the firm. __Id.__ Defendant Kevin Huber ("Huber") was employed by AFS as a full-time sales engineer from November 2006 through his resignation on October 26, 2012, when Huber left to create his own firm, defendant Integrated Systems and Machinery, LLC ("Integrated Systems"). __Id.__ at 470-71. Defendant Livingston & Haven, LLC ("Livingston"), designs, assembles, and installs hydraulic fluid systems. __Id.__ at 471. Defendant Clifton B. Vann IV ("Vann") was Livingston's president at all relevant times. __Id.__ Defendant Thomas Aufiero ("Aufiero") was employed by AFS as a sales engineer and later as a sales manager from 1989 until January 2011, when he left to work for Livingston. __Id.__

---

[1] The factual background of this case is detailed at length in the court's findings of fact, familiarity with which is presumed. __Advanced Fluid Sys., Inc. v. Huber__, 295 F. Supp. 3d 467, 470-82 (M.D. Pa. 2018). We reiterate salient aspects of that background herein for necessary context in addressing the parties' post-trial motions. Citations to the record include the court's findings of fact and conclusions of law; the official transcript of the six-day bench trial convened from September 18 through September 25, 2017, ("[Date] Tr."); and trial exhibits introduced by AFS ("AFS Trial Ex. __"); the Livingston defendants ("L&H Trial Ex. __"); and Huber and Integrated Systems ("Huber Trial Ex. __"). Post-trial exhibits attached to the parties' motions are cited by reference to the applicable Electronic Court Filing system docket entry ("Doc. __-__").

Shortly after beginning employment with AFS, Huber gave AFS the "lead" on a hydraulics project at Wallops Island, Virginia. Id. A college friend of Huber's, Keith Fava ("Fava"), was employed by Orbital Sciences Corporation ("Orbital") and advised that the Virginia Commonwealth Space Flight Authority ("the Authority") was seeking a hydraulics supplier to design a system to launch Orbital's "Antares" rocket from NASA's facility at Wallops Island. Id. The Antares rocket services and supplies the International Space Station. Id. AFS contracted with the Authority in September 2009 to build, install, and maintain the system. Id.

The resulting installation—the Teleporter/Erector/Launcher Hydraulic System ("Hydraulic System")—includes multiple constituent parts, including a "TEL" or "strongback" component which carries the rocket to the launch pad; a pair of "gripper arms" which secure the rocket to the strongback; and the hydraulic cylinder assemblies, which lift the rocket and strongback from horizontal to vertical position for launch. Id. at 471-72. During design and installation of the system, AFS generated a comprehensive package of engineering drawings which it delivered to the Authority. Id. at 472. Each drawing included an AFS title block declaring that the material was proprietary and confidential. Id. Testimony at trial indicated that, with limited exceptions, Orbital and the Authority were satisfied with AFS's work. Id. at 473. Orbital's lead engineer, Michael Brainard ("Brainard"), testified that the system performed "flawlessly" at its first launch and "very well" thereafter, and that his minor customer service complaints were remediable. See id.

Aufiero resigned from Livingston in January 2011 but remained in close contact with Huber. Id. Huber began flagging potential business opportunities

for Aufiero, who eventually coordinated a meeting between Huber and several of Livingston's "high level" employees, including Vann. Id. Huber indicated to the Livingston team at this initial meeting on January 8, 2012, that "the relationship between AFS and [Orbital] was souring," creating an opportunity for Livingston to step in. Id. (alteration in original). That same day, Livingston employees connected to Huber via a commercial Dropbox folder, established a virtual private network on his AFS laptop, and provided him with a Livingston email address. Id. at 473-74. Vann was cognizant of the Dropbox arrangement. Id. As early as March 6, 2012, Huber began sharing AFS documents with Livingston employees, the first of which was a confidential list of spare and component part pricing for the Hydraulic System. Id. at 474.

Huber identified Livingston to Brainard as a potential replacement for AFS and coordinated a visit to Wallops Island for March 21, 2012, for Aufiero and two other Livingston employees. Id. During that visit, the Livingston team toured the rocket assembly and launch areas, and Fava told the group that Orbital was planning to upgrade both the gripper arms and the cylinder assemblies. Id. Huber arranged another visit for April 12, 2012, this time inviting Vann. Id. In the weeks preceding the second meeting, Huber shared several confidential AFS documents with Livingston, including lists of spare parts, bills of materials, and "top-level drawings and hydraulic schematics" for the entire Hydraulic System. Id. at 474-75. The Livingston team reviewed these documents to prepare for the upcoming meeting. Id. Vann communicated with Huber directly about the trip and about Huber's efforts to give Livingston an advantage with Orbital. Id. at 475. During

the April 12 meeting, attended by Huber, Vann, Aufiero, and another Livingston employee, the group again discussed Orbital's upcoming plans for the system, including both the gripper arms upgrade and two options for the cylinder assembly work—a "new" cylinder option and a "modified" cylinder option. Id. at 475-76.

That the Livingston team, including Vann, knew that Huber was an AFS employee is undisputed. Id. Although Vann, Aufiero, and other Livingston employees repeatedly expressed concern about working with Huber while he was employed by a competitor known to be doing business with Orbital, id. at 475, they continued to work with him, id. at 475-81. In May 2012, Livingston actually doubled down on the partnership, with Vann authorizing a compensation package in which Livingston agreed to pay Huber 5.5% of sales on the Hydraulic System project and proposed that Huber serve as Livingston's "project manager" for the Hydraulic System. Id. at 476.

When Orbital sought bids for the gripper arms replacement contract, Livingston and AFS were both in the running, with AFS initially having "a slight nudge" in its favor "due to their experience with the current system." Id. at 476-77. Huber worked closely with Livingston to prepare its firm fixed price of $320,500, which Livingston submitted on September 7, 2012. Id. Huber thereafter inflated AFS's firm fixed price—from $277,828.80 to $410,383—to ensure that Livingston's bid was more competitive. Id. at 477. Livingston was awarded the contract, and Orbital's contemporaneous notes reflect that its decision was based on price. Id. During the ensuing design process, Livingston's team relied extensively on AFS's confidential engineering drawings. Id. Livingston subsequently received contracts

for gripper arms installation and refurbishment which Brainard confirmed would have gone to AFS had it received the underlying replacement contract.  Id.

Orbital also considered both AFS and Livingston for its cylinder assembly project.  Id. at 477-78.  Huber and Livingston knew by April 2012 that Orbital was considering both a "new" and a "modified" cylinder option.  Id. at 478.  Orbital wanted AFS to quote both options, but Huber delayed in disclosing the modified cylinder option to AFS until July 2012 and never revealed the new cylinder option, which Huber and Livingston knew to be Orbital's strong preference.  Id.  Huber pushed AFS to quote a modified cylinder plan, despite AFS's misgivings about its feasibility, while encouraging Livingston to pursue the new cylinder option alone.  Id. at 478-79.  Huber and Livingston worked closely to develop a proposal for the new cylinders, drawing again on confidential AFS documents supplied by Huber.  Id.  Livingston's receipt of the gripper arms contract and AFS's pursuit (at Huber's insistence) of the less-preferable modified cylinder option effectively eliminated AFS as a contender for the cylinder contract.  Id. at 479.

In October 2012, unbeknownst to Livingston or AFS, Huber created his own company, Integrated Systems, intending to submit a competing bid for the cylinder contract.  Id.  On October 8, 2012, Huber downloaded nearly 98 gigabytes of AFS's proprietary files, including its engineering drawings, bills of materials, and other documents for the Hydraulic System; documents pertaining to AFS's gripper arms quote; and all of its pending and past project files dating back to 1993.  Id. at 479-80.  Huber then tendered his resignation notice to AFS, setting a last day of November 9, 2012, and later accelerating that date to October 26, 2012.  Id. at 480.

6

Huber continued working with Livingston on its gripper arms design and its cylinder upgrade bid, and he shared with the Livingston team many of the files that he took from AFS on October 8. Id. Livingston's preparatory efforts and eventual bid for the new cylinder option relied heavily on drawings generated by AFS in its design of the Hydraulic System as well as insider knowledge gathered from Huber. Id. On November 2, 2012, Livingston submitted its proposal, which was then discussed at length during a November 7 "kick off" meeting for the gripper arms project. Id. To both Livingston's and AFS's surprise, Orbital awarded the cylinder contract to Integrated Systems on March 20, 2013. Id. AFS's experts calculated its lost profits on the gripper arms contract and subcontracts to be $254,984 and its lost profits on the cylinder upgrade to be $841,025. Id. at 480-81.

AFS commenced this action on December 24, 2013, initially naming Huber, Integrated Systems, Livingston, Vann, Aufiero, and Orbital as defendants. AFS eventually dismissed Orbital from the lawsuit pursuant to a settlement agreement, in which Orbital agreed to award AFS a subcontract for component swap work on the Hydraulic System as consideration for AFS's release of claims against Orbital. (L&H Trial Ex. 69 at 1-2; Huber Trial Ex. 58 at 1-2).[2] The agreement explicitly disclaims waiver by AFS of its claims against the remaining defendants, to wit:

> It is expressly understood and agreed that this Release is in
> no way intended to, and will not be construed to, waive,
> impact, discontinue, release or otherwise impair any of the
> Claims that AFS has asserted, or may choose to assert, in
> the Action against remaining defendants Huber, INSYSMA,
> L&H, Vann, and Aufiero (hereafter "remaining defendants")

---

[2] AFS has agreed that the settlement agreement can be filed to the docket and made available publicly. (See Doc. 366-10).

> or any person or entity other than Orbital.  AFS expressly
> reserves its right to continue to pursue its Claims, as well as
> any other claims, against these remaining defendants or any
> other person or entity other than Orbital.  It is further
> agreed that the consideration paid for this release is solely
> the work under the new subcontract . . . and that no money
> is being paid by Orbital pertaining to items of damages
> asserted by AFS against remaining defendants for[,] *inter
> alia*, tortious interference with the cylinder upgrade
> contract or upgraded gripper arms contract or loss of any
> other contracts or contractual opportunities caused by
> remaining defendants.

(L&H Trial Ex. 69 at 2; Huber Trial Ex. 58 at 2).  Orbital agreed as part of the

settlement to "furnish reasonable cooperation" to AFS in pursuit of its claims

against the remaining defendants.  (L&H Trial Ex. 69 at 3; Huber Trial Ex. 58 at 3).

After Rule 12 and Rule 56 motion practice winnowed the initial claims, we

proceeded to a bench trial on two counts: a statutory claim for misappropriation

of trade secrets under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"),

12 PA. CONS. STAT. § 5301 *et seq.*, against all defendants, and common-law claims

for breach of fiduciary duty against Huber and for aiding and abetting that breach

against the remaining defendants.  All parties submitted proposed findings of fact

and conclusions of law with their pretrial memoranda.

Trial began on September 18, 2017.  The Livingston defendants were

represented at trial by Philip J. Morin, Esquire ("Attorney Morin"), and Nishali

Amin Rose, Esquire ("Attorney Rose").  When Attorney Morin stood to give his

opening statement, the court noted that Attorney Morin had not formally entered

his appearance on behalf of the Livingston defendants.  (9/18/17 Tr. 22:15-19).  The

court recorded Attorney Morin's appearance from the bench but instructed him to

complete and submit the proper form for the record, and Attorney Morin agreed to do so. (Id. at 22:20-25). Attorney Morin then proceeded with his opening statement.

The next day, Attorney Morin asked to address the court before trial resumed. (9/19/17 Tr. 4:2-6). At sidebar, Attorney Morin advised that he had not been admitted to practice in this district and that he realized he should have flagged the issue earlier, offering that "I know I'm in violation of the court's rules and ethics rules in that regard." (Id. at 4:8-16). Attorney Morin indicated that Attorney Rose would sponsor his *pro hac vice* admission. (Id. at 4:17-21). He also disclosed his disciplinary history, including a public reprimand in New Jersey and a reciprocal suspension imposed by New York in 2015. (Id. at 5:1-7). In response to the court's inquiry whether Attorney Morin was then "credentialed and fully admitted in both jurisdictions," Attorney Morin stated that he was authorized to practice in New Jersey but that New York required him to file a motion for reinstatement, which was pending. (Id. at 5:8-14). The court accepted Attorney Morin's representations, instructing him to "file the paperwork and we'll get you admitted *pro hac vice*," and the conference concluded. (Id. at 5:15-6:6). Attorney Morin, however, never filed the admission paperwork.

Trial proceeded through two additional days of evidence and testimony during which all counsel, including Attorney Morin, zealously represented their respective clients. At the close of AFS's case in chief, Attorney Morin moved for judgment on behalf of the Livingston defendants pursuant to Federal Rule of Civil Procedure 52(c) and presented oral argument on the motion. (9/21/17 Tr. 100:18-106:19). The undersigned found Attorney Morin's arguments to be "well stated"

but nonetheless denied the motion. (Id. at 106:20-22, 112:4-115:7). Both groups of defendants then put on evidence and called numerous witnesses. Before closing the record, the court commended all counsel "for a well tried case." (9/25/17 Tr. 176:5-7).

The court issued a post-trial order directing the parties to file proposed findings of fact and conclusions of law, including record citations, within 30 days of receipt of the official transcript. The parties thereafter stipulated to extend the deadline for proposed findings and conclusions to December 4, 2017. AFS filed its proposed findings and conclusions on November 16, 2017. Huber and Integrated Systems followed suit on December 4, 2017. The Livingston defendants never filed a post-trial submission, nor did they request an extension of time in which to do so. On December 15, 2017, counsel for AFS docketed a letter stating its position that the Livingston defendants had waived the right to file any further proposed findings and conclusions by failing to meet the December 4 deadline.

On March 6, 2018, the court issued its findings of fact and conclusions of law. We entered judgment against Huber, Integrated Systems, Livingston, Vann, and Aufiero on AFS's trade secret misappropriation claim; against Huber on the breach of fiduciary duty claim; and against Livingston and Vann but in favor of Aufiero on the aiding and abetting breach of fiduciary duty claim. We awarded compensatory damages in the amount of $1,096,009, reflecting the lost profits on the gripper arms and cylinder contracts, against Huber, Integrated Systems, Livingston, Vann, and Aufiero, jointly and severally. We also awarded $1,000,000 in exemplary damages

on the PUTSA claim against Huber alone, and $1,000,000 in punitive damages on the common-law claims against Huber, Livingston, and Vann, jointly and severally.

One week after the court entered judgment, new counsel entered an appearance on behalf of the Livingston defendants. New counsel filed the Livingston defendants' instant post-trial motion shortly thereafter. Affidavits submitted by Vann and Aufiero in connection with that motion reflect that they were unaware that Attorney Morin was not authorized to practice in this district; that Attorney Morin never disclosed his past disciplinary history to his clients; and that Attorney Morin did not disclose to either defendant the mid-trial sidebar discussion concerning his non-admission. (Doc. 351-9 ¶¶ 7, 9, 11; Doc. 351-10 ¶¶ 5, 7-8, 10).

The Livingston defendants also submit the affidavit of James Skinner, III ("Skinner"), which attests that Attorney Morin actively misled his clients regarding the status of the case in the months after trial. Skinner avers that Attorney Morin represented that proposed findings and conclusions were due within 30 days of the final transcript's filing. (Doc. 351-8 ¶ 8). On December 21, 2017, Skinner emailed Attorney Morin for a status update, and Attorney Morin responded: "I will send you out the draft of my findings/conclusions tomorrow. I plan to file next week so if you have a chance to review and provide any constructive critique, I'd appreciate it." (Id. ¶ 9). When Attorney Morin did not send the draft, Livingston's outside counsel, Martin L. White, Esquire ("Attorney White"), sent two follow-up emails, one dated December 27, 2017, and one dated January 8, 2018, inquiring about the status of the draft and the litigation. (Id. ¶¶ 9-10). Attorney Morin replied: "Good afternoon. I

requested an extension of time to January 17.  I will get you a draft by Thursday at the latest for your review and comment."  (Id. ¶ 11).

On January 26, 2018, Attorney White again contacted Attorney Morin requesting an update.  (Id. ¶ 12).  Attorney Morin advised that "we requested an additional (and final) extension to 1/31," adding that "I do want to get you my draft to review and will send it out by Monday morning at the latest so you have it in hand prior to the Board meeting."  (Id.)  Attorney White spoke by phone with Attorney Morin on February 20, 2018, and thereafter sent the following email:

> Phil, good talking with you this afternoon.  Just to confirm: we have until this Friday, February 23, to file our proposed Findings of Fact and Conclusions of Law with the Court, and you'll send me a draft to review before then.  I was able to find the attached letter from plaintiff's counsel on the court's website today [referring to AFS's December 15 letter], but I understand from you that you got this issued resolved.  Please let me know if I have misunderstood anything.
>
> I'll look forward to your email later this week.

(Id. ¶ 13).  Attorney Morin responded, "That is correct, Marty."  (Id.)  Two weeks later, Vann, Aufiero, and Skinner received the court's opinion and judgment and learned that Attorney Morin never requested an extension from the court.  (Doc. 351-8 ¶ 14; Doc. 351-9 ¶ 10; Doc. 351-10 ¶ 9).  Skinner has attached to his affidavit a copy of the post-trial email exchanges with Attorney Morin.  (Doc. 351-8, Exs. 2-6).

Before the court are (1) the Livingston defendants' motion for new trial or relief from judgment or, in the alternative, to amend our judgment, findings, and conclusions; (2) Huber and Integrated System's motion to amend our findings and judgment or, in the alternative, for a new trial; (3) AFS's motion to amend our

conclusions to allow counsel fees against the Livingston defendants; and (4) the Livingston defendants' motion to amend pleadings to conform to evidence.  The motions have been extensively briefed and are ripe for disposition.  Defendants also request oral argument on their respective motions pursuant to Local Rule of Court 7.9.  (Doc. 346 at 2 n.1; Doc. 350 at 34).  Because we find oral argument unnecessary to disposition of the instant motions, we will deny this request.

## II.    **Discussion**

All defendants move the court, pursuant to various Federal Rules of Civil Procedure, to either set aside or substantially alter the findings of fact and conclusions of law rendered, and thus the judgment entered, on March 6, 2018.[3] The Livingston defendants request a new trial or *vacatur* of the court's judgment based on alleged misconduct by their former counsel.  Both groups of defendants then oppugn the findings of fact, conclusions of law, and judgment on multiple other grounds, asking the court to set aside various liability determinations and reduce the compensatory and punitive damages award to zero.  We begin our analysis with the Livingston defendants' arguments concerning former counsel.

---

[3] The Livingston defendants also move to amend their pleadings to conform to the evidence at trial.  Because this motion is substantially related to their motion to amend the judgment, findings, and conclusions (and AFS's opposition thereto), we address both motions together.  Similarly, because AFS's separate motion to modify the court's conclusions to permit an award of attorney's fees against the Livingston defendants is intertwined with the Livingston defendants' motion to alter the damages award, we will address these motions simultaneously.

### A. Alleged Fraud on the Court and Excusable Neglect by Former Counsel

The Livingston defendants invoke Federal Rules of Civil Procedure 59(a)(1)(B), 60(b)(1), and 60(b)(6) in urging the court to vacate its judgment and grant a new trial based on the purported misconduct of their former counsel, Attorney Morin.  (Doc. 350 ¶¶ 4-8).  Rule 59(a)(1)(B) permits a court, following a bench trial, to grant a new trial on any issue "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court."  FED. R. CIV. P. 59(a)(1)(B).  Rule 60(b)(1) articulates several bases on which a court may grant relief from final judgment, to wit: "mistake, inadvertence, surprise, or excusable neglect."  FED. R. CIV. P. 60(b)(1).  And Rule 60(b)(6) allows a court to vacate a final judgment for "any other reason that justifies relief."  FED. R. CIV. P. 60(b)(6).

The Livingston defendants ground their request in two theories: *first*, that Attorney Morin committed fraud on the court and also his clients by allegedly misrepresenting his professional disciplinary history and engaging in unauthorized practice of law; and *second*, that Attorney Morin's failure to file proposed findings of fact and conclusions of law on behalf of his clients was "excusable neglect" justifying relief from judgment.[4]

---

[4] The Livingston defendants do not identify a separate basis for a new trial under Rule 59(a)(1)(B).  We construe their arguments regarding fraud on the court and excusable neglect as being made collectively under Rule 59(a)(1)(B) and Rules 60(b)(1) and 60(b)(6), respectively.  The difference is in the relief requested: they seek both a new trial, which is authorized by Rule 59(a)(1)(B), and *vacatur* of the judgment, which falls under Rule 60(b).

### 1. *Fraud upon the Court*

The Livingston defendants first contend that Attorney Morin committed fraud concerning his ability to practice law. Specifically, they assert that Attorney Morin committed fraud (1) on his clients by concealing his professional disciplinary history from them and (2) on the court by disclosing only certain aspects of that disciplinary history when the issue was raised at trial. We find no basis to vacate the judgment or grant a new trial on grounds of fraud.

The Livingston defendants appear to invoke Rules 60(b)(3) and 60(b)(6) in tandem. Their motion and supporting brief cite only to Rule 60(b)(6), but then rely largely on decisional law arising under Rule 60(b)(3). (See Doc. 362 at 13-14). We must not blur the distinction, because the two rules provide different avenues of relief. Rule 60(b)(3) permits courts to reopen a judgment in certain instances of fraud, to wit: "fraud (whether previously called intrinsic or extrinsic) . . . by an opposing party." FED. R. CIV. P. 60(b)(3). Ostensibly, defendants did not invoke Rule 60(b)(3) explicitly because its plain text forecloses application here—the rule applies only to purported fraud committed "by an *opposing party.*" Id. (emphasis added); see also 11 CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE & PROCEDURE § 2864 (3d ed. 2018).

The Livingston defendants are thus left to pursue relief under Rule 60(b)(6) alone. Relief under that section is reserved for "extraordinary circumstances." Cox v. Horn, 757 F.3d 113, 120 (3d Cir. 2014) (quoting Sawka v. Healtheast, Inc., 989 F.2d 138, 140 (3d Cir. 1993)). The rule vests courts with a "grand reservoir of equitable

power to do justice in a particular case." Id. at 122 (quoting Hall v. Cmty. Mental Health Ctr., 772 F.2d 42, 46 (3d Cir. 1985)).  Acts of fraud upon the court by a party's own attorney might, in certain circumstances, support *vacatur* of a judgment.  See 11 WRIGHT & MILLER, *supra*, § 2864.  Nonetheless, authority under Rule 60(b)(6) may be exercised only in the rare circumstance where, without relief, "an extreme and unexpected hardship would occur."  Cox, 757 F.3d at 120 (quoting Sawka, 989 F.2d at 140).

The fatal deficiency in the Livingston defendants' motion is that the record reflects nothing resembling "fraud" by Attorney Morin.  The New York reciprocal suspension order directed Attorney Morin to "desist and refrain from the practice of law in any form" and forbade him "to appear as an attorney or counselor-at-law before any court, judge, justice, board, commission or other public authority" for 90 days "and until further order of this Court."  In re Morin, 15 N.Y.S.3d 707 (N.Y. App. Div. 2015).  The Livingston defendants aver that this order, still in effect today, bars Attorney Morin from practicing law in *any* court and that his failure to disclose this "cease and desist" aspect to the undersigned constitutes fraud.  We disagree with this interpretation of the order and the suggestion that the New York Supreme Court has authority to subject Attorney Morin to a national ban on the practice of law.  The New York order applies only to practice of law in that state, see N.Y.

JUDICIARY LAW § 90, and Attorney Morin fully disclosed his status with the New York bar to this court.[5]

The Livingston defendants also assert that Attorney Morin misrepresented to them that he was "authorized to represent them and to practice law before this Court" and never disclosed his disciplinary history. (See Doc. 362 at 11). Vann and Aufiero attest that they were advised by Attorney Morin on January 24, 2014, that there was "no issue regarding his ability to practice before this Court." (Doc. 350-9 ¶ 7; Doc. 350-10 ¶ 5). Vann, Aufiero, and Skinner further aver that Attorney Morin never disclosed the New Jersey and New York discipline to them and that, had they known, they would have objected to Attorney Morin's representation and requested new counsel. (Doc. 350-8 ¶¶ 15-16; Doc. 350-9 ¶¶ 7, 11-12; Doc. 350-10 ¶¶ 5, 10-11).

Attorney Morin's alleged lack of candor with his clients is troubling, and it may potentially form the basis of a complaint of professional misconduct. However, it is not the deliberate "fraud" depicted by defendants. The reprimand entered on consent in New Jersey did not prohibit Attorney Morin from practicing law. See In re Morin, 93 A.3d 758, 759 (N.J. 2014). When New York issued reciprocal discipline in August 2015, the suspension was limited in both time and geographic scope. See In re Morin, 15 N.Y.S.3d at 700. Under these circumstances, it was not

---

[5] The Livingston defendants suggest that Attorney Morin committed fraud by failing to advise the court that he executed his petition for reinstatement with the New York bar on September 17, 2017, just one day before trial in this case. The timing of the petition matters not; Attorney Morin told the court on September 19, 2017, that he had not been formally readmitted in New York state, that he was required to file a petition for reinstatement to do so, and that his reinstatement petition was "pending." This statement was neither inaccurate nor deceptive.

unreasonable for Attorney Morin to assume, past discipline notwithstanding, that this court would eventually grant him *pro hac vice* admission. This assumption ostensibly informed his communication to the Livingston defendants that there were no obstacles to his representation of them. Attorney Morin's mistaken but good faith belief that reinstatement in New York would be a routine matter is not intentional fraud. We will deny the Livingston defendants' motion to vacate the judgment pursuant to Rule 60(b)(6).

### 2. *Excusable Neglect*

The Livingston defendants next argue that Attorney Morin's failure to file proposed findings of fact and conclusions of law following the bench trial in this matter constitutes "excusable neglect" requiring the court to set the judgment against them aside. Rule 60(b)(1) permits a court to relieve a party from a final judgment for "mistake, inadvertence, surprise, or excusable neglect." FED. R. CIV. P. 60(b)(1). The determination of whether neglect is excusable "is at bottom an equitable one," in which a court must "tak[e] account of all relevant circumstances surrounding the party's omission." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993).

Courts examine four factors in assessing whether an attorney's excusable neglect justifies setting aside a final judgment: "the danger of prejudice to the [non-movant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." Id.; see also Nara v. Frank, 488 F3d 187, 194 (3d Cir. 2007) (citing *In re* Cendant Corp. PRIDES Litig., 234 F.3d

166, 171 (3d Cir. 2000)).  The Third Circuit Court of Appeals has imposed "a duty of explanation" on district courts conducting an excusable neglect analysis.  *In re* Cendant Corp. PRIDES Litig., 234 F.3d at 171.

As an initial matter, it is not entirely clear that Rule 60(b)(1) should apply here.  In most cases implicating the rule, an attorney's alleged neglect has a direct and causal connection to the adverse judgment: for example, a proof of claim being foreclosed when an attorney fails to file it by the deadline, see, e.g., Pioneer Inv. Servs., 507 U.S. at 383-85; *In re* Cendant Corp. PRIDES Ligit., 235 F.3d at 168-69. Courts have intimated that excusable neglect principles do not apply when the merits of a claim or defense are reached despite counsel's alleged neglect.  See Logan v. Am. Contract Bridge League, 173 F. App'x 113, 115-17 (3d Cir. 2006) (nonprecedential) (citing Lorenzo v. Griffith, 12 F.3d 23, 27 & n.4 (3d Cir. 1993)).

The adverse judgment against the Livingston defendants did not flow automatically from a procedural or technical defect attributable to Attorney Morin. Rather, it followed six days of trial testimony and admission of hundreds of exhibits; opening and Rule 52(c) arguments by Attorney Morin on the Livingston defendants' behalf; and a careful review of the merits of the case by the court.  The Livingston defendants do not now identify anything that should have been done differently by Attorney Morin or his associates during pretrial motion practice or during the trial

itself; they object under Rule 60(b)(1) only to his failure to file post-trial proposed findings of fact and conclusions of law for the court's consideration.[6]

Assuming *arguendo* that Rule 60(b)(1) is available in such circumstances, we find no basis for its application here. The prejudice to AFS in being forced to retry this case would be considerable. Conversely, any prejudice to the Livingston defendants is minimal. As the court has observed, and thorough analysis *infra* confirms, the result would not have differed had we received a timely post-trial submission from the Livingston defendants' former counsel. The first <u>Pioneer</u> element weighs against the Livingston defendants.

The second element tasks the court to consider the length of the delay. <u>Pioneer Inv. Servs.</u>, 507 U.S. at 395. We credit the Livingston defendants' assertion that they did not learn of Attorney Morin's failure to make a post-trial filing until after the court entered its opinion and judgment on March 6, 2018. The Livingston defendants thereafter promptly retained new counsel and timely filed the instant post-trial motion. We must also consider, however, the "potential impact on judicial proceedings" of reopening the judgment. <u>Id.</u> The delay here was not substantial by any measure—whether calculated from the missed December 4, 2017 filing deadline

---

[6] We note that counsel did submit proposed findings and conclusions before trial, as an exhibit to the Livingston defendants' pretrial memorandum. (<u>See</u> Doc. 247-2). The pretrial submission raised many of the arguments that the Livingston defendants now claim, through new counsel, that Attorney Morin failed to present to the court. (<u>See</u>, <u>e.g.</u>, <u>id.</u> ¶¶ 20-41, 149, 153, 169 (arguing that Orbital's dissatisfaction with AFS's performance was the principal reason Orbital sought other vendors); ¶¶ 50, 150-56, 159-65 (positing that Livingston's team acted in good faith to confirm Huber's representations concerning Orbital's dissatisfaction with AFS and that Orbital was authorized to share drawings with Livingston); ¶ 173 (intimating that no Livingston employee committed "affirmative" wrongful act)).

or the court's March 6, 2018 ruling—but the impact of unwinding all that transpired in that time would be profound.  For several weeks, we carefully examined the voluminous trial record, eventually issuing a 54-page memorandum opinion in which we comprehensively assessed AFS's claims and requests for damages and, in fact, anticipated and addressed many of the arguments defendants now seek to raise.  AFS underscores this point in its briefing, (see Doc. 365 at 21-22), and the Livingston defendants offer no response, (see Doc. 362 at 16-17; Doc. 380 at 8-9).  To vacate the bench trial opinion and judgment under such circumstances would constitute a "disruption to efficient judicial administration," which favors leaving the judgment intact.  See Pioneer Inv. Servs., 507 U.S. at 397.

The third factor examines the proffered reasons for the delay, including whether those reasons were "within the reasonable control of the movant."  Id. at 395.  In this respect, Pioneer is instructive.  The attorney in Pioneer appealed to the court for leniency under Rule 60(b)(1) due to "a major and significant disruption" in his professional life when his withdrawal from his former firm left him unable to access case files for nearly a month.  Id. at 384.  The Court was unpersuaded that this apparent tumult constituted "excusable" neglect, "giv[ing] little weight to the fact that counsel was experiencing upheaval in his law practice" and instead granting relief based on the "unusual" and "ambiguous" notice setting forth the deadline at issue.  Id. at 398-99.

The Livingston defendants submit a declaration from Attorney Morin describing various personal, familial, and financial issues which converged during

the fall of 2017 to cause him to miss the filing deadline. (See Doc. 351-12).[7] We are not unsympathetic to the challenges described by Attorney Morin, and we do not doubt that those challenges impacted his professional life. But Attorney Morin simply did not exhibit "neglect" in the accepted sense of the word; rather, he allowed a deadline to pass without seeking further extension (despite having previously been granted a five-day extension without objection), and then repeatedly misled his clients regarding the status of their post-trial filing. This conduct cannot be fairly described as "inadvertence, mistake, or carelessness." See Pioneer Inv. Servs., 507 U.S. at 388.

Moreover, several attorneys from Attorney Morin's firm were counsel of record in this case and received electronic filing notifications, including notice of AFS's December 15 letter asking the court to deem the Livingston defendants to have waived their right to submit a post-trial filing. Yet none of these attorneys requested an extension of the filing deadline.[8] Particularly when other counsel of record bear equal responsibility to the client, courts have been disinclined to grant relief based on one attorney's claimed extenuating circumstances. Cf. In re Grigg, 568 B.R. 498, 514-15 (W.D. Pa. 2017) (noting that even if temporary disability was

---

[7] In the interest of protecting Attorney Morin's privacy, we do not describe these circumstances in detail and we cite only to the redacted version of Attorney Morin's affidavit. We note to the limited extent necessary to our analysis that we credit Attorney Morin's description of his personal, familial, and financial issues and accept as true that those issues had a substantial impact on Attorney Morin's mental health.

[8] The Livingston defendants do not endeavor to excuse these attorneys' conduct; they simply contend that only Attorney Morin was authorized to act on their behalf. We address and reject this assertion infra.

excusable neglect, "[n]o reasonable justification has been advanced . . . as to why any other attorney retained in this matter could not have" made the subject filing during the period of disability). We cannot conclude on this record that the missed deadline is attributable to "excusable neglect" by counsel.

The final <u>Pioneer</u> factor queries whether "the movant acted in good faith." <u>Pioneer Inv. Servs.</u>, 507 U.S. at 395. We agree with the Livingston defendants that the record is devoid of evidence that either Attorney Morin, his co-counsel, or any of the defendants acted in bad faith with respect to the filing deadline. This factor and the Livingston defendants' general post-trial diligence, however, do little to counterbalance the remaining <u>Pioneer</u> factors. We will thus deny the Livingston defendants' request to vacate the judgment and for a new trial pursuant to Rule 60(b)(1).

### 3. *Other Unauthorized Practice Claims*

The Livingston defendants' final argument on this subject is that Attorney Morin was never formally admitted to practice in this judicial district, and in fact could not be admitted to practice here, such that he was at all times engaged in the unauthorized practice of law. Because Attorney Morin had not been generally admitted to practice in this district, he was required by the Local Rules of Court to petition for *pro hac vice* admission to represent the Livingston defendants in this case. <u>See</u> LOCAL RULE OF COURT 83.8.2.1. Attorney Morin did not do so. According to the Livingston defendants, the remedy for this procedural defect is *vacatur* of the judgment against them. Although this court does not countenance noncompliance

with its local rules, we disagree that such a draconian result is appropriate under the circumstances of this case.

Local Rule 83.8.2.1 governs *pro hac vice* admission in this judicial district. To be specially admitted pursuant to this rule, an attorney must be (1) admitted to practice in any United States District Court and the highest court of a state, (2) in good standing in every jurisdiction where the attorney is admitted to practice, and (3) not subject to pending disciplinary proceedings in any jurisdiction. Id. The rule requires an attorney seeking *pro hac vice* admission to submit a petition to the court establishing these requirements and identifying "associate counsel," id., an attorney generally admitted to practice in this district to sponsor the petitioning attorney's special admission, see LOCAL RULE OF COURT 83.9. The petitioning attorney must pay a fee to the Clerk of Court upon admission. See LOCAL RULE OF COURT 83.8.2.5.

The Livingston defendants are correct that Attorney Morin never properly applied for special admission and never filed a formal entry of appearance on their behalf. But these defects were remedied, for all material purposes, on the record at trial. Attorney Morin confirmed on the first day of trial that the lack of an official entry of appearance was "[a]n oversight on the part of [his] office," and the court noted Attorney Morin's entry of appearance at that time. (9/18/17 Tr. 22:15-25). The next morning, Attorney Morin requested a sidebar and the following discussion ensued:

> Mr. Morin: Good morning, Your Honor. I have never filed a *pro hac vice* admission before this court. I am not admitted to practice in the Middle District of Pennsylvania[.] I did provide *pro hac vice* papers on Sunday. I

intended to present them to the court Monday before we started trial. We were a little late, the court was ready to proceed. I felt that I should have stopped the court at that time and advised [the] court that I needed to do that. I know I'm in violation of the court's rules and ethics rules in that regard.

The Court: That's fine. What do we need to do to get you admitted at this juncture? Do you have a sponsor?

Mr. Morin: I do. [Attorney Rose] is admitted to practice in the Middle District and she will sponsor, she will sponsor me. I do have papers that I can submit in support.

The Court: That's fine. Don't worry about it. I think it's all good. If you could just help us coordinate the paperwork, I'll sign off on it.

Mr. Morin: Okay.

The Court: I'm assuming there are no major disciplinary issues that I need to address.

Mr. Morin: I did. I'm admitted in two states, New York and New Jersey. I primarily practice in New Jersey. I did receive a reprimand in New Jersey several years ago. New York in imposing a reciprocal discipline imposed a ninety day suspension back in August of 2015.

The Court: Okay. So you're credentialed and fully admitted in both jurisdictions as of right now?

Mr. Morin: I have filed – technically I need to file a motion for reinstatement in New York even though it was a ninety day suspension. That motion is pending, Your Honor.

> The Court:   Are you credentialed in New Jersey?
>
> Mr. Morin:   Yes, I am.  I am.
>
> The Court:   All right.  Fine.  I don't see any problems,
>              Mr. Morin.  I appreciate you bringing it to
>              my attention.  Just file the paperwork and
>              we'll get you admitted *pro hac vice*.

(Id. at 4:8-5:18).

Attorney Morin never submitted the *pro hac vice* admission application. Nonetheless, the contents of any such application were fully explored on the record at trial.  Attorney Morin identified the jurisdictions where he had been admitted to practice, disclosed past attorney discipline, and identified his prospective sponsor. The court repeatedly stated its intent to grant Attorney Morin admission to practice in this case.  The court also expressed its intent to waive any technical obstacle to admission arising from then-outstanding reciprocal discipline in New York in view of Attorney Morin's reinstatement in his primary jurisdiction.

As suggested by the trial record, the court is prepared to forgive Attorney Morin's technical noncompliance with the Local Rules of Court and deem him to be admitted *pro hac vice* in this case.  The Livingston defendants anticipate this result and remonstrate that any such waiver is beyond the court's authority, intimating that a judge may not deviate from the court's local rules for any reason.  (Doc. 380 at 3).  They posit that, as a result, this court is without authority to retroactively admit Attorney Morin to practice in this district or to overlook his license suspension with the New York bar.  (Id.)

Controlling authority is to the contrary. The Local Rules of Court explicitly contemplate that a judicial officer may suspend the rules in a given case. LOCAL RULE OF COURT 1.3. Moreover, the Third Circuit Court of Appeals has held that "a district court can depart from the strictures of its own local procedural rules" when two criteria are satisfied: (1) the court must have a "sound rationale" for departure, and (2) the departure must "not unfairly prejudice a party who has relied on the local rule to [its] detriment." United States v. Eleven Vehicles, Their Equipment & Accessories, 200 F.3d 203, 215 (3d Cir. 2000). The only conflicting authority cited by the Livingston defendants is a single statement in a hearing transcript appended to an unpublished 1987 decision of the Eastern District of Pennsylvania. (Doc. 380 at 3 (quoting Jones v. Morrisville, No. 85-1859, 1987 WL 10409, at *12 (E.D. Pa. May 6, 1987))). To the extent Jones ever held persuasive weight, it has obviously been superseded by the Third Circuit's decision in Eleven Vehicles.

Departure from our local rules—both as to technical noncompliance with the petition requirement and as to Attorney Morin's status with the New York bar—is appropriate for several reasons. Local Rule 83.8.2.1 itself states that *pro hac vice* admission is subject to the "discretion of the court." LOCAL RULE OF COURT 83.8.2.1. Federal courts generally take a liberal approach to allowing *pro hac vice* admission. See Kohlmayer v. Nat'l R.R. Passenger Corp., 124 F. Supp. 2d 877, 880 (D.N.J. 2000) (citing Leis v. Flynt, 439 U.S. 438 (1979) (*per curiam*); Selling v. Radford, 243 U.S. 46 (1917)). And the Supreme Court has signaled that it views this practice approvingly. See Leis, 439 U.S. at 441-42 ("In view of the high mobility of the bar, and also the trend toward specialization, perhaps this is a practice to be encouraged.").

Further, the objective of the rule was largely satisfied in this case.  Rule 83.8.2.1 serves to present the court with a snapshot of the attorney seeking special admission to practice, and Attorney Morin orally provided all information requisite to guide the court's determination.  The court was fully prepared to admit Attorney Morin based on his representations on the record.  Trial had commenced after nearly four years of litigation, all parties and their witnesses were prepared to proceed, and opposing counsel raised no objection to the court's indication that it did not perceive the rule's good-standing requirement as a bar to Attorney Morin's admission.  To compel strict adherence to the local rules under the circumstances would have delayed the case, hindering rather than facilitating the efficient dispensation of justice.

As to the prejudice component, no party can be said to have "relied on" Local Rule 83.8.2.1 to its detriment.  The essential purpose of our rules regarding special admission is not to protect an interest of the parties but to allow the court to efficiently administer justice, to manage its docket and those permitted to practice on it, and to preserve the integrity of the judiciary.  Furthermore, there exists in the federal courts a strong and longstanding preference for disposing of matters on the merits rather than technical missteps by counsel, see Eash v. Riggins Trucking Inc., 757 F.2d 557, 566-67 (3d Cir. 1985) (*en banc*) (quoting Hritz v. Woma Corp., 732 F.2d 1178, 1181 (3d Cir. 1984)), and respecting the finality of judgments once entered, see Mayberry v. Maroney, 558 F.2d 1159, 1163 (3d Cir. 1977).  To unravel four years of full and fair litigation, extensive motion practice, multiple memorandum opinions, and a final bench trial judgment due to technical compliance with a local rule would

be entirely inconsistent with the interests of justice and judicial economy. We will deny the Livingston defendants' motion for new trial on this ground.[9]

The Livingston defendants' final salvo is their claim that they did not authorize Attorney Morin's colleagues to assist in their representation. (See Doc. 380 at 4-5). Defendants apparently object to participation of other counsel from Attorney Morin's law firm, *viz.*, Attorney Rose; Brian R. Tipton, Esquire; and Veronica P. Hallett, Esquire ("Attorney Hallett"), each of whom has been generally admitted to practice in this district and entered an appearance on behalf of the Livingston defendants. (See Docs. 13, 44, 202). One or more of these attorneys signed the Livingston defendants' pleadings and motions and participated in all pretrial proceedings on their behalf. (See, e.g., Docs. 28, 35, 48, 55, 78, 175, 177, 203, 225, 247). According to the Livingston defendants, "[Attorney] Morin was the only person authorized to enter an appearance on behalf of the Livingston Parties," effectively nullifying filings made by any other attorney. (Doc. 380 at 4-5).

There are several flaws in this argument. As a threshold matter, it ignores the realities of modern law firm practice, which typically involves multi-attorney litigation teams and delegation by lead counsel. More problematically, the record simply does not support the claim that Livingston authorized Attorney Morin alone, and not his law firm, to represent their interests. Vann and Skinner aver that they

---

[9] We will not, however, waive the special admission fee. We will order Attorney Morin to remit the $50 admission fee within 30 days of the date of this memorandum and forthcoming order. See LOCAL RULE OF COURT 83.8.2.5; District Court Miscellaneous Schedule of Fees, https://www.pamd.uscourts.gov/district-court-miscellaneous-fees (last visited Mar. 4, 2019).

were advised that Livingston's insurer "had retained [Attorney Morin] of Florio Perucci Steinhardt & Fader, LLC, . . . to represent the Livingston Parties in the AFS lawsuit"; they simply observe that Attorney Morin "was the only attorney" with whom they communicated. (Doc. 351-8 ¶¶ 5-7; Doc. 351-9 ¶¶ 6, 8). Aufiero describes Attorney Morin as the "lead attorney with whom I spoke." (Doc. 351-10 ¶¶ 4, 6).

None of these individuals state that they limited their representation to Attorney Morin. And the record would belie any such assertion. Vann and Aufiero were present at trial during which co-counsel, Attorney Rose, was seated next to and assisting Attorney Morin. Neither defendant questioned her participation. Clearly someone at Livingston reviewed pretrial filings during this litigation, all of which are signed by Attorney Morin's co-counsel, yet no objection was raised. And Aufiero admits that he spoke on multiple occasions with Attorney Hallett, "who identified herself as Mr. Morin's associate and who sat in on [his] deposition," and that Attorney Hallett even called Aufiero to let him know that Attorney Morin was "the lead attorney" and would be the main point of contact after her departure from the firm. (Doc. 351-10 ¶ 6). Given all of this, we reject defendants' claim that they were "in effect, unrepresented" throughout this litigation. (Doc. 380 at 5).

The Livingston defendants' disappointment with their former counsel's performance is palpable. But that disappointment is not cause to vacate a valid and final judgment of this court. The Livingston defendants' recourse lies, if at all, in an action for professional malpractice or a complaint with the appropriate attorney disciplinary authority. For all of the reasons stated herein, we will deny

the Livingston defendants' motion to vacate the judgment or for a new trial based on Attorney Morin's conduct.

## B. Defendants' Merits Arguments

For their remaining arguments, defendants collectively invoke Federal Rules of Civil Procedure 52(a)(5), 52(b), 59(a)(2), and 59(e). The rules offer similar relief. Rule 52(a)(5) allows a party to "question the sufficiency of the evidence" supporting the court's findings of fact. FED. R. CIV. P. 52(a)(5). Under Rule 52(b), a party may ask the court, on the record before it, to "amend its findings—or make additional findings—and [to] amend the judgment accordingly." FED. R. CIV. P. 52(b). Rule 59(a)(2) authorizes a court, on motion for a new trial, to reopen the judgment, take additional testimony, amend or render new findings or conclusions, and direct the entry of a new judgment. FED. R. CIV. P. 59(a)(2). And under Rule 59(e), the court may alter or amend a judgment on three grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." Wiest v. Lynch, 710 F.3d 121, 128 (3d Cir. 2013) (quoting Lazaridis v. Wehmer, 591 F.3d 666, 669 (3d Cir. 2010)) (discussing FED. R. CIV. P. 59(e)).

Rule 52(b) does not explicitly speak to amending conclusions of law, but the Third Circuit has construed the rule, when read in conjunction with Rule 59(e), as empowering the court "to alter or add to its conclusions of law where appropriate." U.S. Gypsum Co. v. Schiavo Bros., 668 F.2d 172, 180 & n.9 (3d Cir. 1981) (citations omitted). The purpose of Rule 52(b) is to ensure that the district court's reasoning is clear, the essential factual and legal points are covered, and the *ratio decidendi*

will be readily understood by the court of appeals.  <u>See</u> 9C WRIGHT & MILLER, *supra*, § 2582.  Neither Rule 52 nor Rule 59 are intended to allow parties the proverbial "second bite at the apple."  <u>See</u> <u>Exxon Shipping Co. v. Baker</u>, 554 U.S. 471, 485 n.5 (2008); <u>Gutierrez v. Ashcroft</u>, 289 F. Supp. 2d 555, 561 (D.N.J. 2003); 9C WRIGHT & MILLER, *supra*, § 2582; 11 WRIGHT & MILLER, *supra*, § 2810.1.

## 1. *The Orbital Settlement Agreement*

Both groups of defendants ask the court to alter or amend the judgment or for a new trial for what they deem to be a failure by the court to account for the value of the AFS-Orbital settlement in calculating AFS's compensatory damages. (<u>See</u> Doc. 346 at 2-6; Doc. 350 at 19).  Defendants invoke the Pennsylvania Uniform Contribution Among Tortfeasors Act ("UCATA"), 42 PA. CONS. STAT. § 8321, *et seq.*, contending that Orbital is a joint tortfeasor in this action and that compensatory damages must be reduced to reflect the amount of the AFS-Orbital settlement.

Initially, no defendant raised a setoff issue at trial or in post-trial submissions, a point that AFS makes in its briefing.  Defendants' answer to this argument is severalfold.  Huber and Integrated Systems maintain that there is no requirement under Pennsylvania law that a UCATA setoff be pled as an affirmative defense.  They further aver that, even if such a requirement exists, some affirmative defenses can be raised late when there will be no prejudice from the delay.  The Livingston defendants assert that the issue was sufficiently raised by the proof at

trial and request leave to amend their pleadings to conform to the evidence pursuant to Federal Rule of Civil Procedure 15(b)(2).[10]

We do not dwell long on these threshold issues. We are compelled to note, however, that we find no merit in defendants' suggestion that AFS was "on notice" that a setoff theory was fair game at trial or that any defendant intended to prove that Orbital was a joint tortfeasor. No defendant raised this argument prior to or during trial. Huber and Integrated Systems did not raise the issue in their post-trial submission. And no defendant ever so much as hinted that the isolated evidence on which they now rely—the AFS-Orbital settlement agreement, AFS's initial verified complaint in this case, and an isolated passage from Jim Vaughn's trial testimony— was introduced for the purpose of establishing Orbital as a joint tortfeasor.

The obvious purpose of introducing the settlement agreement was to impeach the Orbital witnesses' credibility. At trial, defendants urged the court to "pay close attention to the demeanor" of these witnesses, suggesting that their

---

[10] The Livingston defendants request in the alternative that we permit them to raise this issue via Federal Rule of Civil Procedure 15(b)(1) or 52(a)(5). (Doc. 380 at 21 n.13). Rule 15(b)(1) allows a court to permit amendment to pleadings when a party objects to evidence at trial on the basis that it "is not within the issues raised in the pleadings." FED. R. CIV. P. 15(b)(1). AFS did not object to introduction of the cited evidence at trial because defendants obscured what they now claim to be the true purpose of that evidence. The circumstances simply do not implicate Rule 15(b)(1). The Livingston defendants also ask the court to "make additional findings pursuant to [Rule] 52(a)(5)." (Doc. 380 at 21 n.13). Rule 52(a)(5) does not speak to additional findings; rather, it authorizes any party to "question the sufficiency of the evidence supporting" existing findings. FED. R. CIV. P. 52(a)(5). It is Rule 52(b) which allows a court to amend findings "or make additional findings" on motion of a party. FED. R. CIV. P. 52(b). For all of the reasons stated *infra*, even if the court were to make the additional findings sought by the Livingston defendants, the judgment would not change.

testimony was offered begrudgingly under the agreement's cooperation clause. (See 9/18/17 Tr. 21:2-6; 9/20/17 Tr. 142:24-143:25). As for Jim Vaughn's comments on his view of Orbital's culpability, Huber and Integrated Systems elicited this testimony to deflect blame from themselves, not to establish that *Orbital* was the legal cause of AFS's injuries. (Doc. 323 at 56 ¶ 149 (quoting 9/22/17 Tr. 148:24-149:1); see also 9/22/17 Tr. 148:9-13). When AFS objected to the question posed to Jim Vaughn about Orbital's perceived culpability, counsel for Huber and Integrated Systems proffered that the testimony was relevant to his clients' causation defense but never suggested that Orbital was a joint tortfeasor. (9/22/17 Tr. 147:22-148:22). Counsel introduced the initial complaint—identifying Orbital as a defendant alleged to have acted "jointly and severally" with the others—in building the foundation for this testimony. (See id. at 146:2-149:3). It cannot be said under these circumstances that AFS (or the court, for that matter) was on notice that joint tortfeasor status was an issue to be decided.[11]

Assuming *arguendo* that defendants could surmount the notice hurdle, a more fundamental defect remains: defendants' proof does not establish Orbital as a joint tortfeasor. The UCATA requires non-settling defendants to "establish that those allegedly culpable are joint tortfeasors." Carr v. Am. Red Cross, 17 F.3d 671, 683 (3d Cir. 1994) (quoting Rocco v. Johns-Manville Corp., 754 F.2d 110, 114 (3d Cir. 1985)). The statute defines joint tortfeasors as "two or more persons jointly or

---

[11] To the extent defendants knew, as they now claim, that this issue was being tried by consent at trial, it is puzzling that defendants did not argue the point explicitly at that time.

severally liable in tort for the same injury to persons or property." 42 PA. CONS. STAT. § 8322. For purposes of obtaining a setoff, joint-tortfeasor status can be established by adjudication (in the underlying suit by the injured party or in a separate contribution action) or by plaintiff's concession. See Rocco, 754 F.2d at 114-15 (citing Mazer v. Sec. Ins. Gr., 507 F.2d 1338 (3d Cir. 1975); Griffin v. United States, 500 F.2d 1059 (3d Cir. 1974); Swartz v. Sunderland, 169 A.2d 289 (Pa. 1961); Davis v. Miller, 123 A.2d 422 (Pa. 1956)). An injured party may, for example, concede joint tortfeasor status in a release with the settling tortfeasor. See id. (citing Griffin, 500 F.2d 1059).

AFS did not concede joint tortfeasor status in its settlement with Orbital. Indeed, the agreement expressly disclaims that it compensates AFS for either of the principal injuries underlying the compensatory damages award. (L&H Trial Ex. 69 at 2; Huber Trial Ex. 58 at 2). We disagree with defendants' claim that a legal theory articulated in AFS's long-withdrawn initial complaint, or Vaughn's confirmation of that initial theory during trial, are "admissions" deployable against AFS to establish joint tortfeasor liability. (Doc. 380 at 13-14; Doc. 396 at 16). The case on which the Livingston defendants rely for this proposition signals only that a plaintiff bears a "heavy burden" in reversing *facts* pled in a withdrawn verified complaint; it cannot be fairly read to transform withdrawn claims into binding liability determinations against settling defendants. See W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank, 712 F.3d 165, 173 & n.4 (3d Cir. 2013) (addressing "party's assertion of contrary *factual* positions in the pleadings" (emphasis added)). Nor do we find a reference to this withdrawn claim by AFS in its opening statement to constitute a

"judicial admission" of joint tortfeasor status. (See Doc. 380 at 17, 20 n.9 (citing 9/18/17 Tr. 12:4-13:10)).

Defendants lastly identify two passages from Jim Vaughn's trial testimony as evidence that Orbital is jointly liable. In response to an inquiry by Huber and Integrated Systems' counsel as to "what you think Orbital did wrong to divert business from AFS," Jim Vaughn answered, "[w]ell, they took our drawings and gave them to a competitor." (9/22/17 Tr. 147:22-25). And in response to counsel's follow-up, "if Orbital had not acted wrongfully[,] would your company have still lost the contracts, the two contracts," Jim Vaughn replied, "No." (Id. at 148:24-149:2). These fleeting, subjective, and undeveloped statements—never previously identified as evidence under the UCATA—are inadequate to establish Orbital as a joint tortfeasor as a matter of law. Quite simply, the mere fact that Jim Vaughn personally believed that Orbital committed a wrong does not make it legally so.

In sum, the record does not support defendants' newly minted assertion that Orbital's conduct was wrongful under PUTSA, at common law, or both. *Per contra*, as reflected in the court's findings of fact and conclusions of law, the only thing the evidence demonstrated as to Orbital was that its engineers, in good faith, "believed it was authorized to share documents with Livingston." Advanced Fluid Sys., Inc., 295 F. Supp. 3d at 485.

Defendants' UCATA argument misfires for another reason: neither the $1,498,000 component swap contract nor the approximately $524,300 in profit that AFS received thereunder were payment for the "same injury" as that caused by the Livingston defendants, Huber, and Integrated Systems. See 42 Pa. Cons. Stat.

36

§ 8322.  The settlement eliminated the component swap contract as an additional item of damages at trial.[12]  The money paid under that contract compensated AFS for work performed for Orbital, separate and apart from the cylinder upgrade and gripper arms contracts underlying the compensatory damages award.  The only additional benefit derived from the settlement agreement, beyond what appears to be *bona fide* compensation for its work, was that AFS did not need to bid for the contract as it would in the usual course.  (See 9/20/17 Tr. 142:5-23).  Neither group of defendants identifies a practical method for valuing this benefit.

Defendants' argument thus fails on all three fronts: they failed to notify the court and opposing counsel of their potential setoff argument; they failed to prove that Orbital is a joint tortfeasor on one or both of AFS's substantive claims; and they failed to establish that the amount paid by Orbital compensated AFS for the "same injury" as that caused by the non-settling defendants.  We will deny defendants' request to reduce the compensatory damages award based on the settlement agreement between AFS and Orbital.

---

[12] The Livingston defendants rejoin that the component swap contract was not a potential item of damages in this lawsuit.  We disagree.  The initial complaint explicitly referenced AFS's expectation of an ongoing relationship with Orbital and a "continuing stream of future business for upgrading, maintaining and servicing" the Hydraulic System, (Doc. 1 ¶ 40; see also id. ¶ 36), which would plainly include subsequent component swap work.  Evidence at trial revealed that the swap work was initially part of the cylinder upgrade contract awarded to Integrated Systems by Orbital.  (See AFS Trial Ex. 192 at 6).  The record supports that the AFS-Orbital settlement agreement eliminated a potential item of damages from this suit.

## 2.     *The Component Swap Work*

Huber and Integrated Systems challenge the damages award on a separate but related basis.  These defendants posited at and after trial that AFS's damages witnesses—whom the court credited in calculating compensatory damages—failed to account for the fact that the initial cylinder contract tasked Integrated Systems to perform a "component swap," which Huber valued at approximately $470,000.  (See 9/25/17 Tr. 80:2-8; Doc. 323 ¶ 125).  We rejected this assertion, crediting Brainard's testimony, as a representative of Orbital, that Integrated Systems did not perform and was never compensated for component swap work.  Advanced Fluid Sys., Inc., 295 F. Supp. 3d at 492 (citing 9/20/17 Tr. 90:24-92:7).  Huber and Integrated Systems now argue that the court erred in resolving this issue "through a subjective contest of credibility" rather than on written documents.  (Doc. 359 at 19-20).

Integrated Systems' best and final offer of March 5, 2013, does refer to both "Finished Goods" (the new cylinders) as well as "Cylinder Component Re-Integration" (the component swap work).  (AFS Trial Ex. 191 at 1, 7, 14).  And the initial contract awarded to Integrated Systems by Orbital describes the project as "New Hydraulic Cylinder & Cylinder Component Re-Integration."  (AFS Trial Ex. 192 at 6).  These documents establish, as Huber and Integrated Systems aver, that the contract initially contemplated component swap work.

To rely exclusively on these documents, however, would ignore crucial context and Huber's own words.  In an email nearly a year after these documents issued, Huber admitted that a component swap was "not part of the contract yet."

(AFS Trial Ex. 198). The Orbital-Integrated Systems contract was later modified to increase the agreed price from $1,909,966, (see AFS Ex. 192 at 6), to $2,028,966, (see AFS Ex. 193 at 2). Integrated Systems subsequently refused to deliver the completed cylinders to Orbital, prompting Orbital to file a separate federal lawsuit and seek a preliminary injunction in the Eastern District of Virginia. See Orbital Scis. Corp. v. Integrated Sys. & Mach., LLC, and Kevin C. Huber, No. 1:14-CV-1378 (E.D. Va.); (see also 9/20/17 Tr. 91:9-12). That lawsuit resolved by settlement, with Orbital agreeing to pay Integrated Systems a "little bit under . . . two million" for the cylinders and gimbals. (9/20/17 Tr. 91:9-18). At trial, Brainard confirmed that Integrated Systems never performed a component swap—in fact, as discussed *supra*, AFS performed that work—and that the money paid to Integrated Systems was for cylinders and gimbals only. (Id. at 91:21-92:7).

Huber and Integrated Systems essentially ask the court to assume, based on the terms of a later-modified cylinder contract and against the overwhelming weight of the evidence, that Orbital paid Integrated Systems nearly half a million dollars for work performed by AFS. This we will not do. Accordingly, we will deny Huber and Integrated Systems' separate request to reduce the damages award.

### 3. *The Livingston Defendants' Remaining Arguments*

The Livingston defendants raise a bevy of additional arguments, challenging the court's findings of liability under PUTSA, our causation analysis, and other aspects of the damages award. We begin with the Livingston defendants' arguments concerning misappropriation.

### a.    **Existence of Trade Secrets**

The Livingston defendants assert that we should amend the judgment under

PUTSA because AFS failed to identify, with "precision and specificity," which of its

documents constitute trade secrets. (Doc. 350 ¶¶ 104-10). They cite Dow Chemical

Canada, Inc. v. HRD Corp., 909 F. Supp. 2d 340 (D. Del. 2012), for its proposition

that trade secret identification "must be particular enough as to separate the trade

secret from matters of general knowledge in the trade or of special knowledge of

persons skilled in the trade." (Doc. 350 ¶ 108 (quoting Dow Chem. Canada, Inc.,

909 F. Supp. 2d at 346)). As a general rule, vague references to products and

information will not suffice. See, e.g., Synygy, Inc. v. ZS Assocs., No. 07-3536, 2013

WL 3716518, at *2 (E.D. Pa. July 15, 2013) (collecting cases).

AFS has amply satisfied its burden. At each stage of this litigation, AFS

has identified precisely which of its engineering drawings, pricing information, and

proprietary materials undergird the trade secrets claim, and it explained when and

how each document was used by the various defendants. (See generally Docs. 169,

312). In multiple declarations, Dan Vaughn delineated and described in detail each

item perceived by AFS to be a trade secret. (See Doc. 166-1; Doc. 209-5). AFS

submitted copies of these documents as exhibits, allowing the court to identify and

examine the trade secrets, as well as the manner in which they were used by Huber,

Integrated Systems, and the Livingston defendants, in our summary judgment and

bench trial opinions. See Advanced Fluid Sys., Inc., 295 F. Supp. 3d at 472-80;

<u>Advanced Fluid Sys., Inc. v. Huber</u>, No. 1:13-CV-3087, 2017 WL 2445303, at \*2-7

(M.D. Pa. June 6, 2017).  The suggestion that it is unclear at this juncture what items

AFS claims as trade secrets is a nonstarter.

A plaintiff invoking PUTSA's remedies also must show that it employed

"efforts that are reasonable under the circumstances to maintain . . . secrecy" of the

claimed trade secrets.  12 PA. CONS. STAT. § 5302.  The Livingston defendants aver

that AFS failed to exercise reasonable efforts to secure its proprietary information,

foreclosing its claim for misappropriation.  We rejected this argument at the Rule 56

stage, <u>see</u> <u>Advanced Fluid Sys., Inc.</u>, 2017 WL 2445303, at \*11-12, and the Livingston

defendants offer no basis to revisit that decision.

### b.      <u>Individual Liability of Vann</u>

The Livingston defendants submit that the record does not support a

judgment against Vann for misappropriating AFS's trade secrets or aiding and

abetting Huber's breach of fiduciary duty.  (Doc. 350 ¶¶ 95-103).  Defendants

correctly identify the applicable law, noting that liability cannot be imposed on an

individual defendant based solely on his status as a corporate officer or director,

and that an officer can only be held personally liable if he directs, participates in, or

cooperates with the commission of a wrongful act.  <u>See</u> <u>Wicks v. Milzoco Builders,</u>

<u>Inc.</u>, 470 A.2d 86, 90 (Pa. 1983) (citations omitted).  Defendants are incorrect,

however, in suggesting that these principles provide respite for Vann.

As we observed in our March 6, 2018 opinion, Vann actively facilitated

Huber's breach of fiduciary duty and participated in Livingston's misappropriation

of AFS's trade secrets. The evidence supporting this finding included, but is not

limited to:

- Vann's participation in meetings with Huber and Livingston employees, knowing that Huber was employed by AFS and that Huber was attempting to steer business toward Livingston and away from AFS, <u>Advanced Fluid Sys., Inc.</u>, 295 F. Supp. 3d at 473-75;

- Vann's concession that he was aware as early as February 2012 of his employees' Dropbox document-sharing arrangement with Huber, and his implicit authorization thereof, despite knowing that Huber was employed by AFS, <u>id.</u> at 473-74;

- Vann's correspondence with Huber (in advance of the April 12 Wallops Island visit) in which Huber advised that he was "working diligently" to give Livingston an edge with Orbital, and his participation in a nearly hour-long phone call with Huber concerning these efforts the following day, <u>id.</u> at 475;

- Vann's continued engagement and communication with, and encouragement of, Huber, even after Vann became "alarmed" that Huber was working on behalf of both AFS and Livingston contemporaneously and after Vann warned that Huber "would have to leave AFS to continue a relationship with Livingston," <u>id.</u> at 475-76;

- Vann's attendance at and participation in an April 12, 2012 meeting at Wallops Island with Huber, Aufiero, Hill, and certain Orbital employees, at which Orbital's upgrade plans and dissatisfaction with AFS, and the Livingston defendants' interest in the project, were discussed, <u>id.</u>;

- And perhaps most troublingly, Vann's approval of a compensation package for Huber, designed and intended to compensate Huber "for business that he steered toward[] or participated in with Livingston," at a time when Vann not only knew Huber to still be employed by AFS against Vann's admonition but also

knew that Huber was working directly against AFS's interests, <u>id.</u> at 476 (alteration in original).

The Livingston defendants do not attempt to refute this evidence, nor could they: much of the evidentiary support for these findings came from Vann's own trial testimony. This conduct is not the "nonfeasance" or executive passivity described by the Livingston defendants. Nor is it mere acquiescence or cooperation, each of which would permit individual liability against Vann. Rather, his conduct reflects active participation in and encouragement and facilitation of known misconduct. We will deny the Livingston defendants' motion to set aside the judgment against Vann.

### c. <u>Causation</u>

The Livingston defendants raise two causation arguments: *first*, that they were not the legal cause of AFS's damages related to the cylinder contract because that contract was awarded to Integrated Systems and not Livingston, (<u>see</u> Doc. 350 ¶¶ 58-60); and *second*, that AFS lost both the cylinder contract and the gripper arms contract due to Orbital's dissatisfaction with AFS's work, not because of misconduct by any defendant, (<u>see</u> <u>id.</u> ¶¶ 72-77). We disagree on both accounts.

As to the first, the evidence established that Livingston's team worked tirelessly with Huber in hopes of securing the cylinder contract for Livingston. The Livingston team, aware that AFS was Orbital's incumbent vendor, willingly worked with one of AFS's own employees, using AFS's proprietary information, to submit a bid to compete against AFS for the cylinder contract. That this effort to secure the contract was foiled by Huber's eleventh-hour competing bid does not

immunize the Livingston defendants from the deleterious effects of their tortious and misappropriative conduct over the course of the preceding year. Fava, one of Orbital's engineers, testified that, by securing the gripper arms contract, Livingston placed AFS at a "huge disadvantage" in bidding the cylinder contract. (9/20/17 Tr. 194:14-19). AFS's loss of the cylinder contract was one of several injuries flowing directly from the various defendants' collusive conduct. We reject the Livingston defendants' assertion that they were not a legal cause of AFS's lost profits for the cylinder contract.

The Livingston defendants also argue that AFS has only itself to blame for its lost profits, which defendants attribute to "AFS's deficient performance and Orbital's overall dissatisfaction with AFS." (Doc. 362 at 25). The flaw in this argument is that *Orbital* did not attribute its decisionmaking, for either contract, to these factors. As we previously found:

> Key members of the Hydraulic System teams from both the Authority and Orbital agreed that, with few and minor exceptions, they were satisfied with AFS's work. (See, e.g., AFS Ex. 274, Reed and Nash Dep. 24:7-26:15, Mar. 30, 2016 ("Reed/Nash Dep."); 9/20/17 Tr. 65:17-70:25; VCSFA Ex. 5). According to Orbital's lead engineer, Michael Brainard ("Brainard"), the system worked "flawlessly" at its first launch and "performed very well" on subsequent launches. (9/20/17 Tr. 66:2-67:2; AFS Ex. 18). Brainard's principal criticism was with Baum [the AFS project manager for the Hydraulic System], with whom Brainard did not get along . . . and whose project management services Brainard found to be lacking. (See 9/20/17 Tr. 67:10-24, 68:10-16). Brainard agreed that his minor customer service complaints were remediable and likely could have been resolved by AFS's hiring of a new project manager dedicated to Orbital. (Id. at 68:7-9, 170:2-4).

Advanced Fluid Sys., Inc., 295 F. Supp. 3d at 473. Orbital identified pricing—not customer service issues—in explaining why it awarded Livingston the gripper arms contract, with two of Orbital's lead engineers remarking that, prior to Huber's price inflation, AFS had the clear advantage for that contract. (See 9/20/17 Tr. 74:9-17, 76:8-16, 80:17-19, 175:12-20; AFS Ex. 238 at 22, 26). The record refutes the claim that AFS's damages from the lost Hydraulic System contracts are due to anything other than defendants' tortious and misappropriative conduct.

### d.    Claim for Contribution

Pennsylvania recognizes the right of contribution among joint tortfeasors by statute. See 42 PA. CONS. STAT. § 8324(a). The Livingston defendants invoke this provision in urging the court to amend its judgment and apportion damages among the various defendants. (See Doc. 350 ¶¶ 61-71). They contend that the damages in this case flow from two discrete contracts, valued at a total of $1,096,009, and that, because only one of those contracts was awarded to Livingston, the court must allocate the total damages among the recipients of each contract.

There are several problems with the Livingston defendants' request. First, the UCATA makes clear that a joint tortfeasor "is not entitled to money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof." 42 PA. CONS. STAT. § 8324(b). Because execution of the joint and several judgment in this case was stayed at defendants' request, (Doc. 379), this precondition has not yet been satisfied. It appears, then, that what the Livingston defendants seek is not a contribution judgment *per se* but

an allocation of the joint and several damages award to later be enforced in a contribution action once they have satisfied their share of the judgment.

The Livingston defendants cite <u>McMeekin v. Harry M. Stevens, Inc.</u>, 530 A.2d 462 (Pa. Super. Ct. 1987), for the proposition that contribution judgments need not necessarily result in equal apportionment of damages among all defendants. (<u>See</u> Doc. 380 at 25). The court in <u>McMeekin</u> intimated that contribution can take two forms: common liability, where each tortfeasor is responsible for an equal share of the total judgment, and comparative, where a contribution percentage is assigned according to each defendants' equitable share of responsibility for the harm. <u>See</u> <u>McMeekin</u>, 530 A.2d at 467-68 (quoting RESTATEMENT OF TORTS, § 886A (AM. LAW. INST. 1939)). The Supreme Court of Pennsylvania has suggested, however, that comparative contribution principles have no application when liability is based on something other than negligence. <u>See</u> <u>Walton v. Avco Corp.</u>, 610 A.2d 454, 462 (Pa. 1992). Specifically, the court observed: "In a case such as this, *where neither defendant was found liable under the theory of negligence, we believe it is improper to introduce concepts of fault in the damage-apportionment process.*" <u>Id.</u> For their part, the Livingston defendants have not identified a single case supporting comparative allocation of damages among jointly liable intentional tortfeasors.[13]

---

[13] None of the cases cited by the Livingston defendants as support for their comparative contribution argument are analogous to this case. <u>Cf. Carrozza v. Greenbaum</u>, 916 A.2d 553 (Pa. 2007) (medical malpractice and hospital vicarious liability action); <u>McMeekin</u>, 530 A.2d 462 (comparative contribution between strictly liable and negligent defendants).

Assuming *arguendo* that comparative contribution is permissible in this case, we find its application inappropriate. As noted *supra*, the fact that the Livingston defendants did not receive the cylinder upgrade contract does not absolve them from their tortious and misappropriative conduct, which was a substantial factor in AFS ultimately losing that contract to Integrated Systems. Through yearlong collusion with Huber and their knowing use of AFS's trade secrets, the Livingston defendants achieved a competitive advantage over AFS, securing the gripper arms contract for itself and, in the process, eliminating AFS as a viable contender for the cylinder upgrade contract. But for this coalescence of wrongs, AFS arguably would have received both the gripper arms and the cylinder upgrade contract. Thus, both liability and injury are indivisible.

The damages award in this case is appropriately borne by all defendants equally. Based on the court's determination that the defendants are jointly and severally liable, AFS is entitled to recover the full measure of damages against any one of them. See Baker v. ACandS, 755 A.2d 664, 669 (Pa. 2000) (citing Incollingo v. Ewing, 379 A.2d 79, 85 (Pa. 1977)). The joint tortfeasor who has paid more than its proportionate share may thereafter seek contribution from the other defendants. See id. (citing, *inter alia*, 42 PA. CONS. STAT. § 8324(c)).

### e.    **Punitive Damages**

The Livingston defendants raise a twofold challenge to the court's punitive damages award. *First*, they suggest that the award of punitive damages on AFS's tort claim is inconsistent with the court's finding that exemplary damages were not warranted on AFS's claim under PUTSA and that the evidence does not support an

award of punitive damages in any event. (Doc. 350 ¶¶ 78-90). *Second*, they contend

that the court erred in awarding punitive damages on the tort claim when it did not

award, and AFS did not seek, compensatory damages on that claim. (Id. ¶¶ 91-93).

We disagree as to both arguments.

PUTSA authorizes a court to award exemplary damages for "willful and

malicious misappropriation," which the statute defines to include

> [s]uch intentional acts or gross neglect of duty as to evince
> a reckless indifference of the rights of others on the part
> of the wrongdoer, and an entire want of care so as to raise
> the presumption that the person at fault is conscious of
> the consequences of his carelessness.

12 PA. CONS. STAT. § 5302. We found that although the Livingston defendants knew

that acceptance and use of AFS's trade secrets was wrong, their respective states of

mind did not reflect malice toward or an intent to harm AFS or an "entire want of

care" as to that consequence. Advanced Fluid Sys., Inc., 295 F. Supp. 3d at 494.

As to the claim for aiding and abetting breach of fiduciary duty, however,

the evidence compelled a different result. We noted that punitive damages may be

appropriate when tortious conduct is "outrageous, because of the defendant's evil

motive or his reckless indifference to the rights of others." *In re* Lemington Home

for the Aged, 777 F.3d 620, 633 (3d Cir. 2015) (internal quotation marks omitted)

(quoting Feld v. Merriam, 485 A.2d 742, 747 (Pa. 1984)). After "careful analysis of

the entire trial record," id. (quoting David by Berkeley v. Pueblo Supermarket of

St. Thomas, 740 F.2d 230, 237 (3d Cir. 1984)), we concluded that both Vann's and

Livingston's tortious conduct warranted punitive damages. That conduct included

the unabashed and unabated facilitation of Huber's fiduciary breach and a million-

plus dollar harm done to AFS as a result.  We summarized the tortious wrong
committed by Livingston and Vann as follows:

> At trial, Livingston's witnesses tried to lay blame for
> AFS's injury exclusively at Huber's feet.  The events
> which unfolded *sub judice* unquestionably originated with
> Huber.  But AFS's injury could not have been effected
> so swiftly without Livingston and Vann's complicity.
> Livingston, through Vann and its employees, deliberately
> disregarded Huber's fiduciary breach in pursuit of a
> profit.  And they indeed profited—several times over—on
> the gripper arms contract.  Both defendants knowingly
> and willfully facilitated the injury that Huber inflicted
> upon AFS.

Advanced Fluid Sys., Inc., 295 F. Supp. 3d at 495.  Chief among the evidence

supporting this finding is Vann's and Livingston's authorization of a compensation

package for Huber, agreeing to pay him handsomely for Hydraulic System business

driven from AFS to Livingston, while Huber was still employed by AFS, the known

incumbent vendor on Wallops Island.  Id. at 475-76.  We underscored that neither

defendant expressed remorse for their wrongdoing or conveyed that any lesson had

been learned.  Id. at 495-96.

The court's award of punitive damages is amply supported by the record.

We also reject the assertion that our enhanced damages determinations cannot

be reconciled.  AFS's substantive claims targeted different—albeit, at times,

overlapping—conduct.  In deciding whether to award enhanced damages, and in

what amount, we examined different aggravating conduct under each claim.  The

distinction, in our view, lies in defendants' states of mind and the nature of their

actions.  Defendants' misappropriative conduct, while knowing and unlawful under

the statute, might fairly be characterized (with limited exceptions) as passive and

acquiescent. Their tortious conduct, *per contra*, was active, deliberate, and willful;
it endured without pause for the better part of a year; and the defendants to date
fail to appreciate the gravity of their wrongdoing. See *In re* Lemington Home for
the Aged, 777 F.3d at 633, 635. We have little difficulty reaffirming that Vann's and
Livingston's tortious conduct warrants punitive damages.[14]

---

[14] We will also deny AFS's motion to amend our conclusions of law to find
that the Livingston defendants' conduct was "willful and malicious" as defined by
PUTSA. (Doc. 347). As noted above, we find material distinctions of fact, law, and
degree between the nature and manner of the wrongs committed under PUTSA
and the common law, respectively. We respond briefly to three points raised by
AFS. *First*, we disagree with AFS's assertion that the fact that the Livingston
defendants knew their misappropriative conduct was wrong "more than satisfies"
the willful and malicious standard. (See Doc. 367 at 4-5). To adopt this low bar
would render every wrongful acquisition case an exemplary damages case, because
liability for wrongful acquisition turns, by statute, on whether one "knows or has
reason to know that the trade secret was acquired by improper means." 12 PA.
CONS. STAT. § 5302. *Second*, AFS seemingly misconstrues the court's observation,
in declining to award exemplary damages against the Livingston defendants, that
their misappropriative motives "were purely competitive." (See Doc. 348 at 7-18).
This sentence was not intended, and should not be construed, as immunizing any
PUTSA violation accomplished in the interest of competitive advantage. It was
offered *after* liability had already been determined as a means of conveying that,
at least as to the Livingston defendants, the record established nothing more than
run-of-the-mill misappropriation, which will nearly always be undertaken in pursuit
of competitive interests. Under Pennsylvania law, something beyond competitive
intent—to wit: "intentional acts or gross neglect of duty as to evince a reckless
indifference of the rights of others" and "an entire want of care"—is required, see
12 PA. CONS. STAT. § 5302, and we found that AFS's proof did not meet that *mens
rea*. *Third*, we reject AFS's suggestion that our transitional observation that the
Livingston defendants' conduct "pales in comparison" to Huber's establishes a
"doctrine of comparative culpability" in misappropriation cases. (Doc. 348 at 8 n.5).
We did not base our determination that exemplary damages were unwarranted
against the Livingston defendants on the mere fact that Huber's conduct was more
egregious, nor did we adopt Huber's conduct as a baseline standard for measuring
whether conduct is willful and malicious. In deciding whether exemplary damages
were warranted, we examined each defendant's conduct individually. The evidence
simply did not support an exemplary damages award for misappropriation against
the Livingston defendants.

The Livingston defendants next assert that a court cannot award punitive damages on a tort claim when it has not awarded compensatory damages for that claim.[15] (Doc. 362 at 27). However, the Pennsylvania Supreme Court signaled nearly 30 years ago that punitive damages may be appropriate, even without an award of compensatory damages, when the plaintiff proves the cause of action that would support punitive damages. Kirkbride v. Lisbon Contractors, Inc., 555 A.2d 800, 802-03 (Pa. 1989); see Taha v. County of Bucks, 862 F.3d 292, 303 (3d Cir. 2017) (citing Kirkbride, 555 A.2d at 801, 802). The court distinguished a past case where a punitive damages request failed—Hilbert v. Roth, 149 A.2d 649 (Pa. 1959), invoked here by the defendants—on the ground that when the independent cause for compensatory damages in Hilbert was dismissed, it took with it any basis for punitive damages. See Kirkbride, 555 A.2d at 802 (citing Hilbert, 149 A.2d 649). Punitive damages may accordingly be recovered so long as there exists a valid, underlying claim to support them. See id.; Taha, 862 F.3d at 303 (citing Kirkbride, 555 A.2d at 801, 802). AFS prevailed on its underlying tort claim. It simply elected to seek compensatory damages under its statutory claim. Hence, the award of punitive damages is authorized under Pennsylvania law.

---

[15] The defendants note that AFS did not respond to this argument in its opposition brief and ask the court to deem any opposition to be waived. (Doc. 393 at 2-3). We recognize that courts have discretion to deem an opposing party to have waived an argument by failing to address it. The issue *sub judice*, however, was fully briefed in sur-reply and sur-sur-reply briefs authorized by the court, and we accordingly decline to exercise that discretion here.

The Livingston defendants raise a due process argument for the first time in their reply brief.  (See Doc. 380 at 27).  They intimate that this case represents the "grossly excessive or arbitrary punishment[] on a tortfeasor" contemplated by the Supreme Court in State Farm Mutual Insurance Co. v. Campbell, 538 U.S. 408, 416-17 (2003) (citing Cooper Indus., Inc. v. Leatherman Tool Gr., Inc., 532 U.S. 424, 433 (2001)).  We addressed this issue in our March 6, 2018 opinion, notwithstanding the Livingston defendants' failure to file post-trial submissions raising the argument.  We reiterate our conclusion that an award of $1,096,009 in compensatory damages and $1,000,000 in punitive damages is well-within the "single digit ratio" sanctioned by the Supreme Court.  See Advanced Fluid Sys., Inc., 295 F. Supp. 3d at 496 n.10 (quoting Campbell, 538 U.S. at 424-25).  We will deny the Livingston defendants' request to vacate the punitive damages award.

IV.  **Conclusion**

The court will deny the post-trial motions to alter or amend the judgment filed by AFS, the Livingston defendants, Huber, and Integrated Systems and will also deny the Livingston defendants' motion to amend pleadings to conform to the evidence.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    March 5, 2019